# 15-3335-ag

## United States Court of Appeals

### *for the*

## Second Circuit

MARVEL ENTERTAINMENT, LLC, as Successor to Marvel Entertainment, Inc., f.k.a. Marvel Enterprises, Inc. and as agent for members of Marvel Enterprises, Inc. and Subsidiaries Group,

*Petitioner-Appellant,*

– v. –

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES TAX COURT,
NO. 12113-13 (RUWE, J.)

## BRIEF FOR PETITIONER-APPELLANT

B. JOHN WILLIAMS, JR.
DAVID W. FOSTER
NATHAN P. WACKER
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7000

SONJA S. SCHILLER
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606
(312) 407-0700

*Attorneys for Petitioner-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Marvel Entertainment, LLC is a wholly owned subsidiary of The Walt Disney Company, a publicly traded company listed on the New York Stock Exchange.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF ISSUE....................................................................................1

INTRODUCTION ................................................................................................2

STATEMENT OF THE CASE ...........................................................................10

SUMMARY OF ARGUMENT ...........................................................................14

ARGUMENT ........................................................................................................15

    I.    Contrary to the Tax Court's Opinion, *United Dominion*
    Does Not Answer the Question in this Case....................................15

    II.    The Plain Language of the Code Requires a Taxpayer-By-
    Taxpayer Application of Section 108. .............................................24

    III.    Section 108 Provides an Insolvent "Taxpayer" with a
    "Fresh Start" by Excluding COD Income from Gross
    Income. .............................................................................................29

    IV.    Under this Court's *Prudential Lines* Decision, Each Member
    of a Consolidated Group Owns the Portion of the CNOL
    Attributable to its Activities. ...........................................................34

    V.    The Regulations in Force in 1998 and IRS Guidance
    Support Marvel's Position. ..............................................................39

    VI.    The Government's Improper Attempt to Change the Rules
    Retroactively Violates Both the Code and the APA. ......................41

CONCLUSION .....................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Altera Corp. v. Commissioner*,
    145 T.C. No. 3 (July 27, 2015)........................................................5, 6, 43

*American Mining Congress v. Mine Safety & Health Administration*,
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................6, 44

*Arnold Constable Corp. v. Commissioner*,
    69 F.2d 788 (2d Cir. 1934)..........................................................................25

*In re Bob Richards Chrysler-Plymouth Corp.*,
    473 F.2d 262 (9th Cir. 1973).......................................................................36

*Bowers v. New York & Albany Lighterage Co.*,
    273 U.S. 346 (1927)....................................................................................42

*CSI Hydrostatic Testers, Inc. v. Commissioner*,
    103 T.C. 398 (1994), *aff'd*, 62 F.3d 136 (5th Cir. 1995)............................44

*Capital Bancshares, Inc. v. FDIC*,
    957 F.2d 203 (5th Cir. 1992).......................................................................37

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)......................................................................................6

*Commissioner v. Uniacke*,
    132 F.2d 781 (2d Cir. 1942).......................................................................25

*In re Community Bancorp*,
    Bk. No. 10-20038, 2013 WL 4441925
    (9th Cir. Aug. 20, 2013).......................................................................37, 38

*Electronic Sensing Products, Inc. v. Commissioner*,
    69 T.C. 276 (1977)......................................................................................25

*Golsen v. Commissioner*,
  54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971)............................27

*Gottesman & Co. v. Commissioner*,
  77 T.C. 1149 (1981)....................................................................26, 43, 44

*Helvering v. Morgan's, Inc.*,
  293 U.S. 121 (1934).........................................................................6, 26

*In re Indymac Bancorp, Inc.*,
  554 F. App'x 668 (9th Cir. 2014)......................................................37, 38

*Interstate Transit Lines v. Commissioner*,
  319 U.S. 590 (1943)..............................................................................25

*Marine Recreational Opportunities, Inc. v. Berman*,
  15 F.3d 270 (2d Cir. 1994)....................................................................38

*Natural Resources Defense Council, Inc. v. Muszynski*,
  268 F.3d 91 (2d Cir. 2001)....................................................................24

*In re NetBank, Inc.*,
  729 F.3d 1344 (11th Cir. 2013)........................................................37, 38

*PSB Holdings, Inc. v. Commissioner*,
  129 T.C. 131 (2007)..............................................................................25

*In re Prudential Lines Inc.*,
  928 F.2d 565 (2d Cir. 1991).................................................9, 34, 35, 36

*Rite Aid Corp. v. United States*,
  255 F.3d 1357 (Fed. Cir. 2001).........................................................5, 43

*Rowan Cos. v. United States*,
  452 U.S. 247 (1981)..............................................................................41

*Rubin v. United States*,
  449 U.S. 424 (1981)..............................................................................29

*Swift & Co. v. United States*,
38 F.2d 365 (Ct. Cl. 1930) ....................................................................7, 26

*United Dominion Industries, Inc. v. United States*,
532 U.S. 822 (2001)..............................................................................*passim*

*United States v. Merriam*,
263 U.S. 179 (1923)......................................................................................42

*United States v. Piervinanzi*,
23 F.3d 670 (2d Cir. 1994)............................................................................30

*Veritas Software Corp. v. Commissioner*,
133 T.C. 297 (2009)......................................................................................45

*Warshauer v. Solis*,
577 F.3d 1330 (11th Cir. 2009).....................................................................46

*Woolford Realty Co. v. Rose*,
286 U.S. 319 (1932)......................................................................................25

## STATUTES

5 U.S.C. § 553 ...............................................................................9, 45, 46

26 U.S.C. § 61 ...................................................................................2, 11

26 U.S.C. § 108 .................................................................................*passim*

26 U.S.C. § 172 .................................................................................*passim*

26 U.S.C. § 1501...................................................................................4

26 U.S.C. § 1502 (1998) ........................................................................5, 43

26 U.S.C. § 1504....................................................................................38

26 U.S.C. § 6110..........................................................................41

26 U.S.C. § 6213............................................................................1

26 U.S.C. § 7442............................................................................1

26 U.S.C. § 7482............................................................................1

26 U.S.C. § 7701......................................................................6, 26

T.D. 9089, 2003-2 C.B. 906, *amended*,
    T.D. 9098, 2003-2 C.B. 1248..............................27, 39, 48

T.D. 9192, 2005-1 C.B. 866, *clarified*,
    I.R.S. Ann. 2006-15, 2006-1 C.B. 632 .............22, 40, 48

Treas. Reg. § 1.1502-11 (1998)..........................................12, 17

Treas. Reg. § 1.1502-12 (1998)................................................17

Treas. Reg. § 1.1502-19 (1998)................................................40

Treas. Reg. § 1.1502-28 ..........................................................9

Treas. Reg. § 1.1502-32 (1998)..........................................39, 40

Treas. Reg. § 1.1502-79 (1998)................................................23

Treas. Reg. § 1.1502-80 (1998)................................................5

## OTHER AUTHORITIES

1 Andrew J. Dubroff, et al., *Federal Income Taxation of Corporations*
    *Filing Consolidated Returns* § 33.06 (2d ed. rev. 2015)........23, 26

Basis Reduction Due to Discharge of Indebtedness,
62 Fed. Reg. 955 (proposed Jan. 7, 1997)
(to be codified at 26 C.F.R. pts. 1, 301)..................................2, 30

David Lupi-Sher, *High Court Clarifies Consolidated Return Regulations*,
91 Tax Notes (TA) 1961 (June 18, 2001)..................................16

Fed. R. App. P. 13(a)(1) ......................................................................1

H.R. Rep. No. 96-833 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017 ..............4, 32

I.R.S. Statistics of Income (1998) tbl.19,
http://irs.gov/pub/irs-soi/98co19bs.xls .........................................4

I.R.S. C.C.A. 201033031 (Aug. 20, 2010) ..............................24, 27, 48

I.R.S. F.S.A. 199912007 (Mar. 26, 1999) ...........................................41

I.R.S. F.S.A. 200027026 (July 7, 2000) ..............................................26

I.R.S. P.L.R. 9121017 (Feb. 21, 1991) ...............................................40

I.R.S. P.L.R. 9226064 (Mar. 31, 1994) ..............................................41

I.R.S. P.L.R. 9650019 (Dec. 13, 1996)..............................................41

Jared Gordon, *Unbaking the Consolidated Cake: Deciphering the
Impact of* United Dominion, 28 J. Corp. Tax'n 3 (2001)...........................28

Kevin Hennessey, et al., *The Consolidated Tax Return*, ¶ 11.05
(6th ed. 2002 & Supp. 2015-2)....................................................16

Miscellaneous Tax Bills VII:  Hearing Before the Subcommittee on
Taxation and Debt Management Generally of the Committee on Finance
on S. 2484, S. 2486, S. 2503, H.R. 5043, 96th Cong., 2d Sess. 242 (1980)
(statement of David Shakow, Associate Tax Legislative Counsel,
Department of the Treasury) .......................................................32

Rev. Rul. 63-104, 1963-1 C.B. 172 .......................................................................38

S. Rep. No. 96-1035 (1980), *reprinted in* 1980-2 C.B. 620 ...........................*passim*

W. Eugene Seago and Edward J. Schnee,
    *Marvel Haunted by* United Dominion, 123 J. Tax'n 244 (Dec. 2015) .........21

William S. Jordan, III, *Rulemaking*, *in* 2011 ABA Admin. L. Sec.,
    Dev. Admin. L. & Reg. Prac. ch. 4 ...........................................................46

# STATEMENT OF JURISDICTION

The Tax Court had jurisdiction under 26 U.S.C. §§ 6213(a) and 7442, and entered its decision on July 21, 2015. On October 16, 2015, Marvel Entertainment, LLC ("Marvel")[1] timely filed a notice of appeal. Fed. R. App. P. 13(a)(1); A149. This Court has jurisdiction under 26 U.S.C. § 7482(a)(1). Venue is proper because Marvel's principal place of business is in New York, NY. 26 U.S.C. § 7482(b)(1)(B); A115.

# STATEMENT OF ISSUE

Whether Marvel's application of 26 U.S.C. § 108(b) on a taxpayer-by-taxpayer basis—an application consistent with the plain language of section 108, the precedent of this Court, and the then-existing consolidated return regulations—was correct.

---

[1] For simplicity, "Marvel" is sometimes used to refer broadly to the group of entities engaged in the common entertainment business even though some of the entities referenced ceased to exist before Marvel Entertainment, LLC was formed in 2009. As noted by the Tax Court in its opinion, Marvel has reorganized its business over time. A115-16. None of those changes in corporate organization, however, is relevant to the issues before this Court.

**INTRODUCTION**

In 1996, each of four corporations affiliated with Marvel (the "Bankrupt Debtors") encountered financial difficulty and filed for bankruptcy. In October 1998, the bankruptcy court ordered the debts of each of the Bankrupt Debtors discharged (the "Discharged Debts") as part of the final bankruptcy plan.

In general taxpayers must include the cancellation of debt in income (referred to in tax parlance as "COD Income").[2]  Notwithstanding that general rule, Congress has long permitted taxpayers in bankruptcy to exclude "COD Income" from gross income. Section 108(a). Congress' intent in enacting section 108 was to ensure that bankrupt taxpayers are given a "fresh start." *See* S. Rep. No. 96-1035, at 10 (1980), *reprinted in* 1980-2 C.B. 620, 624; *see also* Basis Reduction Due to Discharge of Indebtedness, 62 Fed. Reg. 955, 956 (proposed Jan. 7, 1997) (to be codified at 26 C.F.R. pts. 1, 301). Indeed, to forgive debt of a troubled corporation

---

[2] *See* section 61(a)(12). "COD" is an acronym for "cancellation of debt." Unless otherwise indicated, all references to "section" are to the Internal Revenue Code of 1986, as amended and in effect for the taxable years at issue (the "Code"), 26 U.S.C., and all "Treas. Reg. §" references are to the regulations promulgated thereunder.

(or individual) only to immediately saddle the bankrupt debtor with a large tax on the value of the debt forgiven would contradict the purposes of the Bankruptcy Code.

Nevertheless, while section 108(a) excludes income, section 108(b) provides that "the taxpayer" must reduce its "tax attributes"—e.g., net operating losses ("NOLs"), business credits, or basis in assets—by the amount of the debt discharged up to the amount of the "tax attributes." Section 108(b). The effect of this requirement to reduce tax attributes is generally to defer the tax that would have otherwise been due on COD Income to a future tax year. This deferral occurs because the taxpayer could have otherwise used the tax attributes reduced under section 108(b) to reduce a future tax bill.[3] As Congress explicitly understood, however, where a bankrupt taxpayer has more debt discharged than favorable tax attributes subject to reduction, the taxpayer is granted not merely a deferral but instead

_____

[3] For example, NOLs can be carried forward and used to offset future income. *See* section 172(a). Thus, if NOLs are eliminated pursuant to section 108(b), the taxpayer will have increased income in future years. Similarly, where a taxpayer reduces its basis in property, it will recognize more income (or have a smaller loss) when it sells or disposes of that asset.

a permanent reprieve from paying tax on its COD Income.[4]  *See* S. Rep. No. 96-1035, at 2, 1980-2 C.B. at 621 ("Any further remaining debt discharge amount is disregarded, i.e., does not result in income or have other tax consequences."); *see also* H.R. Rep. No. 96-833, at 10-11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7018.

The application of section 108(b) to individuals and corporations that file a separate tax return is straightforward.  As with many other tax rules, however, the question becomes more complicated when applied to corporations that, like the Bankrupt Debtors, join with affiliated corporations to file a single, "consolidated" federal income tax return.[5]  The dispute in this case sits at the intersection of the COD Income rules of section 108 and the consolidated return rules.

---

[4] For example, if the taxpayer has $500 of debt discharged but only $100 of tax attributes subject to reduction under section 108(b), the taxpayer will have $400 of income permanently excluded with no corresponding reduction in other tax attributes.

[5] Since 1942, corporations that are sufficiently "affiliated" have been allowed to elect to file a single consolidated federal income tax return.  *See* sections 1501 *et seq*.  The election to file a consolidated return is extremely common, with more than 60,000 such returns filed for the 1998 year.  I.R.S. Statistics of Income (1998) tbl.19, http://www.irs.gov/pub/irs-soi/98co19bs.xls.

In general, corporations that are members of a consolidated group are subject to the same rules as corporations that file separate returns. *See* Treas. Reg. § 1.1502-80(a)(1) ("The Internal Revenue Code . . . shall be applicable to the group to the extent the regulations do not exclude its application."). In some instances, however, application of the Code may create distortions for consolidated groups or their members. Recognizing the complexities of taking otherwise separate taxable items (e.g., income, deductions, credits, etc.) of distinct corporations and combining them into a single consolidated return, Congress long ago allocated near complete responsibility to Treasury—with the assistance of notice and comment from the public—for setting forth rules applicable "in such manner as clearly to reflect the income tax liability" of the group and "each corporation in the group." Section 1502 (1998); *see also Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001). The resulting regulations—the so-called "consolidated return regulations"—are legislative regulations that have the force of law.[6] *See*

_____

[6] Legislative regulations "create rights, impose obligations, or effect a change in existing law," whereas interpretive regulations merely explain preexisting substantive law. *See Altera Corp. v. Commissioner*, 145 T.C. No. 3 at 33 (July 27, 2015) (citing *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082,

*(cont'd)*

5

*Altera Corp. v. Commissioner*, 145 T.C. No. 3 (July 27, 2015); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).

As of October 1998 (when the Bankrupt Debtors' debts were canceled), Treasury had not yet promulgated regulations addressing the specific question presented in this case:  is section 108(b) applied to reduce the tax attributes of the individual member corporation whose debts were discharged or those of the entire consolidated group?  That question, however, was unambiguously answered by the plain language of the Code, judicial precedents, and existing IRS authorities.  Section 108(b) required the reduction of the tax attributes of "the taxpayer" whose debts were discharged.  Section 7701(a)(14) defined "taxpayer" to mean "any *person* subject to any internal revenue tax." (emphasis added).  Section 7701(a)(1), in turn, defined "person" to include a "company or corporation" but *not* an affiliated group.[7]  Accordingly, Marvel reduced the tax attributes

_____

*(cont'd from previous page)*

1087 (9th Cir. 2003)); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1979).

[7] *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 127 (1934) ("After affiliation, as before, the affiliated corporations, although filing consolidated

*(cont'd)*

(specifically the amount of the group's consolidated NOL (the "CNOL")) apportionable to *each* of the Bankrupt Debtors by the amount of *each* such taxpayer's discharged debts that did not exceed the amount of *each* such taxpayer's tax attributes.

In addition to the support of law extant at the time,[8] Marvel's approach was simple and easily administrable. Thus, if the amount of the debt discharged exceeded the portion of the CNOL attributable to the debtor-member (as it did for two of the Bankrupt Debtors), the benefit of income exclusion was, to the extent of the difference, permanent (i.e., that income was never to be taxed). This was no windfall as Congress expressly anticipated that result.

_____

*(cont'd from previous page)*

returns, continued to be separate taxable units. The consolidated returns operated only to unite them for the purpose of tax computation and the equitable apportionment between them of the tax thus computed."); *Swift & Co. v. United States*, 38 F.2d 365, 374 (Ct. Cl. 1930) ("Moreover, the separate corporations are the taxpayers, and the affiliated group is merely a tax computing unit, not a taxable unit.").

[8] Because Marvel excluded COD Income from gross income and made corresponding adjustments to attributes pursuant to Section 108(b) in 1998, the law applicable in 1998 governs the identification of any tax attribute subject to reduction under section 108(b)(2)(A). *See* A122.

The Government took a contrary position and argued that Marvel was required to reduce the CNOL by the total amount of the Bankrupt Debtors' forgiven debt, regardless of whether any part of the CNOL was attributable to the Bankrupt Debtor or another taxpayer. There was no consolidated return regulation, however, that permitted or required the reduction of the entire CNOL in 1998. In accepting the Government's position, the Tax Court articulated a rule that contradicts the Code without support in the consolidated return regulations as in effect at the time—a court-created rule that raises more questions than it answers (as recognized by the regulations finalized in 2005 by Treasury after careful consideration of the application of section 108 to members of consolidated groups).[9]

In reaching its result, the Tax Court relied almost exclusively on its over-reading of the Supreme Court's decision in *United Dominion Industries, Inc. v. United States*, 532 U.S. 822 (2001). Despite superficial similarities to this case, however, *United Dominion* simply does not address whether the apportionable amount of the CNOL is a tax attribute of a bankrupt taxpayer member of the group. This Court, however, has addressed the

---

[9] *See generally infra* Part V, and specifically note 22.

apportionability of a CNOL, holding that the portion of a CNOL attributable to a bankrupt taxpayer-member's activities is owned by the individual member-taxpayer and an asset of the member-taxpayer's bankruptcy estate. *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991).

Marvel assumes the Government had the authority to mandate a different result by issuing new consolidated return regulations prior to the time 1998 consolidated returns were due, but the Government did not exercise that authority until 2005.[10]  The Government, however, is barred from making those regulations retroactive, *see* 5 U.S.C. § 553, and it cannot be permitted to circumvent that limitation through this litigation.  Instead, the law actually in place in 1998 must be applied, and that law requires the tax treatment reported by Marvel on its return.

_____

[10] The validity of the resulting regulation is not at issue here and need not be addressed.  Notably, when Treasury finally did exercise its rulemaking authority to prescribe a rule on point, it actually required taxpayers to do exactly what the Tax Court held cannot be done in this case—i.e., to first reduce the apportionable amount of the consolidated group's CNOL that is attributable to the member whose debts have been discharged.  *See* Treas. Reg. § 1.1502-28 (current).

## STATEMENT OF THE CASE

The facts of this case are undisputed. Marvel is an entertainment company known for its comic book characters. A115, n.2. Like any other holding company, Marvel organizes its business through a number of affiliated, subsidiary businesses. This appeal concerns the taxation of several taxpayers affiliated with Marvel or its predecessors.

On December 27, 1996, nine Marvel-affiliated entities—Marvel Entertainment Group, Inc. ("MEG") and eight of MEG's subsidiaries[11]—filed voluntary petitions for relief under chapter 11 of the bankruptcy code. A115. Pursuant to an approved plan of reorganization, MEG and its subsidiaries were acquired by Marvel Entertainment, Inc. ("MEI") on October 1, 1998. A116.[12] Pursuant to the same bankruptcy plan, the Bankruptcy Court eliminated certain debts (the "Discharged Debts") of MEG and three of its subsidiaries (collectively the "Bankrupt Debtors") in the amounts indicated below (A116):

———————————

[11] Those subsidiaries were Fleer Corp. ("Fleer"); Skybox International, Inc.; Marvel Characters, Inc.; Heroes World Distribution, Inc. ("Heroes"); Asher Candy Co.; Malibu Comics Entertainment, Inc. ("Malibu"); Frank H. Fleer Corp.; and Marvel Direct Marketing, Inc. A115.

[12] Prior to October 1, 1998, MEI was named Toy Biz, Inc. A116.

| Debtor | Debt Discharged |
|--------|-----------------|
| MEG | $2,497,828 |
| Fleer | $163,680,402 |
| Heroes | $4,930,767 |
| Malibu | $353,466 |
| Total | $171,462,463 |

As a general rule, a taxpayer is required to include in gross income so-called "cancellation of debt" or "COD Income" equal to the amount owed on any discharged debt. *See* section 61(a)(12). Because the Discharged Debts were eliminated in connection with a bankruptcy proceeding, however, the Bankrupt Debtors fell within an exception to that general rule. *See* section 108(a)(1)(A). By granting an exclusion of COD Income, section 108 helps facilitate the "fresh start" given to taxpayers when they emerge from bankruptcy. *See* S. Rep. No. 96-1035, at 10, 1980-2 C.B. at 624. Taxpayers that exclude COD Income under section 108(a) are required to decrease "the taxpayer['s]" specified "tax attributes" in amounts up to the amount of debt discharged." *See* section 108(b).

It is undisputed that section 108 applied to the COD Income of the Bankrupt Debtors. It is also undisputed that section 108(b) required a

reduction in the Bankrupt Debtors' available NOLs.[13]  If the Bankrupt

Debtors were not part of a consolidated group, the application of section 108

in this case would be noncontroversial.  Each Bankrupt Debtor would

decrease its available NOL by one dollar for each dollar of Discharged Debt

to the extent of the NOL, i.e., by the *lesser* of the excluded COD Income or

the NOL.  Section 108(b)(2)(A), 108(b)(3)(A).

The Bankrupt Debtors, however, were all part of the same

consolidated group for U.S. federal income tax purposes (the "MEG Group")

at the time the debts were discharged.  A116.  Pursuant to the Treasury

regulations, the MEG Group annually computed its consolidated taxable

income or CNOL.  Treas. Reg. § 1.1502-11 (1998).  On its 1998 U.S. federal

income tax return, Marvel applied section 108 on a member-by-member

———————————————

[13] An NOL arises when a taxpayer has more deductions than gross income in
a given tax year.  *See* section 172(c).  A taxpayer is permitted to deduct the
NOL, and may carry back that deduction to offset income for the taxable
year two years prior to the year the NOL is accrued.  *See* section
172(b)(1)(A)(i).  The amount of the NOL is reduced by one dollar for each
dollar of gross income offset.  If the taxable income of the carryback year is
less than the amount of the NOL, the taxpayer may then claim an NOL
deduction in the subsequent year.  Any remaining amount of NOL can be
carried forward in this way for up to twenty years after the year in which the
NOL arises.  *See* section 172(b)(1)(A)(ii).

basis, reducing the allocable portion of the MEG Group's existing CNOL attributable to each Bankrupt Debtor in an amount up to the cancelled debt of that debtor-taxpayer.

Marvel reduced the Bankrupt Debtors' respective shares of MEG Group's CNOL as follows (A117):

| Bankrupt Debtor | Apportionable Share of CNOL | Excluded COD Income | Reduction in CNOL Share | Remaining CNOL Share |
|---|---|---|---|---|
| MEG | $71,330,567 | $2,497,828 | $2,497,828 | $68,832,739 |
| Fleer | $82,656,671 | $163,680,402 | $82,656,671 | $0 |
| Heroes | $4,058,504 | $4,930,767 | $4,058,504 | $0 |
| Malibu | $2,707,590 | $353,466 | $353,466 | $2,354,124 |

The IRS disagreed with Marvel's approach, arguing instead that Marvel should have reduced the CNOL of the entire consolidated group by the amount of COD Income excluded under section 108 (i.e., approximately $171 million). The IRS issued statutory notices of deficiency for Marvel's 2003 and 2004 tax years, and Marvel timely petitioned the Tax Court for a redetermination of the alleged deficiencies. The parties submitted cross motions for summary judgment that presented the Tax Court with a single question: "whether the NOL subject to reduction under section 108(b)(2)(A) is the entire CNOL of a consolidated group (single-entity approach) or a

portion of a consolidated group's CNOL allocable to each group member (separate-entity approach)." A121. The Tax Court ruled as a matter of law that Marvel was required to reduce the entire CNOL, upholding in full the IRS's determinations in its statutory notice of deficiency. A146-47.

## SUMMARY OF ARGUMENT

Marvel correctly applied section 108 by reducing only the portion of the MEG Group's CNOL apportionable to the Bankrupt Debtors. Section 108(b) plainly requires "the taxpayer" to reduce its tax attributes. Where the Code is being applied to a corporation that is a member of a consolidated group, courts, the Treasury, and the IRS have routinely read "taxpayer" to mean the member corporation. Indeed, a consolidated group is not a "taxpayer" as the Code defines that term.

That straightforward analysis answers the question in this case. Section 108 applies to the Bankrupt Debtors, not the MEG Group, and the "tax attributes" that belong to those corporations are the portions of the CNOL attributable to their respective activities (and not the entire CNOL).

Treasury did not exercise its authority to issue the regulations necessary to change the application of section 108 for members of a group until 2005, nearly six years after Marvel filed its 1998 tax return. The

Administrative Procedure Act (the "APA") forbids retroactive effect for Treasury's legislative, consolidated return regulations, but the Tax Court's decision permitted the Government to evade APA requirements and duck the necessary result of section 108's unambiguous language. The Tax Court's decision rested on an over-reading of *United Dominion* and a misstatement of the purpose of section 108, and it conflicts both with valid precedent of this Court and then-existing regulations. The decision should be reversed.

## ARGUMENT

I. **Contrary to the Tax Court's Opinion, *United Dominion* Does Not Answer the Question in this Case.**

The reasoning below began and ended with the Tax Court's over-reading of *United Dominion Industries, Inc. v. United States*, 532 U.S. 822 (2001). The Tax Court's holding, however, rested on the mistaken conclusion that the *United Dominion* Court addressed an issue "identical" to the one presented in this case. *See* A131. In fact, the Supreme Court was presented with an entirely different issue, and, by applying isolated, selected quotes to circumstances beyond those addressed by *United Dominion*, the Tax Court committed legal error.

Contrary to the Tax Court's reading of *United Dominion*, the case does not hold that an NOL, once calculated, cannot be apportioned to

members of the group. Thus, as the leading commentators have noted, *United Dominion* addresses a wholly separate issue and leaves the question in this case unanswered. *See, e.g.*, David Lupi-Sher, *High Court Clarifies Consolidated Return Regulations*, 91 Tax Notes (TA) 1961, 1964 (June 18, 2001) ("For example, one of the important open areas is how section 108(b) applies in the consolidated return context . . . ." (quoting Andrew J. Dubroff )); Kevin Hennessey, et al., *The Consolidated Tax Return*, ¶ 11.05 at n.84 (6th ed. 2002 & Supp. 2015-2) ("The authors continue to believe that separate company attribute reduction under Section 108(b) is proper for discharges prior to the effective date of the temporary regulations.").

In *United Dominion*, the Supreme Court addressed the question of how to compute a "product liability loss" ("PLL") for a consolidated group and its members. PLLs comprise a specific subset of NOLs that can be carried back to offset taxable income as many as ten tax years prior to the year in which the loss is incurred, whereas other NOLs can be carried back no more than two years. Section 172(b)(1)(A), (C). For each tax year, the portion of the NOL treated as a PLL is equal to the "product liability expenses" incurred limited to the amount of the NOL for that year. Section 172(j)(1).

The parties in *United Dominion* agreed on the amount of "product liability expenses" that had been incurred, but disputed how the PLL should be calculated for a consolidated return. The Government argued that the limit should be determined at the separate-member level by comparing the product liability expenses of a member with the member's apportionable amount of the CNOL. *United Dominion*, 532 U.S. at 828. Conversely, the taxpayer argued the calculation of PLL must occur at the group level, using the group's CNOL as the limit in determining the amount of PLL, because the consolidated return regulations required the calculation of the NOL at the group level. *Id*. at 827.

The Supreme Court agreed with the taxpayer. The "first step" of the Court's analysis was "the calculation of NOL." *Id.* at 829. Because Treasury had promulgated regulations requiring the computation of the NOL for a consolidated group only at the group level, the group-level CNOL had to be used to compute PLLs. *Id.* at 829-30; Treas. Reg. §§ 1.1502-11, -12 (1998).[14] Indeed, this had to be the case because, for purposes of calculating

_____

[14] Section 172 sets forth rules for the computation of the NOL of a "taxpayer." As discussed below in Part II, the term "taxpayer" must be read to mean an individual corporation (rather than the consolidated group)

*(cont'd)*

NOL (and PLL) for a group, "the concept of separate NOL simply does not exist." *United Dominion*, 532 U.S. at 830 (citation omitted). Having determined that it must use the group-level CNOL when computing PLL for a group, the rest of the analysis followed naturally. In general, the PLL of a taxpayer is computed by comparing "product liability expenses" to NOL. Nothing in the Code or regulations operated to change that "essential relationship between NOL and PLL" for purposes of a consolidated group. *Id.* Thus, to achieve "comparable treatment of PLL" for individual corporations and corporations filing consolidated returns, "the comparison of [product liability expenses] with a limiting loss amount [must] occur[] at the consolidated level" after CNOL has been determined. *Id.* at 831.

Accordingly, the Court put great weight on the requirement that the NOL of a consolidated group and its members be computed solely at the group level. "[B]y expressly and exclusively defining NOL as CNOL, the regulations support the position that group members' [product liability

_____

*(cont'd from previous page)*

absent explicit instruction to the contrary. In the case of section 172—which includes the rules for the computation of a taxpayer's PLLs—Treasury's regulations requiring the computation of NOL at the group level overrode the plain meaning of section 172 for purposes of filing a consolidated return.

expenses] should be aggregated and the affiliated group's PLL determined on a consolidated, single-entity basis." *Id.* at 834.

Marvel applied section 108 consistently with *United Dominion*'s guidance on calculating a CNOL. Under the Supreme Court's decision and the applicable consolidated return regulations, MEG Group calculated its CNOL at the consolidated level.

*United Dominion* says nothing, however, about how a CNOL is used after calculation. The apportionment of the group's PLL to member entities was not in dispute in *United Dominion*, and that decision cannot fairly be read to stand for the proposition that a properly calculated CNOL cannot be apportioned among its members for purposes of applying section 108. Indeed, the Tax Court's opinion in this case directly conflicts with the principles that guided the Supreme Court's analysis in *United Dominion*.

The Supreme Court expressly relied on the principle that the Code must generally be applied consistently to all corporations, whether filing separate or consolidated tax returns. *See id.* at 831 (requiring "comparable treatment" of all corporations). To override this general rule of "comparable treatment," there must be a clear statement to the contrary. The Tax Court's approach violated this principle.

Under section 108(b), a corporation filing a separate tax return must reduce its own tax attributes in the order prescribed in the statute, i.e., first reduce its own NOL then reduce its other credits, losses, and basis in the order prescribed in the statute. Although there is nothing in the Code or regulations that clearly changes this essential relationship between a corporation and its own tax attributes, the Tax Court's decision requires corporations filing consolidated returns to first reduce the CNOL of the group (including such losses attributable to the activities of other affiliated corporations) before reducing the other tax attributes attributable to the corporation and listed in section 108(b).

For example, assume a consolidated group had a CNOL of $200, $50 of which was apportionable to a member-taxpayer that had $100 of debt discharged in bankruptcy. Under the Tax Court's decision, the group's CNOL would be reduced by $100, thus reducing $50 of tax attributes attributable to other member-taxpayers, even if the bankrupt member had other tax attributes that should have been reduced under section 108(b) (e.g., basis in depreciable property or tax credits).

In contrast to the Tax Court's decision, Marvel applied section 108(b) to the Bankrupt Debtors, and not to any other member-corporation.

Marvel's approach is consistent with *United Dominion* because the consolidated return regulations in effect for 1998 returns provided for calculation of the CNOL at the group level and for the apportionment of the CNOL to member-taxpayers. There was no clear statement in the consolidated return regulations that overrode the plain language of section 108(b) requiring the reduction of tax attributes of "the taxpayer." Accordingly, the "comparable treatment" sought by the Supreme Court in *United Dominion* here is the reduction only of the apportionable amount of CNOL.

Moreover, rather than adopting an interpretation that "is (relatively) easy to understand and to apply," *see United Dominion*, 532 U.S. at 831, the Tax Court's ruling creates significant complications for members of a consolidated group. When applied to the regulations existing in 1998, the Tax Court's decision potentially creates unpalatable distortions in applying the Code. *See, e.g.*, W. Eugene Seago & Edward J. Schnee, *Marvel Haunted by* United Dominion, 123 J. Tax'n 244 (Dec. 2015). Indeed, when Treasury ultimately issued final regulations addressing the application of section 108 to members of a consolidated group nearly seven years later, it needed to make conforming changes to seven other sections of the consolidated return

regulations for them to operate without distortion. *See* T.D. 9192, 2005-1 C.B. 866, *clarified*, I.R.S. Ann. 2006-15, 2006-1 C.B. 632.

The Tax Court placed great weight on certain of the Supreme Court's statements in *United Dominion*, but those statements must be read in the context of the entire decision and the guiding principles discussed above. For example, the Supreme Court stated that "the concept of a separate NOL simply does not exist." *United Dominion*, 532 U.S. at 830 (citation omitted). But nothing about that statement compels the conclusion that a group's CNOL, once calculated, cannot be apportioned among the group's member-taxpayers. Instead, the Court's statement was a rejection of the Government's effort to have it both ways in computing the PLL: having provided regulations requiring that CNOL be computed at the group level, the Government could not turn around and argue that PLL (a component of the group's CNOL) should be calculated at the separate-member level. Further, as the Supreme Court recognized, the consolidated return regulations did apportion a CNOL among contributing members, but that was not a circumstance before it. *Id.* at 829 (citing Treas. Reg. § 1.1502-79).

The Tax Court's reliance on the Supreme Court's statement that "section 1.1502-79(a)(3) unbakes the cake for only one reason, and that

reason has no application here," is similarly misguided. *United Dominion*, 532 U.S. at 833. As discussed above, *United Dominion* decided how to calculate a group's PLL. The apportionment rules found in Treasury Regulation section 1.1502-79 (as in effect in 1998) have no relevance to baking the cake (i.e., calculating the PLL or the CNOL), and how to calculate a PLL or a CNOL has no bearing on slicing the cake once baked (i.e., reducing a taxpayer member's tax attributes). What are relevant are principles of attribute reduction under section 108. Section 108, like the apportionment rules, relates to the possible future use of a NOL, and it cannot be known at the time a return is filed whether that may affect separate return years of the relevant member when it is no longer a member of the group. *See* 1 Andrew J. Dubroff, et al., *Federal Income Taxation of Corporations Filing Consolidated Returns* § 33.06 (2d ed. rev. 2015).

*United Dominion* does not stand for the proposition that a group's properly computed CNOL cannot be apportioned among its members. Indeed, to the extent it is relevant at all to the question before this Court, *United Dominion* supports Marvel's tax treatment because the Supreme Court in effect refused to allow the Government to create a new consolidated return rule through litigation. Here, the Government also attempts to collect

additional tax through a rule that is not only new but contradicts authorities extant in October 1998 (as discussed in Parts IV and V, *infra*).

## II.    The Plain Language of the Code Requires a Taxpayer-By-Taxpayer Application of Section 108.

As a general rule, taxpayers are required to report COD Income as ordinary income in the year in which the debt is forgiven.  When applicable, section 108(a) eliminates that requirement (and relieves the taxpayer from the resulting obligation to pay tax).  If COD Income is excluded under section 108(a), Congress also requires the reduction of "the tax attributes of *the taxpayer*."  Section 108(b)(1) (emphasis added.).  The plain language of section 108, particularly when read in light of the circumstances that trigger its application, requires reading "the taxpayer" to refer to debtor-members rather than the entire consolidated group.  Indeed, in connection with this very controversy regarding Marvel's application of section 108 to the Bankrupt Debtors, the IRS Office of Chief Counsel conceded that "the reference to 'the taxpayer' in section 108(b)(1) refers to the consolidated group *member* with excluded COD income . . . rather than the entire group." I.R.S. C.C.A. 201033031, at 2 (Aug. 20, 2010).

"Statutory analysis begins with the plain meaning of a statute."  *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001).  As

numerous courts have held, the term "taxpayer" means an individual person or entity, even if that entity is a corporation that is part of a consolidated group. *See, e.g.*, *PSB Holdings, Inc. v. Commissioner*, 129 T.C. 131, 140 (2007) ("[T]he statutes use the term 'taxpayer' in the singular, and well-established law treats [individual consolidated group members] as separate taxpayers notwithstanding the fact that they join in the filing of a consolidated return." (citing *Wegman's Props., Inc. v. Commissioner*, 78 T.C. 786, 789 (1982))); *Elec. Sensing Prods., Inc. v. Commissioner*, 69 T.C. 276, 281 (1977) ("Each corporation is a separate taxpayer whether it stands alone or is in an affiliated group and files a consolidated return." (citing *Nat'l Carbide Corp. v. Commissioner*, 336 U.S. 422 (1949))); *Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943); *Woolford Realty Co. v. Rose*, 286 U.S. 319 (1932). Interpreting "taxpayer" in this way is also consistent with the precedent of this Court, which recognizes that a consolidated group is not a "taxable unit" but instead merely a "tax computing unit." *Arnold Constable Corp. v. Commissioner*, 69 F.2d 788, 790 (2d Cir. 1934) (citing *Woolford*, 286 U.S. 319); *see also Commissioner v. Uniacke*, 132 F.2d 781, 783 (2d Cir. 1942).

Those court decisions have continuing vitality because they are well grounded in the text of the Code and in the regulations. Section 7701(a)(14) defines "taxpayer" to mean "any *person* subject to any internal revenue tax." (emphasis added). Section 7701(a)(1), in turn, defines "person" to include a "company or corporation" but *not* an affiliated group. Consistent with the statutory definitions, the IRS has recognized that "[a] consolidated group is not a person, but each corporate member of the group is a separate person." I.R.S. F.S.A. 200027026 (July 7, 2000). *See also Helvering v. Morgan's, Inc.*, 293 U.S. 121, 127 (1934) ("After affiliation, as before, the affiliated corporations, although filing consolidated returns, continued to be separate taxable units."); *Swift & Co. v. United States*, 38 F.2d 365, 374 (Ct. Cl. 1930) ("Moreover, the separate corporations are the taxpayers, and the affiliated group is merely a tax computing unit, not a taxable unit."). Moreover, the regulations provide that, as a general principle, the Code is to be applied on an entity-by-entity basis absent contrary instruction. *See* Dubroff, et al., § 1.05 (citing Treasury Regulation section 1.1502-80 for the proposition that corporations are treated as separate, distinct entities in the absence of express guidance to the contrary); *Gottesman & Co. v. Commissioner*, 77 T.C. 1149, 1156 (1981) ("[T]o the extent the consolidated return regulations

do not mandate different treatment, corporations filing consolidated returns are to be treated as separate entities when applying other provisions of the Code.").[15] Thus, it is clear that "taxpayer," wherever used in the Code, should be read to mean an individual member corporation rather than the consolidated group unless otherwise specified by Treasury.[16]

The argument supporting such a reading is even stronger in the specific context of section 108.[17] Section 108 is triggered where the debts of a taxpayer are discharged through bankruptcy. Only individual

---

[15] Pursuant to *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), the Tax Court was bound to follow its own precedent in *Gottesman*. The court's rejection of Marvel's argument under *Gottesman* was based entirely on its over-reading of *United Dominion*. A146.

[16] The provisions of the Code are, as a general matter, applicable to members of consolidated groups in the same way as to corporations that file separate returns. Congress has given Treasury the authority to set forth rules altering the application of Code provisions to members of consolidated groups, but, at the time the relevant debts were discharged, Treasury had not acted on that authority in connection with section 108. *See infra* Part VI.

[17] While not precedential, it is notable that both the IRS and Treasury have stated their view that "taxpayer" as used in section 108 must be read as referring to the individual debtor-member. *See* T.D. 9089, 2003-2 C.B. 906 ("Questions have arisen regarding the application of section 108 when *the taxpayer* with discharge of indebtedness income that is excluded from gross income is a *member* of a consolidated group." (emphasis added)), *amended*, T.D. 9098, 2003-2 C.B. 1248; I.R.S. C.C.A. 201033031, at 2 (Aug. 20, 2010).

corporations—not consolidated groups, which exist only for federal income tax purposes—can incur debt or file for bankruptcy. Accordingly, as at least one commentator has recognized, section 108(b)'s reference to "the taxpayer" can refer only to the individual debtor-member of the consolidated group that declared bankruptcy and had its individual debts discharged. Jared Gordon, *Unbaking the Consolidated Cake: Deciphering the Impact of United Dominion*, 28 J. Corp. Tax'n 3, 8 (2001) ("Perhaps the most persuasive argument in support of the separate-member approach is that the principle of Section 108(a)(1)(A) and (B) is to exclude [COD] income to the extent the taxpayer is in bankruptcy or is insolvent. Often, one member of the group may be insolvent or bankrupt when other members are not.").

If "taxpayer" is properly read to mean the member corporation rather than the consolidated group, the application of section 108 in this case is simple. The attributes to be reduced under section 108(b) are only those attributes of the corporations whose debts were discharged. Under this Court's precedent, a corporation owns the portion of the CNOL attributable to its activities, but not the amount of the CNOL apportionable to other members. *See infra* Part IV. Accordingly, Marvel properly applied section 108(b) by reducing only the portion of the CNOL apportionable to each of

the Bankrupt Debtors. The Government (and the Tax Court) disfavor that treatment because it allows Marvel a permanent benefit by preserving other members' apportionable shares of the CNOL to be used to offset future income, but that is the expected result required by the plain language of the Code and expressly anticipated in section 108's legislative history.

## III. Section 108 Provides an Insolvent "Taxpayer" with a "Fresh Start" by Excluding COD Income from Gross Income.

The Tax Court held that, when applied to a member of a consolidated group, section 108(b) requires the reduction of the entire CNOL. The CNOL, however, is an attribute that belongs not to an individual member but instead to the whole consolidated group. Thus, the Tax Court's opinion can only be reconciled with the Congressional mandate to "reduce the tax attributes of the taxpayer" by reading "taxpayer" to mean "the consolidated group of which the debtor-member is a part."

The Tax Court argued its conclusion was justified because it was necessary to further the purpose of section 108. A135-36. But the meaning of "taxpayer" is unambiguous. Accordingly, resort to a purposive interpretation of section 108 is inappropriate. *Rubin v. United States*, 449 U.S. 424, 430 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances."

(citations omitted)); *see also United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994) (citing *Rubin*).  Even assuming, however, that it was appropriate to examine the legislative history of section 108, the Tax Court did so selectively, and in so doing reached the incorrect conclusion.

As the Senate Finance Committee stated in reporting on the 1980 Bankruptcy Tax Act's proposed amendments to section 108, section 108 grants distressed taxpayers a "fresh start" after debt discharge.  *See* S. Rep. No. 96-1035, at 10 (1980), *reprinted in* 1980-2 C.B. 620, 624; *see also* Basis Reduction Due to Discharge of Indebtedness, 62 Fed. Reg. 955, 956 (proposed Jan. 7, 1997) (to be codified at 26 C.F.R. pts. 1, 301) ("The legislative history of the Bankruptcy Tax Act states that the exclusion of discharge of indebtedness income (COD income) from gross income under section 108 is intended to promote a debtor's fresh start.").  Thus, section 108 reflects Congress' policy judgment that an already financially troubled taxpayer should not achieve some relief from his debts only to be "burdened with an immediate tax liability."  S. Rep. No. 96-1035, at 10, 1980-2 C.B at 624.

Mechanically, that relief is provided immediately by excluding COD Income from gross income where debts are discharged in a bankruptcy

proceeding.  Section 108(a)(1) ("Gross income does not include any amount

[of COD Income] . . . ."); *see also* S. Rep. No. 96-1035, at 10, 1980-2 C.B.

at 624 ("[T]he bill provides that no income is recognized by reason of debt

discharge in bankruptcy . . . .").  At the same time, section 108(b) requires

"the taxpayer" whose debt is discharged to reduce the value of its available

"tax attributes" (e.g., net operating loss, tax credits, basis in property owned)

by the *lesser* of (i) the amount of debt discharged and excluded from income

under section 108(a) or (ii) the amount of then available tax attributes.  To

the extent that a taxpayer has available attributes subject to reduction,

section 108 will generally result in a deferral of tax rather than a permanent

reduction of liability.  To the extent that a "taxpayer" does not have

available tax attributes to reduce, the COD Income is permanently

excluded.[18]

Selectively quoting from the legislative history, the Tax Court

mistakenly held that the "legislative objective" of section 108 is "deferral"

_____

[18] Furthermore, a taxpayer that reduces its basis in assets will recognize
additional gain (or less of a loss) upon sale of that asset in an amount equal
to the basis reduction.  In such a case involving individuals, there is always a
permanent reduction in tax equal to the differential in rates on COD Income
(ordinary) and capital gain.

of income and the prevention of any "permanent exclusion" of income. A136. But, Congress expressly recognized before enactment that section 108 was not designed to prevent taxpayers from obtaining permanent benefits. To be sure, section 108 generally operates to defer tax liability, but deferral is not the statutory objective. *See* S. Rep. No. 96-1035, at 10-11, 1980-2 C.B. at 624-25. In this regard, contrary to the Tax Court's conclusion, Congress expressly acknowledged that, if a taxpayer's COD Income exceeded the tax attributes designated for reduction under section 108(b), any remaining COD Income would be permanently excluded from gross income. *Id.* at 2, 1980-2 C.B. at 621 ("Any further remaining debt discharge amount is disregarded, i.e., does not result in income or have other tax consequences."); *see also* H.R. Rep. No. 96-833, at 10-11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7018.

Treasury also recognized in testimony before Congress regarding proposals to adopt section 108 as enacted and in effect in 1998 that the statute might result in permanently excluding COD Income. *See, e.g.*, Miscellaneous Tax Bills VII: Hearing Before the Subcommittee on Taxation and Debt Management Generally of the Committee on Finance on S. 2484, S. 2486, S. 2500, S. 2503, S. 2548, H.R. 5043, 96th Cong., 2d Sess. 242

(1980) (statement of David Shakow, Associate Tax Legislative Counsel, Department of the Treasury) ("If [a taxpayer in bankruptcy] had a tax credit which it hadn't been able to use, or a loss, or a capital loss, or the basis of its assets, it can reduce those, and a floor is placed on that below which the attributes can't be reduced. Any additional forgiveness is totally forgotten for tax purposes.").

In stark contrast to both Congress' and Treasury's formal observations that some taxpayers would achieve a permanent benefit through the operation of section 108, the Tax Court employed a results-oriented interpretation of section 108 to prevent Marvel from benefitting from the permanent exclusion of COD Income. *See* A135-36. The Tax Court's opinion distorted statutory interpretation by reading section 108 to avoid an outcome that Congress itself expressly anticipated, consistent with the objective of a "fresh start." Moreover, the tax benefits at issue in this case are not the result of clever tax planning, but of the application of existing rules to unfortunate declines in the Bankrupt Debtors' respective businesses.

As demonstrated above, the true purpose of section 108 is to encourage the recovery of financially troubled taxpayers by providing a "fresh start." Congress achieved that goal through the immediate exclusion

of COD Income from gross income and the simultaneous reduction of certain specified tax attributes. Through these mechanics, section 108 often merely defers tax liability but may, in cases such as this, result in some permanent exclusion of income because "the taxpayer" has tax attributes that total less than the amount of excluded COD Income—exactly what Treasury and the Senate Finance Committee stated could be expected when applying section 108 in accordance with its terms.

## IV. Under this Court's *Prudential Lines* Decision, Each Member of a Consolidated Group Owns the Portion of the CNOL Attributable to its Activities.

The Tax Court held that a consolidated group member does not have a separate NOL tax attribute until an event occurs that requires the specific apportionment of the CNOL to the member, such as the member leaving the group. A131-32. The Tax Court, however, did not address precedents of this Court that contradict that holding. Under the law of this Circuit, each bankrupt member of a consolidated group owns the portion of a CNOL attributable to its operations as apportionable under the regulations, even while still a member of the consolidated group.

In *In re Prudential Lines Inc.*, 928 F.2d 565 (2d Cir. 1991), this Court considered a bankrupt entity's (Prudential Lines, Inc. or "PLI") request that

the consolidated group of which it was a member (the "PSS Group") be

enjoined from taking a worthless stock deduction for its ownership interest

in PLI. *Id.* at 568.[19] Allowing that deduction would eliminate the group's

CNOL, and consequently any part that could be apportioned to PLI. Almost

all of the CNOL was attributable to PLI's pre-bankruptcy operations. *Id.* at

567. Put simply, PLI sought to preserve the value of its apportionable

amount of the PSS Group's CNOL for the estate and its creditors.

This Court first addressed the question of whether the PSS Group's

CNOL that could be apportioned under the regulations to PLI was property

of PLI's bankruptcy estate. *Id.* at 569. The Court noted that "[t]hose

corporations that file consolidated returns are treated as a single entity for

income tax purposes as if they were, in fact, one corporation." *Id.* (internal

quotations and alterations omitted). Nevertheless, the Court held that a

member-taxpayer's attributable portion of a CNOL was its property, stating

that "[t]he fact that a subsidiary's NOL ultimately may be used to offset

---

[19] Based on the facts as described by the Second Circuit, PLI continued to be
a member of the PSS Group throughout the bankruptcy.

another corporation's income does not mean that the subsidiary loses any interest in its NOL." *Id.* at 571.

Based on that decision, the Second Circuit upheld the preliminary injunction granted by the bankruptcy court, because:

> If PSS were permitted to take a worthless stock deduction on its 1988 tax return, it would have an adverse impact on PLI's ability to carryforward its NOL. Accordingly, despite the fact that PSS' action is not directed specifically at PLI, it is barred by the automatic stay as an attempt to exercise control over property of the estate.

*Id.* at 574. The consolidated return regulations supported the conclusion that a member's apportionable *share* of the group's CNOL was a tax attribute of that member-taxpayer and property of the bankruptcy estate. This is the principle articulated by *Prudential Lines*. If an attribute of a member-taxpayer subject to reduction under section 108(b) includes an NOL, that attribute is the member-taxpayer's share of the CNOL, not the entire CNOL. The entire CNOL is not, and cannot be, a tax attribute of a member. Otherwise, the value of other members' apportionable shares of the CNOL would be damaged or eliminated.

*Prudential Lines* is consistent with the law of other circuits. *See, e.g.*, *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262, 264-65 (9th Cir. 1973) (trustee for estate of bankrupt member of consolidated group entitled

to tax refund resulting from carryback of CNOL attributable to bankrupt member); *Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 208 (5th Cir. 1992) (relying on *Bob Richards* to reach similar result); *In re Community Bancorp*, Bk. No. 10-20038, 2013 WL 4441925 (9th Cir. Aug. 20, 2013) (citing *Bob Richards* with approval but ruling that debtor-member did not own the NOLs because of a contractual agreement with other members of the consolidated group);[20] *In re NetBank, Inc.*, 729 F.3d 1344, 1347, 1352 (11th Cir. 2013) (bankrupt member entitled to refund resulting from NOL attributable member pursuant to contractual agreement among members of consolidated group); *In re Indymac Bancorp, Inc.*, 554 F. App'x 668 (9th Cir. 2014) (citing *Bob Richards* with approval but ruling that debtor-member did not own the NOLs because of a contractual agreement with other members of the consolidated group).

If the Tax Court's over-reading of *United Dominion* is accepted, then a consolidated group's CNOL, once calculated, cannot be allocated to

---

[20] These contracts are known as "tax sharing agreements" and can change the group's use and enjoyment of a member's tax attributes. Marvel had no contractual agreement among the members of the group that ran counter to the regulations as in effect in 1998.

bankrupt member-taxpayers and *Prudential Lines* would be overruled.[21]

Notably, however, both the Ninth and Eleventh Circuits have reached

decisions consistent with *Prudential Lines* after the Supreme Court's 2001

decision in *United Dominion*. *See In re Indymac Bancorp, Inc.*, 554 F.

App'x. 668; *In re NetBank, Inc.*, 729 F.3d 1344; *In re Community Bancorp*,

2013 WL 4441925. Accordingly, a decision by this Court to uphold the Tax

Court's decision below would create a Circuit split, while also significantly

altering the rights of bankrupts and their creditors. This Court has said that

it disfavors the creation of a Circuit split, departing from the decisions of its

sister Circuits only where there is a "compelling reason" to do so. *See, e.g.*,

*Marine Recreational Opportunities, Inc. v. Berman*, 15 F.3d 270, 272 (2d

Cir. 1994).

---

[21] Where an election is made to file a consolidated return, all "includible corporations" connected through ownership to a common parent must be included in the consolidated group. Section 1504. There is no exception to this rule where a corporation is in bankruptcy, and the IRS has expressly ruled that bankrupt "includible corporations" must remain part of the consolidated group. Rev. Rul. 63-104, 1963-1 C.B. 172.

## V. The Regulations in Force in 1998 and IRS Guidance Support Marvel's Position.

As stated above, the Treasury did not exercise its authority to promulgate rules for applying section 108 to members of consolidated groups until seven years after Bankrupt Debtors' debts were discharged.[22] The consolidated return regulations in effect in 1998 (the "1998 Regulations"), however, universally support the application of section 108 separately to each of the Bankrupt Debtors.

Examples in the 1998 Regulations addressing other consolidated return rules expressly assumed that section 108 should be applied to reduce only those tax attributes of the member whose debts are discharged. In illustrating the rules for adjusting a parent's basis in its subsidiary when both entities are members of a consolidated group, Treasury addressed a scenario in which a member-taxpayer has debt discharged. Treas. Reg. § 1.1502-32(b)(5), Ex. 4 (1998). The example not only assumed that the member-taxpayer is apportioned a share of the CNOL (directly contradicting the Tax

---

[22] Treasury first proposed regulations addressing the application of section 108 to corporations filing consolidated returns in 2003. *See* T.D. 9089, 2003-2 C.B. 906, *amended*, T.D. 9098, 2003-2 C.B. 1248. The final regulations promulgated in 2005 after public notice and comment reflected significant changes from the rules initially proposed in 2003.

Court's reading of *United Dominion*), but also provided (consistently with the principles of *Prudential Lines*) that only those tax attributes of the member-taxpayer will be reduced under section 108. *Id.* at Ex. 4(c) ("Under section 108(b), . . . [the member-taxpayer's] net operating loss is reduced to [zero] . . . . No other attributes are reduced."). Similarly, an example provided by Treasury to illustrate the rules regarding so-called "excess loss accounts" also assumed that the CNOL to be reduced under section 108 was only the portion of the "consolidated net operating loss . . . attributable to [the member whose debts were discharged]." Treas. Reg. § 1.1502-19(g), Ex. 5(c) (1998). These examples in the 1998 Regulations were not changed until 2005.[23]

Consistent with Treasury's guidance in the 1998 Regulations, the IRS publicly declared that the "taxpayer" in a consolidated group whose tax attributes were reduced under section 108(b) was the bankrupt member with COD Income. For example, in Private Letter Ruling 9121017 (Feb. 21,

---

[23] Treasury amended the examples described below to reconcile the examples with the new rules for the application of section 108 to members of a consolidated group. *See* T.D. 9192, 2005-1 C.B. 866, *clarified*, I.R.S. Ann. 2006-15, 2006-1 C.B. 632.

1991), the IRS ruled that section 108(b) required "a separate company by company approach to attribute reduction, rather than a consolidated approach." *But see* I.R.S. FSA 199912007 (Mar. 26, 1999) (disagreeing with Private Letter Ruling 9121017). Similarly, the IRS ruled in Private Letter Ruling 9650019 (Dec. 13, 1996), that section 108(b) is to be applied as if the debtor member were filing a separate return. *See also* I.R.S. P.L.R. 9226064 (Mar. 31, 1992). While those private letter rulings are not precedential, *see* section 6110(k)(3), they are evidence of the IRS's administrative practice and of its understanding of the law as it existed in October 1998. *See Rowan Cos. v. United States*, 452 U.S. 247, 261 n.17 (1981).

## VI. The Government's Improper Attempt to Change the Rules Retroactively Violates Both the Code and the APA.

For the reasons discussed above, law extant in 1998 required Marvel to apply section 108 by reducing only the portion of the group's CNOL attributable to the Bankrupt Debtors. Even if this Court were to decide that the law was ambiguous on this point, however, Marvel should prevail. At the time of the events at issue, Treasury had not promulgated any regulations specifically addressing the application of section 108 to members of a consolidated group. Accordingly, Marvel's reasonable application of

section 108—which was consistent with the then-existing statutes and regulations for the reasons described above—should be sustained. The rule created by the Tax Court below impermissibly allows the Government to create binding consolidated return rules through litigation, rather than through its Congressionally delegated authority, in violation of the notice and comment requirements of the APA.

As the Supreme Court has long recognized, the Internal Revenue Code is generally construed against the Government where its provisions are ambiguous. *See United States v. Merriam*, 263 U.S. 179, 188 (1923) ("If the words are doubtful, the doubt must be resolved against the Government and in favor of the taxpayer."); *Bowers v. N.Y. & Albany Lighterage Co.*, 273 U.S. 346, 350 (1927) ("The provision is a part of a taxing statute; and such laws are to be interpreted liberally in favor of the taxpayers."); *United Dominion*, 532 U.S. at 839 (Thomas, J., concurring) ("[I]n cases such as this one, in which the complex statutory and regulatory scheme lends itself to any number of interpretations, we should be inclined to rely on the traditional canon that construes revenue-raising laws against their drafter." (citation omitted)). That rule is even stronger in the context of the consolidated return regulations. Where Treasury has not acted through

regulation to prescribe a specific rule for consolidated groups and their members, a taxpayer is permitted to take a reasonable position otherwise consistent with the relevant statutes and regulations. *Gottesman & Co. v. Commissioner*, 77 T.C. 1149, 1158 (1981) (upholding taxpayer's position because it "was reasonable under the circumstances").

The high standard to which the Government is held in the application of the consolidated return rules is the direct result of Treasury's broad authority to issue regulations in that area. *See Gottesman*, 77 T.C. at 1157 ("We cannot fault [the taxpayer] for not knowing what the law was in this area when the Commissioner, charged by Congress to announce the law (sec. 1502), never decided what it was himself."). In authorizing the filing of a consolidated return, Congress statutorily delegated to the Treasury legislative authority to prescribe all necessary rules that assured that the various provisions of the Code were applied in a way such that consolidated returns clearly reflected the tax liability of the affiliated group and "of each corporation in the group." *See* section 1502 (1998); *Rite Aid Corp. v. United States*, 255 F.3d 1357 (Fed. Cir. 2001). Because Congress delegated to Treasury the power to promulgate the consolidated return regulations, they are legislative regulations that have the force of law. *See Altera Corp. v.*

*Commissioner*, 145 T.C. No. 3 (July 27, 2015); *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993).[24] That broad delegation of legislative authority to write regulations adapting the Code to the circumstances of a consolidated return filing means the Government may not "fill in the gaps" in the consolidated return regulations by means other than issuing new regulations. *See Gottesman*, at 1157-58 (rejecting the IRS's attempt to "fill in the gaps" in the consolidated return regulations, stating that the IRS "had ample opportunity to amend" the regulations); *see also CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 411 (1994), *aff'd*, 62 F.3d 136 (5th Cir. 1995) (stating "we will apply the consolidated return regulations and the Code as written" where the IRS had not amended the regulations).

Importantly, the APA requires Treasury—and every agency granted legislative authority to write new rules—to provide the public with notice and the opportunity to comment on any proposed rulemaking *prior* to creating regulations that have the force and effect of law and states that, once adopted after public notice and comment, new regulations can be

---

[24] *See supra* note 5.

effective only prospectively.  5 U.S.C. §§ 553, 553(d).  The Tax Court's

misdirected opinion subverted these requirements under the Code and the

APA and effectively allows the Government to create new binding rules

retroactively applicable to consolidated groups through litigation, rather than

through legislative regulations issued only prospectively and pursuant to

notice and comment.  *See Veritas Software Corp. v. Commissioner*, 133 T.C.

297, 316 (2009) (rejecting Government's attempt to regulate through

litigation, because "[t]axpayers are merely required to be compliant, not

prescient.").

Section 553 of the APA sets forth the general rule that a federal

agency must provide public notice and an opportunity for comment on any

proposed rule.  5 U.S.C. §553.[25]  To be excepted from the notice and

comment requirements, the statement must provide an interpretation of a

statute or regulation, rather than a substantive rule with a "legal effect," a

_____

[25] The APA defines "rule" broadly to include virtually any agency statement
about what regulated parties should do in the future; the APA notably
excludes, however, interpretive rules and general statements of agency
policy from the notice and comment requirement, carving out informal
statements or guidance documents that merely change agency procedures or
simply reflect the agency's policies.  5 U.S.C. § 553(b)(3)(A).  The rule at
issue here is neither interpretive nor a statement of Treasury policy.

distinction that "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009). Legislative rules impose binding requirements and therefore are *always* subject to notice and comment to "assure testing of the proposal in the crucible of public comment and ensure fairness to the parties."[26] There are no exceptions that excuse non-publication of the rule prior to enforcement.

Both the Code and the APA prohibit the Government from retroactively creating and applying a consolidated return rule. Where Congress has granted Treasury the legislative power to promulgate binding rules, courts cannot perform their typical role of "filling gaps;" in the absence of regulations on such an issue, a court decision would go beyond merely interpreting the statute and would be tantamount to a legislative act by the judiciary. Instead, where Treasury has been given the authority to create binding legislative rules, only Treasury can adopt such rules and only

---

[26] William S. Jordan, III, *Rulemaking*, *in* 2011 ABA Admin. L. Sec., Dev. Admin. L. & Reg. Prac. ch. 4, http://www.americanbar.org/ content/dam/aba/events/administrative_law/2011/11/2011_fall_administrativ elawconference/rulemaking_chapter_2011.authcheckdam.pdf.

after first publishing them for notice and comment.  The Tax Court's over-reading of *United Dominion* effectively allowed the Government not only to circumvent important notice and comment requirements, but accomplish it without any publication of the rule at all.

The Government's issuance of consolidated return regulations in 2005 (modified materially from the regulations proposed in 2003 pursuant to comments received after notice) that approximate the approach that the Government applies to Marvel's 1998 transaction explicitly confirms the need to issue legislative rules.  Treasury first proposed consolidated return regulations setting forth how section 108 applied to consolidated groups in 2003, and before that there were no regulations that explicitly proposed how section 108 applies to consolidated groups.

Treasury's process for promulgating its 2005 regulations regarding section 108—including its 2003 issuance of proposed regulations on the same subject—reflects that, in the absence of such regulations, the proper method of reducing tax attributes under section 108 for members a consolidated group was unsettled.  Indeed, the preamble to the 2003 proposed regulations explicitly states that the proposal "adopts" a

consolidated approach to attribute reduction only *after* considering and rejecting a separate entity approach.[27]

Moreover, in the preamble to the final regulations promulgated in 2005, Treasury stated that "[q]uestions ha[d] . . . arisen regarding the application of the attribute reduction rules when a *taxpayer* that is a *member* of a consolidated group realizes excluded COD income." T.D. 9192 (emphasis added). By equating the "taxpayer" and the "member," Treasury confirmed that, prior to the issuance of the 2005 regulations, "the taxpayer" referenced in section 108 must be the *individual member* of the consolidated group. *See also* I.R.S. C.C.A. 201033031, at 2 (Aug. 20, 2010) (stating "[the IRS] acknowledges that the reference to 'the taxpayer' in section 108(b)(1) refers to the consolidated group *member* with excluded COD Income . . . rather than the entire group").

––––––––––––––––––––

[27] The preamble to the 2003 regulations stated:

> [The] Treasury Department ha[s] considered a separate entity approach and various consolidated approaches to the application of the attribute reduction rules of section 108(b) in the consolidated group context. As explained below, these regulations adopt a consolidated approach that reduces all attributes that are available to the debtor.

T.D. 9089, 2003-2 C.B. 906, *amended*, T.D. 9098, 2003-2 C.B. 1248.

In 1998, no authority supported the Government's position that the entire CNOL was a tax attribute of a taxpayer member; the Tax Court alone has misread *United Dominion* to provide this authority. But, it is only "the taxpayer's" tax attributes that are subject to reduction under section 108(b). Even while ignoring the meaning of "taxpayer" as provided by the Code, the Tax Court at least acknowledged that "[t]he pre-2003 consolidated return regulations did not specifically articulate how a consolidated group should reduce its tax attributes under section 108(b)." A140. That candid acknowledgement that the regulations lacked a clear statement should have decided the question. In the absence of an express rule to the contrary, the Tax Court was compelled to apply section 108 to the Bankrupt Debtors in the same way as it would to a corporation filing a separate return. The Tax Court's decision to the contrary—premised on its over-reading *United Dominion*—operated as an impermissible exercise of legislative rulemaking. Section 1502, however, requires that Treasury, not the courts, promulgate binding consolidated return regulations after publication, notice, and comment as required under the APA. For these reasons, the Tax Court's decision should be reversed.

## CONCLUSION

The Tax Court ignored the meaning of "taxpayer" as defined by the Code for all federal income tax purposes. The Tax Court defied the plain language of section 108(b) and required a reduction in tax attributes that did not belong to the taxpayer. The Tax Court selectively read the legislative history of section 108, ignoring Congress' and Treasury's express anticipation of permanent tax relief on COD Income. The Tax Court confused the calculation of the CNOL with its use and consequently misread *United Dominion* as having decided the "identical" issue as presented here. Thus, the Tax Court impermissibly allowed the IRS through litigation to enforce a non-existent legislative rule modifying the Code as applied to consolidated returns, rather than, after notice and comment, through regulations with prospective effect as the APA requires. Marvel respectfully requests that the Tax Court's decision be reversed.

January 29, 2016                    Respectfully submitted,

                                   /s/ B. John Williams, Jr.
                                   B. John Williams, Jr.
                                   David W. Foster
                                   Nathan P. Wacker
                                   SKADDEN, ARPS, SLATE,
                                   MEAGHER & FLOM LLP
                                   1440 New York Avenue, NW
                                   Washington, DC  20005

                                   Sonja Schiller
                                   SKADDEN, ARPS, SLATE,
                                   MEAGHER & FLOM LLP
                                   155 N. Wacker Drive
                                   Chicago, IL  60606

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned counsel hereby certifies that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B).

    1.  Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 10,366 words, including headings, footnotes and citations.

    2.  The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

January 29, 2016

/s/ B. John Williams, Jr.
B. John Williams, Jr.

# ADDENDUM

## TABLE OF CONTENTS

**Page**

26 U.S.C. § 108 (1998)................................................ ADD-1

26 U.S.C. § 1502 (1998)........................................... ADD-10

Treas. Reg. § 1.1502-11 and Treas. Reg. § 1.1502-12 (1998)................................................................ ADD-13

Treas. Reg. § 1.1502-19 (1998) ................................ ADD-18

Treas. Reg. § 1.1502-32 (1998) ................................ ADD-24

Treas. Reg. § 1.1502-79 and Treas. Reg. § 1.1502-80 (1998)................................................................ ADD-40

# INTERNAL

# REVENUE CODE

ᨓᨓᨓᨓ

## 1999

ᨓᨓᨓᨓ

## Sections 1 to 1999

Including Legislation Enacted
In The
One Hundred Fifth Congress
Second Session

Volume 1



regard to any extension thereof agreed to after the date of the enactment of this Act) [Apr. 7, 1986], or

"(B) January 1, 1987.

For purposes of subparagraph (A), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement."

**Plan Amendments Not Required Until January 1, 1989**

For provisions directing that if any amendments made by section 1114(b)(1) of Pub.L. 99-514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub.L. 99-514, set out as a note under section 401 of this title.

## § 107. Rental value of parsonages

In the case of a minister of the gospel, gross income does not include—

(1) the rental value of a home furnished to him as part of his compensation; or

(2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home.

(Aug. 16, 1954, c. 736, 68A Stat. 32.)

## § 108. Income from discharge of indebtedness

(a) **Exclusion from gross income.—**

(1) **In general.—**Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—

(A) the discharge occurs in a title 11 case,

(B) the discharge occurs when the taxpayer is insolvent,

(C) the indebtedness discharged is qualified farm indebtedness, or

(D) in the case of a taxpayer other than a C corporation, the indebtedness discharged is qualified real property business indebtedness.

(2) **Coordination of exclusions.—**

(A) **Title 11 exclusion takes precedence.—**Subparagraphs (B), (C), and (D) of paragraph (1) shall not apply to a discharge which occurs in a title 11 case.

(B) **Insolvency exclusion takes precedence over qualified farm exclusion and qualified real property business exclusion.—**Subparagraphs (C) and (D) of paragraph (1) shall not apply to a discharge to the extent the taxpayer is insolvent.

(3) **Insolvency exclusion limited to amount of insolvency.—**In the case of a discharge to which paragraph (1)(B) applies, the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent.

(b) **Reduction of tax attributes.—**

(1) **In general.—**The amount excluded from gross income under subparagraph (A), (B), or (C) of subsection (a)(1) shall be applied to reduce the tax attributes of the taxpayer as provided in paragraph (2).

(2) **Tax attributes affected; order of reduction.—**Except as provided in paragraph (5), the reduction referred to in paragraph (1) shall be made in the following order:

(A) **NOL.—**Any net operating loss for the taxable year of the discharge, and any net operating loss carryover to such taxable year.

(B) **General business credit.—**Any carryover to or from the taxable year of a discharge of an amount for purposes for determining the amount allowable as a credit under section 38 (relating to general business credit).

(C) **Minimum tax credit.—**The amount of the minimum tax credit available under section 53(b) as of the beginning of the taxable year immediately following the taxable year of the discharge.

(D) **Capital loss carryovers.—**Any net capital loss for the taxable year of the discharge, and any capital loss carryover to such taxable year under section 1212.

(E) **Basis reduction.—**

(i) **In general.—**The basis of the property of the taxpayer.

(ii) **Cross reference.—**

For provisions for making the reduction described in clause (i), see section 1017.

(F) **Passive activity loss and credit carryovers.—**Any passive activity loss or credit carryover of the taxpayer under section 469(b) from the taxable year of the discharge.

(G) **Foreign tax credit carryovers.—**Any carryover to or from the taxable year of the discharge for purposes of determining the amount of the credit allowable under section 27.

(3) **Amount of reduction.—**

(A) **In general.—**Except as provided in subparagraph (B), the reductions described in paragraph (2) shall be one dollar for each dollar excluded by subsection (a).

(B) **Credit carryover reduction.—**The reductions described in subparagraphs (B), (C), and (G) shall be 33⅓ cents for each dollar excluded by subsection (a). The reduction described in subparagraph (F) in any passive activity credit carryover shall be 33⅓ cents for each dollar excluded by subsection (a).

**(4) Ordering rules.—**

**(A) Reductions made after determination of tax for year.—**The reductions described in paragraph (2) shall be made after the determination of the tax imposed by this chapter for the taxable year of the discharge.

**(B) Reductions under subparagraph (A) or (D) of paragraph (2).—**The reductions described in subparagraph (A) or (D) of paragraph (2) (as the case may be) shall be made first in the loss for the taxable year of the discharge and then in the carryovers to such taxable year in the order of the taxable years from which each such carryover arose.

**(C) Reductions under subparagraphs (B) and (G) of paragraph (2).—**The reductions described in subparagraphs (B) and (G) of paragraph (2) shall be made in the order in which carryovers are taken into account under this chapter for the taxable year of the discharge.

**(5) Election to apply reduction first against depreciable property.—**

**(A) In general.—**The taxpayer may elect to apply any portion of the reduction referred to in paragraph (1) to the reduction under section 1017 of the basis of the depreciable property of the taxpayer.

**(B) Limitation.—**The amount to which an election under subparagraph (A) applies shall not exceed the aggregate adjusted bases of the depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

**(C) Other tax attributes not reduced.—**Paragraph (2) shall not apply to any amount to which an election under this paragraph applies.

**(c) Treatment of discharge of qualified real property business indebtedness.—**

**(1) Basis reduction.—**

**(A) In general.—**The amount excluded from gross income under subparagraph (D) of subsection (a)(1) shall be applied to reduce the basis of the depreciable real property of the taxpayer.

**(B) Cross reference.—**

For provisions making the reduction described in subparagraph (A), see section 1017.

**(2) Limitations.—**

**(A) Indebtedness in excess of value.—**The amount excluded under subparagraph (D) of subsection (a)(1) with respect to any qualified real property business indebtedness shall not exceed the excess (if any) of—

(i) the outstanding principal amount of such indebtedness (immediately before the discharge), over

(ii) the fair market value of the real property described in paragraph (3)(A) (as of such time), reduced by the outstanding principal amount of any other qualified real property business indebtedness secured by such property (as of such time).

**(B) Overall limitation.—**The amount excluded under subparagraph (D) of subsection (a)(1) shall not exceed the aggregate adjusted bases of depreciable real property (determined after any reductions under subsections (b) and (g)) held by the taxpayer immediately before the discharge (other than depreciable real property acquired in contemplation of such discharge).

**(3) Qualified real property business indebtedness.—**The term "qualified real property business indebtedness" means indebtedness which—

(A) was incurred or assumed by the taxpayer in connection with real property used in a trade or business and is secured by such real property,

(B) was incurred or assumed before January 1, 1993, or if incurred or assumed on or after such date, is qualified acquisition indebtedness, and

(C) with respect to which such taxpayer makes an election to have this paragraph apply.

Such term shall not include qualified farm indebtedness. Indebtedness under subparagraph (B) shall include indebtedness resulting from the refinancing of indebtedness under subparagraph (B) (or this sentence), but only to the extent it does not exceed the amount of the indebtedness being refinanced.

**(4) Qualified acquisition indebtedness.—**For purposes of paragraph (3)(B), the term "qualified acquisition indebtedness" means, with respect to any real property described in paragraph (3)(A), indebtedness incurred or assumed to acquire, construct, reconstruct, or substantially improve such property.

**(5) Regulations.—**The Secretary shall issue such regulations as are necessary to carry out this subsection, including regulations preventing the abuse of this subsection through cross-collateralization or other means.

**(d) Meaning of terms; special rules relating to certain provisions.—**

**(1) Indebtedness of taxpayer.—**For purposes of this section, the term "indebtedness of the taxpayer" means any indebtedness—

(A) for which the taxpayer is liable, or

(B) subject to which the taxpayer holds property.

235

(2) **Title 11 case.**—For purposes of this section, the term "title 11 case" means a case under title 11 of the United States Code (relating to bankruptcy), but only if the taxpayer is under the jurisdiction of the court in such case and the discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court.

(3) **Insolvent.**—For purposes of this section, the term "insolvent" means the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer is insolvent, and the amount by which the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge.

[(4) **Repealed.** Pub.L. 99–514, Title VIII, § 822(b)(3)(A), Oct. 22, 1986, 100 Stat. 2373]

(5) **Depreciable property.**—The term "depreciable property" has the same meaning as when used in section 1017.

(6) **Certain provisions to be applied at partner level.**—In the case of a partnership, subsections (a), (b), (c), and (g) shall be applied at the partner level.

(7) **Special rules for S corporation.**—

(A) **Certain provisions to be applied at corporate level.**—In the case of an S corporation, subsections (a), (b), (c), and (g) shall be applied at the corporate level.

(B) **Reduction in carryover of disallowed losses and deductions.**—In the case of an S corporation, for purposes of subparagraph (A) of subsection (b)(2), any loss or deduction which is disallowed for the taxable year of the discharge under section 1366(d)(1) shall be treated as a net operating loss for such taxable year. The preceding sentence shall not apply to any discharge to the extent that subsection (a)(1)(D) applies to such discharge.

(C) **Coordination with basis adjustments under section 1367(b)(2).**—For purposes of subsection (e)(6), a shareholder's adjusted basis in indebtedness of an S corporation shall be determined without regard to any adjustments made under section 1367(b)(2).

(8) **Reductions of tax attributes in title 11 cases of individuals to be made by estate.**—In any case under chapter 7 or 11 of title 11 of the United States Code to which section 1398 applies, for purposes of paragraphs (1) and (5) of subsection (b) the estate (and not the individual) shall be treated as the taxpayer. The preceding sentence shall not apply for purposes of applying section 1017 to property transferred by the estate to the individual.

(9) **Time for making election, etc.**—

(A) **Time.**—An election under paragraph (5) of subsection (b) or under paragraph (3)(C) of subsection (c) shall be made on the taxpayer's return

for the taxable year in which the discharge occurs or at such other time as may be permitted in regulations prescribed by the Secretary.

(B) **Revocation only with consent.**—An election referred to in subparagraph (A), once made, may be revoked only with the consent of the Secretary.

(C) **Manner.**—An election referred to in subparagraph (A) shall be made in such manner as the Secretary may by regulations prescribe.

(10) **Cross reference.**—

For provision that no reduction is to be made in the basis of exempt property of an individual debtor, see section 1017(c)(1).

(e) **General rules for discharge of indebtedness (including discharges not in Title 11 cases or insolvency).**—For purposes of this title—

(1) **No other insolvency exception.**—Except as otherwise provided in this section, there shall be no insolvency exception from the general rule that gross income includes income from the discharge of indebtedness.

(2) **Income not realized to extent of lost deductions.**—No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction.

(3) **Adjustments for unamortized premium and discount.**—The amount taken into account with respect to any discharge shall be properly adjusted for unamortized premium and unamortized discount with respect to the indebtedness discharged.

(4) **Acquisition of indebtedness by person related to debtor.**—

(A) **Treated as acquisition by debtor.**—For purposes of determining income of the debtor from discharge of indebtedness, to the extent provided in regulations prescribed by the Secretary, the acquisition of outstanding indebtedness by a person bearing a relationship to the debtor specified in section 267(b) or 707(b)(1) from a person who does not bear such a relationship to the debtor shall be treated as the acquisition of such indebtedness by the debtor. Such regulations shall provide for such adjustments in the treatment of any subsequent transactions involving the indebtedness as may be appropriate by reason of the application of the preceding sentence.

(B) **Members of family.**—For purposes of this paragraph, sections 267(b) and 707(b)(1) shall be applied as if section 267(c)(4) provided that the family of an individual consists of the individual's spouse, the individual's children, grandchildren, and parents, and any spouse of the individual's children or grandchildren.

(C) **Entities under common control treated as related.**—For purposes of this paragraph, two enti-

ties which are treated as a single employer under subsection (b) or (c) of section 414 shall be treated as bearing a relationship to each other which is described in section 267(b).

**(5) Purchase-money debt reduction for solvent debtor treated as price reduction.**—If—

(A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,

(B) such reduction does not occur—

(i) in a title 11 case, or

(ii) when the purchaser is insolvent, and

(C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,

then such reduction shall be treated as a purchase price adjustment.

**(6) Indebtedness contributed to capital.**—Except as provided in regulations, for purposes of determining income of the debtor from discharge of indebtedness, if a debtor corporation acquires its indebtedness from a shareholder as a contribution to capital—

(A) section 118 shall not apply, but

(B) such corporation shall be treated as having satisfied the indebtedness with an amount of money equal to the shareholder's adjusted basis in the indebtedness.

**(7) Recapture of gain on subsequent sale of stock.**—

(A) **In general.**—If a creditor acquires stock of a debtor corporation in satisfaction of such corporation's indebtedness, for purposes of section 1245—

(i) such stock (and any other property the basis of which is determined in whole or in part by reference to the adjusted basis of such stock) shall be treated as section 1245 property,

(ii) the aggregate amount allowed to the creditor—

(I) as deductions under subsection (a) or (b) of section 166 (by reason of the worthlessness or partial worthlessness of the indebtedness), or

(II) as an ordinary loss on the exchange,

shall be treated as an amount allowed as a deduction for depreciation, and

(iii) an exchange of such stock qualifying under section 354(a), 355(a), or 356(a) shall be treated as an exchange to which section 1245(b)(3) applies.

The amount determined under clause (ii) shall be reduced by the amount (if any) included in the creditor's gross income on the exchange.

(B) **Special rule for cash basis taxpayers.**—In the case of any creditor who computes his taxable income under the cash receipts and disbursements method, proper adjustment shall be made in the amount taken into account under clause (ii) of subparagraph (A) for any amount which was not included in the creditor's gross income but which would have been included in such gross income if such indebtedness had been satisfied in full.

(C) **Stock of parent corporation.**—For purposes of this paragraph, stock of a corporation in control (within the meaning of section 368(c)) of the debtor corporation shall be treated as stock of the debtor corporation.

(D) **Treatment of successor corporation.**—For purposes of this paragraph, the term "debtor corporation" includes a successor corporation.

(E) **Partnership rule.**—Under regulations prescribed by the Secretary, rules similar to the rules of the foregoing subparagraphs of this paragraph shall apply with respect to the indebtedness of a partnership.

**(8) Indebtedness satisfied by corporation's stock.**—For purposes of determining income of a debtor from discharge of indebtedness, if a debtor corporation transfers stock to a creditor in satisfaction of its indebtedness, such corporation shall be treated as having satisfied the indebtedness with an amount of money equal to the fair market value of the stock.

**(9) Discharge of indebtedness income not taken into account in determining whether entity meets REIT qualifications.**—Any amount included in gross income by reason of the discharge of indebtedness shall not be taken into account for purposes of paragraphs (2) and (3) of section 856(c).

**(10) Indebtedness satisfied by issuance of debt instrument.**—

(A) **In general.**—For purposes of determining income of a debtor from discharge of indebtedness, if a debtor issues a debt instrument in satisfaction of indebtedness, such debtor shall be treated as having satisfied the indebtedness with an amount of money equal to the issue price of such debt instrument.

(B) **Issue price.**—For purposes of subparagraph (A), the issue price of any debt instrument shall be determined under sections 1273 and 1274. For purposes of the preceding sentence, section 1273(b)(4) shall be applied by reducing the stated redemption price of any instrument by the portion of such stated redemption price which is treated as interest for purposes of this chapter.

**(f) Student loans.—**

**(1) In general.**—In the case of an individual, gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of any student loan if such discharge was pursuant to a provision of such loan under which all or part of the indebtedness of the individual would be discharged if the individual worked for a certain period of time in certain professions for any of a broad class of employers.

**(2) Student loan.**—For purposes of this subsection, the term "student loan" means any loan to an individual to assist the individual in attending an educational organization described in section 170(b)(1)(A)(ii) made by—

**(A)** the United States, or an instrumentality or agency thereof,

**(B)** a State, territory, or possession of the United States, or the District of Columbia, or any political subdivision thereof,

**(C)** a public benefit corporation—

**(i)** which is exempt from taxation under section 501(c)(3),

**(ii)** which has assumed control over a State, county, or municipal hospital, and

**(iii)** whose employees have been deemed to be public employees under State law, or

**(D)** any educational organization described in section 170(b)(1)(A)(ii) if such loan is made—

**(i)** pursuant to an agreement with any entity described in subparagraph (A), (B), or (C) under which the funds from which the loan was made were provided to such educational organization, or

**(ii)** pursuant to a program of such educational organization which is designed to encourage its students to serve in occupations with unmet needs or in areas with unmet needs and under which the services provided by the students (or former students) are for or under the direction of a governmental unit or an organization described in section 501(c)(3) and exempt from tax under section 501(a).

The term "student loan" includes any loan made by an educational organization described in section 170(b)(1)(A)(ii) or by an organization exempt from tax under section 501(a) to refinance a loan to an individual to assist the individual in attending any such educational organization but only if the refinancing loan is pursuant to a program of the refinancing organization which is designed as described in subparagraph (D)(ii).

**(3) Exception for discharges on account of services performed for certain lenders.**—Paragraph (1) shall not apply to the discharge of a loan made by an organization described in paragraph (2)(D) if the discharge is on account of services performed for either such organization.

**(g) Special rules for discharge of qualified farm indebtedness.—**

**(1) Discharge must be by qualified person.—**

**(A) In general.**—Subparagraph (C) of subsection (a)(1) shall apply only if the discharge is by a qualified person.

**(B) Qualified person.**—For purposes of subparagraph (A), the term "qualified person" has the meaning given to such term by section 49(a)(1)(D)(iv); except that such term shall include any Federal, State, or local government or agency or instrumentality thereof.

**(2) Qualified farm indebtedness.**—For purposes of this section, indebtedness of a taxpayer shall be treated as qualified farm indebtedness if—

**(A)** such indebtedness was incurred directly in connection with the operation by the taxpayer of the trade or business of farming, and

**(B)** 50 percent or more of the aggregate gross receipts of the taxpayer for the 3 taxable years preceding the taxable year in which the discharge of such indebtedness occurs is attributable to the trade or business of farming.

**(3) Amount excluded cannot exceed sum of tax attributes and business and investment assets.—**

**(A) In general.**—The amount excluded under subparagraph (C) of subsection (a)(1) shall not exceed the sum of—

**(i)** the adjusted tax attributes of the taxpayer, and

**(ii)** the aggregate adjusted bases of qualified property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

**(B) Adjusted tax attributes.**—For purposes of subparagraph (A), the term "adjusted tax attributes" means the sum of the tax attributes described in subparagraphs (A), (B), (C), (D), (F), and (G) of subsection (b)(2) determined by taking into account $3 for each $1 of the attributes described in subparagraphs (B), (C), and (G) of subsection (b)(2) and the attribute described in subparagraph (F) of subsection (b)(2) to the extent attributable to any passive activity credit carryover.

**(C) Qualified property.**—For purposes of this paragraph, the term "qualified property" means any property which is used or is held for use in a trade or business or for the production of income.

**(D) Coordination with insolvency exclusion.—**
For purposes of this paragraph, the adjusted basis of any qualified property and the amount of the adjusted tax attributes shall be determined after any reduction under subsection (b) by reason of amounts excluded from gross income under subsection (a)(1)(B).

(Aug. 16, 1954, c. 736, 68A Stat. 32; June 29, 1956, c. 463, § 5, 70 Stat. 403; June 8, 1960, Pub.L. 86–496, § 1(a), 74 Stat. 164; Oct. 4, 1976, Pub.L. 94–455, Title XIX, §§ 1906(b)(13)(A), 1951(b)(2)(A), 90 Stat. 1834, 1836; Dec. 24, 1980, Pub.L. 96–589, § 2(a), 94 Stat. 3389; Oct. 19, 1982, Pub.L. 97–354, § 3(e), 96 Stat. 1689; Jan. 12, 1983, Pub.L. 97–448, Title I, § 102(h)(1), Title III, § 304(d), 96 Stat. 2372, 2398; July 18, 1984, Pub.L. 98–369, Title I, § 59(a), (b)(1), Title IV, § 474(r)(5), Title VII, § 721(b)(2), Title X, § 1076(a), 98 Stat. 576, 839, 966, 1053; Oct. 22, 1986, Pub.L. 99–514, Title I, § 104(b)(2), Title II, § 231(d)(3)(D), Title IV, § 405(a), Title VI, § 621(e)(1), Title VIII, §§ 805(c)(2) to (4), 822(a), (b)(1) to (3), Title XI, § 1171(b)(4), Title XVIII, § 1847(b)(7), 100 Stat. 2105, 2179, 2224, 2266, 2362, 2373, 2513, 2856; Nov. 10, 1988, Pub.L. 100–647, Title I, § 1004(a)(1) to (4), (6), 102 Stat. 3385, 3387; Nov. 5, 1990, Pub.L. 101–508, Title XI, §§ 11325(a)(1), (b), 11813(b)(6), 104 Stat. 1388–466, 1388–551; Aug. 10, 1993, Pub.L. 103–66, Title XIII, §§ 13150(a), (b), (c)(1) to (5), 13226(a)(1), (2)(B), (b)(1) to (3), 107 Stat. 446, 447, 448, 487, 488; Aug. 20, 1996, Pub.L. 104–188, Title I, § 1703(n)(2), 110 Stat. 1877; Aug. 5, 1997, Pub.L. 105–34, Title II, § 225(a), 111 Stat. 820; July 22, 1998, Pub.L. 105–206, Title VI, § 6004(f), 112 Stat. 795.)

## HISTORICAL AND STATUTORY NOTES

**References in Text**

Chapter 7 or 11 of title 11 of the United States Code, referred to in subsec. (d)(8), means chapter 7 or 11 of Title 11, Bankruptcy, which are classified to §§ 701 et seq. and 1101 et seq. of such title, respectively.

**Effective Dates**

**1998 Acts.** Amendment by section 6004(f) of Pub.L. 105–206, except as otherwise provided, shall take effect as if included in the Taxpayer Relief Act of 1997 (Pub.L. 105–34, Aug. 5, 1997, 111 Stat. 788) to which it relates, see section 6024 of Pub.L. 105–206, set out as a note under section 1 of this title.

**1997 Acts.** Section 225(b) of Pub.L. 105–34, provided that: "The amendments made by this section [amending subsec. (f) of this section] shall apply to discharges of indebtedness after the date of the enactment of this Act [Aug. 5, 1997]."

**1996 Acts.** Amendment by section 1703 of Pub.L. 104–188 effective as if included in provision of Revenue Reconciliation Act of 1993 [Pub.L. 103–66, Title XIII, Chapter I, § 13001 et seq., Aug. 10, 1993, 107 Stat. 416, see Tables for classification] to which it relates, see section 1703(o) of Pub.L. 104–188, set out as a note under section 39 of this title.

**1993 Acts.** Section 13150(d) of Pub.L. 103–66 provided that: "The amendments made by this section [amending subsecs. (a), (c), (d) of this section and sections 703(b), and 1017(a), of this title] shall apply to discharges of indebtedness after December 31, 1992, in taxable years ending after such date."

Section 13226(a)(3) of Pub.L. 103–66 provided that:

"(A) In general.—Except as otherwise provided in this paragraph, the amendments made by this subsection [amending subsec. (e)(6), (8), (10) and (11) of this section and section 382(l)(5) of this title] shall apply to stock transferred after December 31, 1994, in satisfaction of any indebtedness.

"(B) Exception for Title 11 cases.—The amendments made by this subsection shall not apply to stock transferred in satisfaction of any indebtedness if such transfer is in a title 11 or similar case (as defined in section 368(a)(3)(A) of the Internal Revenue Code of 1986[section 368(a)(3)(A) of this title]) which was filed on or before December 31, 1993."

Section 13226(b)(4) of Pub.L. 103–66 provided that: "The amendments made by this subsection [amending subsec. (b)(2)(C), (D), (E), (F) and (G), (3)(B), (4)(B) and (C) and (g)(3) of this section] shall apply to discharges of indebtedness in taxable years beginning after December 31, 1993."

**1990 Acts.** Section 11325(c) of Pub.L. 101–508 provided that:

"(1) In general.—Except as provided in paragraph (2), the amendments made by this section [amending subsec. (e) of this section and section 1275(a) of this title] shall apply to debt instruments issued, and stock transferred, after October 9, 1990, in satisfaction of any indebtedness.

"(2) Exceptions.—The amendments made by this section shall not apply to any debt instrument issued, or stock transferred, in satisfaction of any indebtedness if such issuance or transfer (as the case may be)—

"(A) is in a Title 11 or similar case (as defined in section 368(a)(3)(A) of the Internal Revenue Code of 1986 [section 368(a)(3)(A) of this title]) which was filed on or before October 9, 1990,

"(B) is pursuant to a written binding contract in effect on October 9, 1990, and at all times thereafter before such issuance or transfer,

"(C) is pursuant to a transaction which was described in documents filed with the Securities and Exchange Commission on or before October 9, 1990, or

"(D) is pursuant to a transaction—

"(i) the material terms of which were described in a written public announcement on or before October 9, 1990,

"(ii) which was the subject of a prior filing with the Securities and Exchange Commission, and

"(iii) which is the subject of a subsequent filing with the Securities and Exchange Commission before January 1, 1991."

Amendment by section 11813 of Pub.L. 101–508, applicable to property placed in service after Dec. 31, 1990, except for transition property, as defined in section 49(e) of this title as it existed prior to Nov. 5, 1990, any property to which qualified progress expenditures were previously taken into account pursuant to section 46(d) of this title as it existed prior to Nov. 5, 1990, and property described in section 46(b)(2)(C) of this title, as it existed prior to Nov. 5, 1990, see section 11813(c) of Pub.L. 101–508, set out as a note under section 29 of this title.

**1988 Acts.** Amendments made by Pub.L. 100–647 effective as if included in the provisions of Pub.L. 99–514 to which such amendments relate, except that no addition to tax shall be made under section 6654 or 6655 of this title for any period before Apr. 16, 1989 (Mar. 16, 1989 in the case of a taxpayer subject to section 6655 of this title) with respect to any underpayment to the extent such underpayment was created or increased by any provision of Titles I or II of Pub.L. 100–647, see section 1019 of Pub.L. 100–647, set out as a note under section 1 of this title.

**1986 Acts.** Amendment by section 104(b)(2), of Pub.L. 99–514 applicable to taxable years beginning after Dec. 31, 1986, see section 151(a) of Pub.L. 99–514, set out as a note under section 1 of this title.

Amendment by section 231(d)(3)(D) of Pub.L. 99–514 applicable to taxable years beginning after Dec. 31, 1985, see section 231(g) of Pub.L. 99–514, set out as a note under section 41 of this title.

Section 405(c) of Pub.L. 99–514 provided that: "The amendments made by this section [enacting subsec. (g) of this section and section 1017(b)(4) of this title] shall apply to discharges of indebtedness occurring after April 9, 1986, in taxable years ending after such date."

Repeal by section 621(e)(1) of Pub.L. 99–514 of amendment by section 59(h)(1) of Pub.L. 99–369, which was effective as if included in the amendments made by section 806(e) and (f) of Pub.L. 94–455, effective Jan. 1, 1986, with certain exceptions, see section 621(f)(2) of Pub.L. 99–514, set out as a note under section 382 of this title.

Amendment by section 805(c)(2) to (4) of Pub.L. 99–514 applicable to taxable years beginning after Dec. 31, 1986, with certain changes required in the method of accounting, see section 805(d) of Pub.L. 99–514, set out as a note under section 166 of this title.

Section 822(c) of Pub.L. 99–514 provided that: "The amendments made by this section [amending this section and section 1017 of this title] shall apply to discharges after December 31, 1986."

Amendment by section 1171(b)(4) of Pub.L. 99–514 applicable to compensation paid or accrued after Dec. 31, 1986, in taxable years ending after such date, except as otherwise provided, see section 1171(c) of Pub.L. 99–514, set out as a note under section 38 of this title.

Amendment by section 1847(b)(7) of Pub.L. 99–514 effective as if included in the provisions of the Tax Reform Act of 1984, Pub.L. 98–369, except as otherwise provided, see section 1881 of Pub.L. 99–514, set out as a note under section 48 of this title.

**1984 Acts.** Section 59(b)(2) of Pub.L. 98–369 provided that: "The amendment made by paragraph (1) [enacting subsec. (e)(10)(C) of this section] shall take effect as if it had been included in the amendments made by subsections (e) and (f) of section 806 of the Tax Reform Act of 1976 [Pub.L. 94–455]." See note set out under section 382 of this title.

Section 59(b) [(c)] of Pub.L. 98–369 provided that:

"(1) **In general.**—Except as otherwise provided in this subsection, the amendment made by subsection (a) [enacting subsec. (e)(10)(A) and (B) of this section] shall apply to transfers after the date of the enactment of this Act [July 18, 1984] in taxable years ending after such date.

"(2) **Transitional rule.**—The amendment made by subsection (a) [enacting subsec. (e)(10)(A) and (B) of this section] shall not apply to the transfer by a corporation of its stock in exchange for debt of the corporation after the date of the enactment of this Act [July 18, 1984] if such transfer is—

"(A) pursuant to a written contract requiring such transfer which was binding on the corporation at all times on June 7, 1984, and at all times after such date but only if the transfer takes place before January 1, 1985, and only if the transferee held the debt at all times on June 7, 1984, or

"(B) pursuant to the exercise of an option to exchange debt for stock but only if such option was in effect at all times on June 7, 1984, and at all times after such date and only if at all times on June 7, 1984, the option and the debt were held by the same person.

"(3) **Certain transfers to controlling shareholder.**—The amendment made by subsection (a) [enacting subsec. (e)(10)(A) and (B) of this section] shall not apply to any transfer before January 1, 1985, by a corporation of its stock in exchange for debt of such corporation if—

"(A) such transfer is to another corporation which at all times on June 7, 1984, owned 75 percent or more of the total value of the stock of the corporation making such transfer, and

"(B) immediately after such transfer, the transferee corporation owns 80 percent or more of the total value of the stock of the transferor corporation.

"(4) **Certain transfers pursuant to debt restructure agreement.**—The amendment made by subsection (a) shall not apply to the transfer by a corporation of its stock in exchange for debt of the corporation after the date of the enactment of this Act [July 18, 1984] and before January 1, 1985, if—

"(A) such transfer is covered by a debt restructure agreement entered into by the corporation during November 1983, and

"(B) such agreement was specified in a registration statement filed with the Securities and Exchange Commission by the corporation on March 7, 1984."

Amendment by section 474(r)(5) of Pub.L. 98–369 applicable to taxable years beginning after Dec. 31, 1983, and to carrybacks from such years, see section 475(a) of Pub.L. 98–369, set out as a note under section 21 of this title.

Amendment by section 721(b) of Pub.L. 98–369 applicable to contributions to capital after Dec. 31, 1980, in taxable years ending after

such date, see section 721(y)(2) of Pub.L. 98–369, set out as a note under section 1361 of this title.

Section 1076(b) of Pub.L. 98–369 provided that: "The amendments made by this section [enacting subsec. (f) of this section] shall apply to discharges of indebtedness made on or after January 1, 1983."

**1983 Acts.** Amendment by Title 1 of Pub.L. 97–448 effective, except as otherwise provided, as if it had been included in the provision of the Economic Recovery Tax Act of 1981 [Pub.L. 97–34] to which such amendment relates, see § 109 of Pub.L. 97–448, set out as a note under § 1 of this title.

**1982 Acts.** Amendment by Pub.L. 97–354 applicable to taxable years beginning after Dec. 31, 1982, see § 6(a) of Pub.L. 97–354, set out as a note under § 1361 of this title.

**1980 Acts.** Section 7 of Pub.L. 96–589 provided that:

"(a) For section 2 (relating to tax treatment of discharge of indebtedness).—

"(1) **In general.**—Except as provided in paragraph (2), the amendments made by section 2 [amending sections 108, 111, 118, 382, 703, and 1017 of this title] shall apply to any transaction which occurs after December 31, 1980, other than a transaction which occurs in a proceeding in a bankruptcy case or similar judicial proceeding (or in a proceeding under the Bankruptcy Act) [Title 11, Bankruptcy] commencing on or before December 31, 1980.

"(2) **Transitional rule.**—In the case of any discharge of indebtedness to which subparagraph (A) or (B) of section 108(a)(1) of the Internal Revenue Code of 1954 (relating to exclusion from gross income), as amended by section 2 [subsec. (a)(1)(A) or (B) of this section], applies and which occurs before January 1, 1982, or which occurs in a proceeding in a bankruptcy case or similar judicial proceedings commencing before January 1, 1982, then—

"(A) section 108(b)(2) of the such Code (relating to reduction of tax attributes), as so amended [subsec. (b)(2) of this section], shall be applied without regard to subparagraphs (A), (B), (C), and (E) thereof, and

"(B) the basis of any property shall not be reduced under section 1017 of such Code (relating to reduction in basis in connection with discharges of indebtedness), as so amended [section 1017 of this title], below the fair market value of such property on the date the debt is discharged.

"(b) For section 3 (relating to rules relating to title 11 cases for individuals).—The amendments made by section 3 [enacting sections 1398 and 1399 of this title, and amending sections 443, 6012, and 6103 of this title] shall apply to any bankruptcy case commencing more than 90 days after the date of the enactment of this Act [Dec. 24, 1980].

"(c) For section 4 (relating to corporate reorganization provisions).—

"(1) **In general.**—The amendments made by section 4 [enacting section 370 of this title and amending sections 354, 355, 357, 368, and 381 of this title] shall apply to any bankruptcy case or similar judicial proceeding commencing after December 31, 1980.

"(2) **Exchanges of property for accrued interest.**—The amendments made by subsection (e) of section 4 [amending sections 354(a)(2), (3), and 355(a)(3), (4) of this title] (relating to treatment of property attributable to accrued interest) shall also apply to any exchange—

"(A) which occurs after December 31, 1980, and

"(B) which does not occur in a bankruptcy case or similar judicial proceeding (or in a proceeding under the Bankruptcy Act) [Title 11, Bankruptcy] commenced on or before December 31, 1980.

"(d) For section 5 (relating to miscellaneous corporate amendments).—

"(1) For subsection (a) (relating to exemption from personal holding company tax).—The amendments made by subsection (a) of section 5 [amending section 542 of this title] shall apply to any bankruptcy case or similar judicial proceeding commenced after December 31, 1980.

"(2) For subsection (b) (relating to repeal of special treatment for certain railroad redemptions).—The amendments made by sub-

section (b) of section 5 [amending section 302 of this title] shall apply to stock which is issued after December 31, 1980 (other than stock issued pursuant to a plan of reorganization approved on or before that date).

"(3) For subsection (c) (relating to application of 12-month liquidation rule).—The amendment made by subsection (c) of section 5 [amending section 337 of this title] shall apply to any bankruptcy case or similar judicial proceeding commenced after December 31, 1980.

"(4) For subsection (d) (relating to permitting bankruptcy estate to be subchapter S shareholder).—The amendment made by subsection (d) of section 5 [amending section 1371 of this title] shall apply to any bankruptcy case commenced on or after October 1, 1979.

"(5) For subsection (e) (relating to certain transfers to controlled corporations).—The amendments made by subsection (e) of section 5 [amending section 351 of this title] shall apply as provided in subsection (a) of this section.

"(6) For subsection (f) (relating to effect of debt discharge on earnings and profits).—The amendment made by subsection (f) of section 5 [amending section 312 of this title] shall apply as provided in subsection (a) of this section.

"(e) For section 6 (relating to changes in tax procedures).—The amendments made by section 6 [enacting sections 6658 and 7464 of this title, amending sections 128, 354, 422, 1023, 3302, 6012, 6036, 6155, 6161, 6212, 6213, 6216, 6326, 6404, 6503, 6512, 6532, 6871, 6872, 6873, 7508, and 7430 of this title, repealing section 1018 of this title and redesignating former section 7464 of this title as 7465] shall take effect on October 1, 1979, but shall not apply to any proceeding under the Bankruptcy Act [Title 11] commenced before October 1, 1979.

"(f) Election to substitute September 30, 1979, for December 31, 1980.—

"(1) In general.—The debtor (or debtors) in a bankruptcy case or similar judicial proceeding may (with the approval of the court) elect to apply subsections (a), (c), and (d) by substituting 'September 30, 1979' for 'December 31, 1980' each place it appears in such subsections.

"(2) Effect of election.—Any election made under paragraph (1) with respect to any proceeding shall apply to all parties to the proceeding.

"(3) Revocation only with consent.—Any election under this subsection may be revoked only with the consent of the Secretary of the Treasury or his delegate.

"(4) Time and manner of election.—Any election under this subsection shall be made at such time, and in such manner, as the Secretary of the Treasury or his delegate may be regulations prescribe.

"(g) Definitions.—For purposes of this section—

"(1) Bankruptcy case.—The term 'bankruptcy case' means any case under title 11 of the United States Code (as recodified by Public Law 95–598).

"(2) Similar judicial proceeding.—The term 'similar judicial proceeding' means a receivership, foreclosure, or similar proceeding in a Federal or State court (as modified by section 368(a)(3)(D) of the Internal Revenue Code of 1954) [section 368(a)(3)(D) of this title]."

1976 Acts. Amendment by § 1951(b)(2)(A) of Pub.L. 94–455 applicable with respect to taxable years beginning after Dec. 31, 1976, see § 1951(d) of Pub.L. 94–455, set out as a note under § 72 of this title.

1960 Acts. Section 1(b) of Pub.L. 86–496 provided that: "The amendment made by subsection (a) [amending subsec. (b) of this section] shall apply to taxable years ending after December 31, 1959, but only with respect to discharges occurring after such date."

**Repeals**

Section 59(b)(1) of Pub.L. 98–369, which is set out in the credit of this section and which had enacted subsec. (e)(10)(C) of this section to be effective as if such enactment had been included in the amendments made by section 806(e) and (f) of Pub.L. 94–455, was repealed by Pub.L. 99–514, Title VI, § 621(e), Oct. 22, 1986, 100 Stat. 2266. Such repealed subsec. (e)(10)(C) of this section had created an exception for

transfers in certain workouts of the satisfaction of indebtedness by corporation's stock. See Effective Date of 1986 Acts note set out under this section.

**Savings Provisions**

If any provision amended or repealed by sections 11801 to 11821 of Pub.L. 101–508 applied to (A) transactions occurring before Nov. 5, 1990, (B) property acquired before Nov. 5, 1990, or (C) any item of income, loss, deduction, or credit taken into account before Nov. 5, 1990, and the treatment of such transaction, property, or item under such provision would (without regard to the amendment made by sections 11801 to 11821 of Pub.L. 101–508) affect liability for tax periods ending after Nov. 5, 1990, nothing in such amendments to be construed to affect tax liability for tax periods ending after Nov. 5, 1990, see section 11821(b) of Pub.L. 101–508, set out as a note under section 29 of this title.

Section 1951(b)(2)(B) of Pub.L. 94–455 provided that: "If any discharge, cancellation, or modification of indebtedness of a railroad corporation occurs in a taxable year beginning after December 31, 1976, pursuant to an order of a court in a proceeding referred to in section 108(b)(A) or (B) which commenced before January 1, 1960, then, notwithstanding the amendments made by subparagraph (A) [repealing subsec. (b) of this section], the provisions of subsection (b) of section 108 shall be considered as not repealed with respect to such discharge, cancellation, or modification of indebtedness."

**Plan Amendments Not Required Until January 1, 1989**

For provisions directing that if any amendments made by section 1171(b)(4) of Pub.L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub.L. 99–514, set out as a note under section 401 of this title.

**Transition Rules**

For transition rules respecting amendments made by sections 1171 through 1176 of Pub.L. 99–514, see section 1177 of Pub.L. 99–514, set out as a note under section 38 of this title.

## § 109. Improvements by lessee on lessor's property

Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

(Aug. 16, 1954, c. 736, 68A Stat. 33.)

## § 110. Qualified lessee construction allowances for short-term leases

(a) In general.—Gross income of a lessee does not include any amount received in cash (or treated as a rent reduction) by a lessee from a lessor—

(1) under a short-term lease of retail space, and

(2) for the purpose of such lessee's constructing or improving qualified long-term real property for use in such lessee's trade or business at such retail space,

but only to the extent that such amount does not exceed the amount expended by the lessee for such construction or improvement.

ADD-10

# INTERNAL

# REVENUE CODE

1999

## Sections 1 to 1999

Including Legislation Enacted

In The

One Hundred Fifth Congress

Second Session

Volume 1



WEST GROUP

# CHAPTER 6—CONSOLIDATED RETURNS

Subchapter
A. Returns and payment of tax.
B. Related rules.

## SUBCHAPTER A—RETURNS AND PAYMENT OF TAX

Sec.
1501. Privilege to file consolidated returns.
1502. Regulations.

Sec.
1503. Computation and payment of tax.
1504. Definitions.
1505. Cross references.

## § 1501. Privilege to file consolidated returns

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

(Aug. 16, 1954, c. 736, 68A Stat. 367.)

## § 1502. Regulations

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

(Aug. 16, 1954, c. 736, 68A Stat. 367; Oct. 4, 1976, Pub.L. 94–455, Title XIX, § 1906(b)(13)(A), 90 Stat. 1834.)

### HISTORICAL AND STATUTORY NOTES

**Dual Resident Companies**

Pub.L. 100–647, Title VI, § 6126, Nov. 10, 1988, 102 Stat. 3713, provided that:

"(a) **General rule.**—In the case of a transaction which—

"(1) involves the transfer after the date of the enactment of this Act [Nov. 10, 1988] by a domestic corporation, with respect to which there is a qualified excess loss account, of its assets and liabilities to a foreign corporation in exchange for all of the stock of such foreign corporation, followed by the complete liquidation of the domestic corporation into the common parent, and

"(2) qualifies, pursuant to Revenue Ruling 87–27, as a reorganization which is described in section 368(a)(1)(F) of the 1986 Code [section 368(a)(1)(F) of this title],

then, solely for purposes of applying Treasury Regulation section 1.1502–19 to such qualified excess loss account, such foreign corporation shall be treated as a domestic corporation in determining whether such foreign corporation is a member of the affiliated group of the common parent.

"(b) **Treatment of income of new foreign corporation.**—

"(1) **In general.**—In any case to which subsection (a) applies, for purposes of the 1986 Code [Pub.L. 99–514]—

"(A) the source and character of any item of income of the foreign corporation referred to in subsection (a) shall be determined as if such foreign corporation were a domestic corporation,

"(B) the net amount of any such income shall be treated as subpart F income (without regard to section 952(c) of the 1986 Code [section 952(c) of this title] ), and

"(C) the amount in the qualified excess loss account referred to in subsection (a) shall—

"(i) be reduced by the net amount of any such income, and

"(ii) be increased by the amount of any such income distributed directly or indirectly to the common parent described in subsection (a).

"(2) **Limitation.**—Paragraph (1) shall apply to any item of income only to the extent that the net amount of such income does not exceed the amount in the qualified excess loss account after being reduced under paragraph (1)(C) for prior income.

"(3) **Basis adjustments not applicable.**—To the extent paragraph (1) applies to any item of income, there shall be no increase in basis under section 961(a) of such Code [section 961(a) of this title] on account of such income (and there shall be no reduction in basis under section 961(b) of such Code [section 961(b) of this title] on account of an exclusion attributable to the inclusion of such income).

"(4) **Recognition of gain.**—For purposes of paragraph (1), if the foreign corporation referred to in subsection (a) transfers any property acquired by such foreign corporation in the transaction referred to in subsection (a) (or transfers any other property the basis of which is determined in whole or in part by reference to the basis of property so acquired) and (but for this paragraph) there is not full recognition of gain on such transfer, the excess (if any) of—

"(A) the fair market value of the property transferred, over

"(B) its adjusted basis,

shall be treated as gain from the sale or exchange of such property and shall be recognized notwithstanding any other provision of law. Proper adjustment shall be made to the basis of any such property for gain recognized under the preceding sentence.

"(c) **Definitions.**—For purposes of this section—

**"(1) Common parent.**—The term 'common parent' means the common parent of the affiliated group which included the domestic corporation referred to in subsection (a)(1).

**"(2) Qualified excess loss account.**—The term 'qualified excess loss account' means any excess loss account (within the meaning of the consolidated return regulations) to the extent such account is attributable—

**"(A)** to taxable years beginning before January 1, 1988, and

**"(B)** to periods during which the domestic corporation was subject to an income tax of a foreign country on its income on a residence basis or without regard to whether such income is from sources in or outside of such foreign country.

The amount of such account shall be determined as of immediately after the transaction referred to in subsection (a) and without, except as provided in subsection (b), diminution for any future adjustment.

**"(3) Net amount.**—The net amount of any item of income is the amount of such income reduced by allocable deductions as determined under the rules of section 954(b)(5) of the 1986 Code [section 954(b)(5) of this title].

**"(4) Second same country corporation may be treated as domestic corporation in certain cases.**—If—

**"(A)** another foreign corporation acquires from the common parent stock of the foreign corporation referred to in subsection (a) after the transaction referred to in subsection (a),

**"(B)** both of such foreign corporations are subject to the income tax of the same foreign country on a residence basis, and

**"(C)** such common parent complies with such reporting requirements as the Secretary of the Treasury or his delegate may prescribe for purposes of this paragraph,

such other foreign corporation shall be treated as a domestic corporation in determining whether the foreign corporation referred to in subsection (a) is a member of the affiliated group referred to in subsection (a) (and the rules of subsection (b) shall apply (i) to any gain of such other foreign corporation on any disposition of such stock, and (ii) to any other income of such other foreign corporation except to the extent it establishes to the satisfaction of the Secretary of the Treasury or his delegate that such income is not attributable to property acquired from the foreign corporation referred to in subsection (a))."

**Special Rule For Disposition of Stock of Subsidiary**

Pub.L. 99–514, Title VI, § 647, Oct. 22, 1986, 100 Stat. 2294, provided that: "If for a taxable year of an affiliated group filing a consolidated return ending on or before December 31, 1987, there is a disposition of stock of a subsidiary (within the meaning of Treasury Regulation section 1.1502–19), the amount required to be included in income with respect to such disposition under Treasury Regulation section 1.1502–19(a) shall, notwithstanding such section, be included in income ratably over the 15-year period beginning with the taxable year in which the disposition occurs. The preceding sentence shall apply only if such subsidiary was incorporated on December 24, 1969, and is a participant in a mineral joint venture with a corporation organized under the laws of the foreign country in which the joint venture mineral project is located."

## § 1503. Computation and payment of tax

**(a) [General rule.]**[1]— In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 prescribed before the last day prescribed by law for the filing of such return.

**[(b) Repealed. Pub.L. 94–455, Title X, § 1052(c)(5), Oct. 4, 1976, 90 Stat. 1648]**

**(c) Special rule for application of certain losses against income of insurance companies taxed under section 801.—**

**(1) In general.**—If an election under section 1504(c)(2) is in effect for the taxable year and the consolidated taxable income of the members of the group not taxed under section 801 results in a consolidated net operating loss for such taxable year, then under regulations prescribed by the Secretary, the amount of such loss which cannot be absorbed in the applicable carryback periods against the taxable income of such members not taxed under section 801 shall be taken into account in determining the consolidated taxable income of the affiliated group for such taxable year to the extent of 35 percent of such loss or 35 percent of the taxable income of the members taxed under section 801, whichever is less. The unused portion of such loss shall be available as a carryover, subject to the same limitations (applicable to the sum of the loss for the carryover year and the loss (or losses) carried over to such year), in applicable carryover years.

**(2) Losses of recent nonlife affiliates.**—Notwithstanding the provisions of paragraph (1), a net operating loss for a taxable year of a member of the group not taxed under section 801 shall not be taken into account in determining the taxable income of a member taxed under section 801 (either for the taxable year or as a carryover or carryback) if such taxable year precedes the sixth taxable year such members have been members of the same affiliated group (determined without regard to section 1504(b)(2)).

**(d) Dual consolidated loss.—**

**(1) In general.**—The dual consolidated loss for any taxable year of any corporation shall not be allowed to reduce the taxable income of any other member of the affiliated group for the taxable year or any other taxable year.

**(2) Dual consolidated loss.**—For purposes of this section—

**(A) In general.**—Except as provided in subparagraph (B), the term "dual consolidated loss" means any net operating loss of a domestic corporation which is subject to an income tax of a foreign country on its income without regard to whether such income is from sources in or outside of such foreign country, or is subject to such a tax on a residence basis.

**(B) Special rule where loss not used under foreign law.**—To the extent provided in regulations, the term "dual consolidated loss" shall not include any loss which, under the foreign income tax law, does not offset the income of any foreign corporation.

# FEDERAL

# TAX REGULATIONS

# 1999

## IN FORCE JANUARY 1, 1999

## Kept To Date

*Through*

## U. S. Code Congressional and Administrative News

## Volume 4



**WEST** GROUP

§ 1.1502-11

§ 1.1502-10   [Reserved]

## Computation of Consolidated Taxable Income

§ 1.1502-11   Consolidated taxable income.

(a) In general. The consolidated taxable income for a consolidated return year shall be determined by taking into account:

(1) The separate taxable income of each member of the group (see § 1.1502-12 for the computation of separate taxable income);

(2) Any consolidated net operating loss deduction (see §§ 1.1502-21T (or 1.1502-21A, as appropriate) for the computation of the consolidated net operating loss deduction);

(3) Any consolidated capital gain net income (net capital gain for taxable years beginning before January 1, 1977) (see §§ 1.1502-22T (or 1.1502-22A, as appropriate) for the computation of the consolidated capital gain net income (net capital gain for taxable years beginning before January 1, 1977));

(4) Any consolidated section 1231 net loss (see §§ 1.1502-23T (or 1.1502-23A, as appropriate) for the computation of the consolidated section 1231 net loss);

(5) Any consolidated charitable contributions deduction (see § 1.1502-24 for the computation of the consolidated charitable contributions deduction);

(6) Any consolidated section 922 deduction (see § 1.1502-25 for the computation of the consolidated section 922 deduction);

(7) Any consolidated dividends received deduction (see § 1.1502-26 for the computation of the consolidated dividends received deduction); and

(8) Any consolidated section 247 deduction (see § 1.1502-27 for the computation of the consolidated section 247 deduction).

(b) Elimination of circular stock basis adjustments—(1) In general. If one member (P) disposes of the stock of another member (S), this paragraph (b) limits the use of S's deductions and losses in the year of disposition and the carryback of items to prior years. The purpose of the limitation is to prevent P's income or gain from the disposition of S's stock from increasing the absorption of S's deductions and losses, because the increased absorption would reduce P's basis (or increase its excess loss account) in S's stock

under § 1.1502-32 and, in turn, increase P's income or gain. See paragraph (b)(3) of this section for the application of these principles to P's deduction or loss from the disposition of S's stock, and paragraph (b)(4) of this section for the application of these principles to multiple stock dispositions. See § 1.1502-19(c) for the definition of disposition.

(2) Limitation on deductions and losses—(i) Determination of amount of limitation. If P disposes of one or more shares of S's stock, the extent to which S's deductions and losses for the tax year of the disposition (and its deductions and losses carried over from prior years) may offset income and gain is subject to limitation. The amount of S's deductions and losses that may offset income and gain is determined by tentatively computing taxable income (or loss) for the year of disposition (and any prior years to which the deductions or losses may be carried) without taking into account P's income and gain from the disposition.

(ii) Application of limitation. S's deductions and losses offset income and gain only to the extent of the amount determined under paragraph (b)(2)(i) of this section. To the extent S's deductions and losses in the year of disposition cannot offset income or gain because of the limitation under this paragraph (b), the items are carried to other years under the applicable provisions of the Internal Revenue Code and regulations as if they were the only items incurred by S in the year of disposition. For example, to the extent S incurs an operating loss in the year of disposition that is limited, the loss is treated as a separate net operating loss attributable to S arising in that year. The tentative computation does not affect the manner in which S's unlimited deductions and losses are absorbed or the manner in which deductions and losses of other members are absorbed. (If the amount of S's unlimited deductions and losses actually absorbed is less than the amount absorbed in the tentative computation, P's stock basis adjustments under § 1.1502-32 reflect only the amounts actually absorbed.)

(iii) Examples. For purposes of the examples in this paragraph (b), unless otherwise stated, P owns all of the only class of S's stock for the

entire year, S owns no stock of lower-tier members, the tax year of all persons is the calendar year, all persons use the accrual method of accounting, the facts set forth the only corporate activity, all transactions are between unrelated persons, and tax liabilities are disregarded. The principles of this paragraph (b)(2) are illustrated by the following examples.

**Example 1.** Limitation on losses with respect to stock gain. (a) P has a $500 basis in S's stock. For Year 1, P has ordinary income of $30 (determined without taking P's gain or loss from the disposition of S's stock into account) and S has an $80 ordinary loss. P sells S's stock for $520 at the close of Year 1.

(b) To determine the amount of the limitation on S's loss under paragraph (b)(2)(i) of this section, and the effect under § 1.1502–32(b) of the absorption of S's loss on P's basis in S's stock, P's gain or loss from the disposition of S's stock is not taken into account. The group is tentatively treated as having a consolidated net operating loss of $50 (P's $30 of income minus S's $80 loss). Thus, $50 of S's loss is limited under this paragraph (b).

(c) Because $30 of S's loss is absorbed in the determination of consolidated taxable income under paragraph (b)(2)(i) of this section, P's basis in S's stock is reduced under § 1.1502–32(b) from $500 to $470 immediately before the disposition. Consequently, P recognizes a $50 gain from the sale of S's stock and the group has consolidated taxable income of $50 for Year 1 (P's $30 of ordinary income and $50 gain from the sale of S's stock, less the $30 of S's loss). In addition, S's limited loss of $50 is treated as a separate net operating loss attributable to S and, because S ceases to be a member, the loss is apportioned to S under § 1.1502–21T (or § 1.1502–79A, as appropriate) and carried to its first separate return year.

**Example 2.** Carrybacks and carryovers. (a) For Year 1, the P group has consolidated taxable income of $30, and a consolidated net capital loss of $100 ($50 attributable to P and $50 to S). At the beginning of Year 2, P has a $300 basis in S's stock. For Year 2, P has ordinary income of $30, and a $20 capital gain (determined without taking the $100 consolidated net capital loss carryover or P's gain or loss from the disposition of S's stock into account), and S has a $100 ordinary loss. P sells S's stock for $280 at the close of Year 2.

(b) To determine the amount of the limitation under paragraph (b)(2)(i) of this section on S's losses, and the effect of the absorption of S's losses on P's basis in S's stock under § 1.1502–32(b), P's gain or loss from the disposition of S's stock is not taken into account. For Year 2, the P group is tentatively treated as having a $70 consolidated net operating loss (S's $100 ordinary loss, less P's $30 of ordinary income). The P group is also treated as having no consolidated net capital gain in Year 2, because P's $20 capital gain is reduced by $20 of the consolidated net capital loss carryover from Year 1 under section 1212(a) (the absorption of which is attributed equally to P and S). In addition, of the $70 consolidated net operating loss, $30 is carried back to Year 1 and offsets P's ordinary income in that year, and $40 is carried forward. Consequently, $40 of S's operating loss from Year 2, and $40 of the consolidated net capital loss carryover from Year 1 attributable to S, are limited under this paragraph (b).

(c) Under paragraph (b)(2)(ii) of this section, the limitation under this paragraph (b) does not affect the absorption of any deductions and losses attributable to P, $60 of S's operating loss from Year 2, and $10 of the consolidated net capital

loss from Year 1 attributable to S. Consequently, P's basis in S's stock is reduced under § 1.1502–32(b) by $70, from $300 to $230, and P recognizes a $50 gain from the sale of S's stock in Year 2. Thus, the P group is treated as having a $20 unlimited net operating loss that is carried back to Year 1:

Ordinary income:

| | |
|---|---:|
| P | $30 |
| S (excluding the $40 limited loss) | (60) |
| Sub Total | $(30) |
| Consolidated net capital gain: | |
| P ($20 + $50 from S stock − $50 from Year 1) | $20 |
| S (− $10 from Year 1) | (10) |
| Sub Total | $10 |
| Consolidated taxable income | $(20) |

(d) Under paragraph (b)(2)(ii) of this section, S's $40 ordinary loss from Year 2 that is limited under this paragraph (b) is treated as a separate net operating loss arising in Year 2. Similarly, $40 of the consolidated net capital loss from Year 1 attributable to S is treated as a separate net capital loss carried over from Year 1. Because S ceases to be a member, the $40 net operating loss from Year 2 and the $40 consolidated net capital loss from Year 1 are allocated to S under §§ 1.1502–21T and 1.1502–22T, respectively (or § 1.1502–79A, as appropriate) and are carried to S's first separate return year.

**Example 3.** Allocation of basis adjustments. (a) For Year 1, the P group has consolidated taxable income of $100. At the beginning of Year 2, P has a $40 basis in each of the 10 shares of S's stock. For Year 2, P has an $80 ordinary loss (determined without taking into account P's gain or loss from the disposition of S's stock) and S has an $80 ordinary loss. P sells 2 shares of S's stock for $85 each at the close of Year 2.

(b) Under paragraph (b)(2)(i) of this section, the amount of the limitation on S's loss is determined by tentatively treating the P group as having a $160 consolidated net operating loss for Year 2. Of this amount, $100 is carried back under section 172 and absorbed in Year 1 ($50 attributable to S and $50 attributable to P). Consequently, $30 of S's loss is limited under this paragraph (b).

(c) Under paragraph (b)(2)(ii) of this section, the limitation under this paragraph (b) does not affect the absorption of P's $80 ordinary loss or $50 of S's ordinary loss. Consequently, P's basis in each share of S's stock is reduced from $40 to $35 under § 1.1502–32(b), and P recognizes a $100 gain from the sale of the 2 shares. Thus, the P group is treated as having a $30 unlimited net operating loss:

Ordinary loss:

| | |
|---|---:|
| P | $(80) |
| S (excluding the $30 limited loss) | (50) |
| Sub Total | $(130) |
| Consolidated net capital gain: | |
| P | $100 |
| S | 0 |
| Sub Total | $100 |
| Unlimited consolidated net operating loss | $(30) |

(d) A portion of the $130 of unlimited operating losses for Year 2 is fully absorbed in that year, and a portion is carried back to Year 1. Thus, $61.50 of P's $80 loss ($100 multiplied by $80/$130) and $38.50 of S's $50 unlimited loss ($100 multiplied by $50/$130) are absorbed in Year 2. P's remaining $18.50 of loss and S's remaining $11.50 of loss are not subject to limitation and are carried back and absorbed in Year 1.

(e) Under paragraph (b)(2)(ii) of this section, S's $30 of loss limited under this paragraph (b) is treated as a separate net operating loss.

(3) **Loss dispositions—(i) General rule.** The principles of paragraph (b)(2) of this section apply to the extent necessary to carry out the purposes of paragraph (b)(1) of this section if P recognizes a deduction or loss from the disposition of S's stock.

(ii) **Example.** The principles of this paragraph (b)(3) are illustrated by the following example.

**Example.** (a) P has a $400 basis in S's stock. For Year 1, P has a capital gain of $100 (determined without taking P's gain or loss from the disposition of S's stock into account) and S has both a $60 capital loss and a $200 ordinary loss. P sells S's stock for $140 at the close of Year 1.

(b) Under paragraph (b)(3) of this section, the amount of S's ordinary and capital losses that may offset income and gain is determined by tentatively computing the group's consolidated net operating loss and consolidated net capital loss without taking into account P's loss from the disposition of S's stock. The limitation is necessary to prevent P's loss from the disposition of S's stock from affecting the absorption of S's losses and thereby the adjustments to P's basis in S's stock under § 1.1502–32(b) (which would, in turn, affect P's loss).

(c) Under the principles of paragraph (b)(2)(i) of this section, the amount of the limitation on S's loss is determined by tentatively treating the P group as having a $40 consolidated net capital gain and a $20 ordinary loss, which results in a $160 consolidated net operating loss for Year 1, all of which is attributable to S. Thus, $160 of S's ordinary loss is limited under this paragraph (b). See also § 1.1502–20 for rules applicable to losses from the sale of stock of subsidiaries.

(4) **Multiple dispositions—(i) Stock of a member.** To the extent income, gain, deduction, or loss from a prior disposition of S's stock is deferred under any rule of law, the limitation under paragraph (b)(2) of this section is determined by treating the year the deferred amount is taken into account as the year of the disposition.

(ii) **Stock of different members.** If S is a higher-tier corporation with respect to another member (T), and all of T's items of income, gain, deduction, and loss (including the absorption of T's deduction or loss) would be fully reflected in P's basis in S's stock under § 1.1502–32, the limitation under paragraph (b)(2)(i) of this section with respect to T's deductions and losses is determined without taking into account any income, gain, deduction, or loss from the disposition of the stock of S or T (or of the stock of members owned in the chain connecting S and T). However, this paragraph (b) does not otherwise limit the absorption of one member's deduction or loss with respect to the disposition of another member's stock.

(iii) **Examples.** The principles of this paragraph (b)(4) are illustrated by the following examples.

§ 1.1502–11

**Example 1.** Chain of subsidiaries. (a) P owns all of S's stock with a $500 basis, and S owns all of T's stock with a $500 basis. For Year 1, P has ordinary income of $30, S has no income or loss, and T has an $80 ordinary loss. P sells S's stock for $520 at the close of Year 1.

(b) Under paragraph (b)(4) of this section, to determine the amount of the limitation under paragraph (b) of this section on T's loss, and the effect of the absorption of T's loss on P's basis in S's stock under § 1.1502–32(b), P's gain or loss from the disposition of S's stock is not taken into account. The group is tentatively treated as having a consolidated net operating loss of $50 (P's $30 of income minus T's $80 loss). Because only $30 of T's loss offsets income and gain, P's basis in S's stock is reduced under § 1.1502–32(b) from $500 to $470 immediately before the disposition of S's stock. Thus, P takes into account a $50 gain from the sale of S's stock.

(c) The facts are the same as in paragraph (a) of this Example 1, except that S has a $10 excess loss account in T's stock (rather than a $500 basis). Under paragraph (b)(4) of this section, neither P's gain or loss from the disposition of S's stock nor S's gain or loss from the disposition of T's stock (under § 1.1502–19) are taken into account for purposes of the tentative computations and the effect of any absorption under § 1.1502–32(b) on P's basis in S's stock and S's excess loss account in T's stock. The group is tentatively treated as having a consolidated net operating loss of $50 (P's $30 of income minus T's $80 loss), and only $30 of T's loss may offset the group's income or gain. Under § 1.1502–32(b), the absorption of $30 of T's loss increases S's excess loss account in T's stock to $40, and under § 1.1502–19, the excess loss account is taken into account. Moreover, under § 1.1502–32(b), P's basis in S's stock is increased immediately before the sale by $10 (S's $40 gain under § 1.1502–19(b) minus T's $30 loss absorbed and tiered up under § 1.1502–32(b)), from $500 to $510. Thus, P takes into account a $10 gain from the sale of S's stock, and S takes into account a $40 gain from its excess loss account in T's stock.

**Example 2.** Brother-sister subsidiaries. (a) P owns all of the stock of S1 and S2, each with a $50 basis. For Year 1, the group has a $100 consolidated net operating loss ($50 of which is attributable to S1, and $50 to S2) determined without taking gain or loss from the disposition of member stock into account. At the close of Year 1, P sells the stock of S1 and S2 for $100 each.

(b) Paragraph (b)(4) of this section does not limit the loss of S1 or S2 with respect to the disposition of stock of the other. Consequently, each subsidiary's loss may offset P's gain from the disposition of the stock of the other subsidiary. Because this absorption results in a $50 reduction in P's basis in the stock of each subsidiary under § 1.1502–32(b), P's aggregate gain from the stock dispositions is increased from $100 to $200, $100 of which is offset by the losses of the subsidiaries.

(5) **Effective date.** This paragraph (b) applies to stock dispositions occurring in consolidated return years beginning on or after January 1, 1995. For prior years, see § 1.1502–11(b) as contained in the 26 CFR part 1 edition revised as of April 1, 1994.

(c) **Disallowance of loss attributable to pre–1966 distributions.** No loss shall be allowed

upon the sale or other disposition of stock, bonds, or other obligations of a member or former member to the extent that such loss is attributable to a distribution made in an affiliated year beginning before January 1, 1966, out of earnings and profits accumulated before the distributing corporation became a member.

[T.D. 6500, 25 FR 12085, Nov. 26, 1960, as amended by T.D. 6894, 31 FR 11800, Sept. 8, 1966; T.D. 7246, 38 FR 759, Jan. 4, 1973; T.D. 7728, 45 FR 72650, Nov. 3, 1980; T.D. 8560, 59 FR 41675, Aug. 15, 1994; T.D. 8677, 61 FR 33323, 33326, June 27, 1996; T.D. 8560, 62 FR 12097, March 14, 1997]

## Computation of Separate Taxable Income

### § 1.1502–12   Separate taxable income.

The separate taxable income of a member (including a case in which deductions exceed gross income) is computed in accordance with the provisions of the Code covering the determination of taxable income of separate corporations, subject to the following modifications:

(a) Transactions between members and transactions with respect to stock, bonds, or other obligations of members shall be reflected according to the provisions of § 1.1502–13;

(b) Any deduction which is disallowed under §§ 1.1502–15A or 1.1502–15T shall be taken into account as provided in those sections;

(c) The limitation on deductions provided in section 615(c) or section 617(h) shall be taken into account as provided in § 1.1502–16;

(d) The method of accounting under which such computation is made and the adjustments to be made because of any change in method of accounting shall be determined under § 1.1502–17;

(e) Inventory adjustments shall be made as provided in § 1.1502–18;

(f) Any amount included in income under § 1.1502–19 shall be taken into account;

(g) In the computation of the deduction under section 167, property shall not lose its character as new property as a result of a transfer from one member to another member during a consolidated return year if:

(1) The transfer occurs on or before January 4, 1973, or

(2) The transfer occurs after January 4, 1973, and the transfer is an intercompany transaction as defined in § 1.1502–13 or the basis of the property in the hands of the transferee is determined (in whole or in part) by reference to its basis in the hands of the transferor;

(h) No net operating loss deduction shall be taken into account;

(i) [Reserved]

(j) No capital gains or losses shall be taken into account;

(k) No gains and losses subject to section 1231 shall be taken into account;

(l) No deduction under section 170 with respect to charitable contributions shall be taken into account;

(m) No deduction under section 922 (relating to the deduction for Western Hemisphere trade corporations) shall be taken into account;

(n) No deductions under section 243(a)(1), 244(a), 245, or 247 (relating to deductions with respect to dividends received and dividends paid) shall be taken into account;

(o) Basis shall be determined under §§ 1.1502–31 and 1.1502–32, and earnings and profits shall be determined under § 1.1502–33; and

(p) The limitation on deductions provided in section 613A shall be taken into account for each member's oil and gas properties as provided in § 1.1502–44.

(q) A thrift institution's deduction under section 593(b)(2) (relating to the addition to the reserve for bad debts of a thrift institution under the percentage of taxable income method) shall be determined under § 1.1502–42.

(r) For rules relating to loss disallowance or basis reduction on the disposition or deconsolidation of stock of a subsidiary, see §§ 1.337(d)–1, 1.337(d)–2 and § 1.1502–20.

[T.D. 6500, 25 FR 12088, Nov. 26, 1960, as amended by T.D. 6894, 31 FR 11794, Sept. 8, 1966; T.D. 7191, 37 FR 12949, June 30, 1972; T.D. 7246, 38 FR 760, Jan. 4, 1973; T.D. 7725, 45 FR 65561, Oct. 3, 1980; T.D. 7876, 48 FR 11258, March 17, 1983; T.D. 8294, 55 FR 9434, March 14, 1990; T.D. 8319, 55 FR 49038, Nov. 26, 1990; T.D. 8364, 56 FR 47401, Sept. 19, 1991; T.D. 8597, 60 FR 36679, July 18, 1995; T.D. 8677, 61 FR 33323, June 27, 1996]

ADD-18

# FEDERAL

# TAX REGULATIONS

## 1999

### IN FORCE JANUARY 1, 1999

### Kept To Date

*Through*

### U. S. Code Congressional and Administrative News

## Volume 4

 **WEST** GROUP

§ 1.1502–18                    INCOME TAX—CONSOLIDATED RETURNS                    1092

which they purchased from P during the year on which P derived profits of $85,000 and $105,000, respectively.

(ii) The opening inventories of S and T for 1966, the first year to which this section applies, are increased by $40,000 and $80,000, respectively, pursuant to the provisions of subparagraph (2)(i) of this paragraph. P will take into account (as provided in paragraphs (b) and (c) of this section) an initial inventory amount of $120,000 as of the beginning of 1966, the net amount by which the inventories of S and T were increased in such year. Since the increases in the inventories of S and T are the maximum allowable under paragraph (c) of § 1.1502–39A (as contained in the 26 CFR edition revised as of April 1, 1996) (*i.e.*, the amount by which such inventories were originally decreased), no further adjustments will be made pursuant to subparagraph (2)(ii) of this paragraph to such inventories in the event that separate returns are subsequently filed.

(5) **Election not to eliminate.** If a group filed a consolidated return for the taxable year immediately preceding the first taxable year to which this section applies, and for such preceding year the members of the group did not eliminate gain or loss on intercompany inventory transactions pursuant to the adoption under § 1.1502–31A(b)(1) (as contained in the 26 CFR edition revised as of April 1, 1996) of a consistent accounting practice taking into account such gain or loss, then for purposes of this section each member shall be treated as if it had filed a separate return for such immediately preceding year.

(g) **Transitional rules for years beginning on or after July 12, 1995.** Paragraphs (a) through (f) of this section do not apply for taxable years beginning on or after July 12, 1995. Any remaining unrecovered inventory amount of a member under paragraph (c) of this section is recovered in the first taxable year beginning on or after July 12, 1995, under the principles of paragraph (c)(3) of this section by treating the first taxable year as the first separate return year of the member. The unrecovered inventory amount can be recovered only to the extent it was previously included in taxable income. The principles of this section apply, with appropriate adjustments, to comparable amounts under paragraph (f) of this section. [T.D. 6500, 25 FR 12088, Nov. 26, 1960, as amended by T.D. 6894, 31 FR 11794, Sept. 8, 1966; T.D. 7246, 38 FR 762, Jan. 4, 1973; T.D. 8597, 60 FR 36709, July 18, 1995; T.D. 8677, 61 FR 33323, June 27, 1996]

## § 1.1502–19  Excess loss accounts.

(a) **In general—(1) Purpose.** This section provides rules for a member (P) to include in income its excess loss account in the stock of another member (S). The purpose of the excess loss account is to recapture consolidated taxable income P's negative adjustments with respect to S's stock (e.g., under § 1.1502–32 from S's deductions, losses, and distributions), to the extent the negative adjustments exceed P's basis in the stock.

(2) **Excess loss accounts—(i) In general.** P's basis in S's stock is adjusted under the consolidated return regulations and other rules of law. Negative adjustments may exceed P's basis in S's stock. The resulting negative amount is P's excess loss account in S's stock. For example:

(A) Once P's negative adjustments under § 1.1502–32 exceed its basis in S's stock, the excess is P's excess loss account in the S stock. If P has further adjustments, they first increase or decrease the excess loss account.

(B) If P forms S by transferring property subject to liabilities in excess of basis, § 1.1502–80(d) provides for the nonapplicability of section 357(c) and the resulting negative basis under section 358 is P's excess loss account in the S stock.

(ii) **Treatment as negative basis.** P's excess loss account is treated for all Federal income tax purposes as basis that is a negative amount, and a reference to P's basis in S's stock includes a reference to P's excess loss account.

(3) **Application of other rules of law.** The rules of this section are in addition to other rules of law. See, e.g., §§ 1.1502–32 (investment adjustment rules establishing and adjusting excess loss accounts) and 1.1502–80(d) (nonapplicability of section 357(c)). The provisions of this section and other rules of law must not be applied to recapture the same amount more than once. For purposes of this section, the definitions in § 1.1502–32 apply.

(b) **Excess loss account taken into account as income or gain—(1) General rule.** If P is treated under this section as disposing of a share of S's stock, P takes into account its excess loss account in the share as income or gain from the disposition. Except as provided in paragraph (b)(4) of this section, the disposition is treated as a sale or exchange for purposes of determining the character of the income or gain.

(2) **Nonrecognition or deferral—(i) In general.** P's income or gain under paragraph (b)(1) of this section is subject to any nonrecognition or deferral rules applicable to the disposition. For example, if S liquidates and the exchange of P's stock in S is subject to section 332, or P transfers all of its assets (including S's stock) to S in a reorganization to which section 361(a) applies, P's income or gain from the excess loss account is not recognized under these rules.

(ii) **Nonrecognition or deferral inapplicable.** If P's income or gain under paragraph (b)(1) of this section is from a disposition described in paragraph (c)(1)(ii) or (iii) of this section (relating to deconsolidations and worthlessness), the income or gain is taken into account notwithstanding any nonrecognition or deferral rules (even if the disposition is also described in paragraph (c)(1)(i) of this section). For example, if P transfers S's stock to a nonmember in a transaction to which section 351 applies, P's income or gain from the excess loss account is taken into account.

(3) **Tiering up in chains.** If the stock of more than one subsidiary is disposed of in the same transaction, the income or gain under this section is taken into account in the order of the tiers, from the lowest to the highest.

(4) **Insolvency—(i) In general.** Gain under this section is treated as ordinary income to the extent of the amount by which S is insolvent (within the meaning of section 108(d)(3)) immediately before the disposition. For this purpose S's liabilities include any amount to which preferred stock would be entitled if S were liquidated immediately before the disposition, and any former liabilities that were discharged to the extent the discharge was treated as tax-exempt income under § 1.1502–32(b)(3)(ii)(C) (special rule for discharges).

(ii) **Reduction for amount of distributions.** The amount treated as ordinary income under this paragraph (b)(4) is reduced to the extent it exceeds the amount of P's excess loss account redetermined without taking into account S's distributions to P to which § 1.1502–32(b)(2)(iv) applies.

(c) **Disposition of stock.** For purposes of this section:

(1) **In general.** P is treated as disposing of a share of S's stock:

(i) **Transfer, cancellation, etc.** At the time—

(A) P transfers or otherwise ceases to own the share for Federal income tax purposes, even if no gain or loss is taken into account; or

(B) P takes into account gain or loss (in whole or in part) with respect to the share.

(ii) **Deconsolidation.** At the time—

(A) P becomes a nonmember, or a nonmember determines its basis in the share (or any other asset) by reference to P's basis in the share, directly or indirectly, in whole or in part (e.g., under section 362); or

(B) S becomes a nonmember, or P's basis in the share is reflected, directly or indirectly, in whole or in part, in the basis of any asset other than member stock (e.g., under section 1071).

(iii) **Worthlessness.** At the time—

(A) Substantially all of S's assets are treated as disposed of, abandoned, or destroyed for Federal income tax purposes (e.g., under section 165(a) or § 1.1502–80(c), or, if S's asset is stock of a lower-tier member, the stock is treated as disposed of under this paragraph (c)). An asset of S is not considered to be disposed of or abandoned to the extent the disposition is in complete liquidation of S or is in exchange for consideration (other than relief from indebtedness);

(B) An indebtedness of S is discharged, if any part of the amount discharged is not included in gross income and is not treated as tax-exempt income under § 1.1502–32(b)(3)(ii)(C); or

(C) A member takes into account a deduction or loss for the uncollectibility of an indebtedness of S, and the deduction or loss is not matched in the same tax year by S's taking into account a corresponding amount of income or gain from the indebtedness in determining consolidated taxable income.

(2) **Becoming a nonmember.** A member is treated as becoming a nonmember if it has a separate return year (including another group's consolidated return year). For example, S may become a nonmember if it issues additional stock to nonmembers, but S does not become a nonmember as a result of its complete liquidation. A disposition under paragraph (c)(1)(ii) of this section must be taken into account in the consolidated return of the group. For example, if a group ceases under § 1.1502–75(c) to file a consolidated return as of the close of its consolidated return year, the disposition under paragraph (c)(1)(ii) of this section is treated as occurring immediately before the close of the year. If S becomes a nonmember because P sells S's stock to a nonmember, P's sale is a disposition under both paragraphs (c)(1)(i) and (ii) of this section. If a group terminates under § 1.1502–75(d) because the common parent is the only remaining member, the common parent is not treated as having a deconsolidation event under paragraph (c)(1)(ii) of this section.

(3) **Exception for acquisition of group—(i) Application.** This paragraph (c)(3) applies only if a consolidated group (the terminating group) ceases to exist as a result of—

(A) The acquisition by a member of another consolidated group of either the assets of the terminating group or the stock of the common parent of the terminating group in a reorganization described in section 381(a)(2), or the stock of the common parent of the terminating group; or

(B) The application of the principles of § 1.1502–75(d)(2) or (d)(3).

(ii) **General rule.** Paragraph (c)(1)(ii) of this section does not apply solely by reason of the termination of a group in a transaction to which this paragraph (c)(3) applies, if there is a surviving group that is, immediately thereafter, a consolidated group. Instead, the surviving group is treated as the terminating group for purposes of applying this section to the terminating group. This treatment does not apply, however, to members of the terminating group that are not members of the surviving group immediately after the terminating group ceases to exist (e.g., under section 1504(a)(3) relating to reconsolidation, or section 1504(c) relating to includible insurance companies).

(d) **Special allocation of basis adjustments or determinations.** If a member has an excess loss account in shares of a class of S's stock at the time of a basis adjustment or determination under the Internal Revenue Code with respect to other shares of the same class of S's stock owned by the member, the adjustment or determination is allocated first to equalize and eliminate that member's excess loss account. For example, if P owns 50 shares of S's only class of stock with a $100 basis and 50 shares with a $100 excess loss account, and P contributes $200 to S without receiving additional shares, the contribution first eliminates P's excess loss account, then increases P's basis in each share by $1. (If P transfers the $200 in exchange for an additional 100 shares of S's stock in a transaction to which section 351 applies, P's excess loss account is first eliminated, and P's basis in the additional shares is $100.) See § 1.1502–32(c) for similar allocations of investment adjustments to prevent or eliminate excess loss accounts.

(e) **Anti-avoidance rule.** If any person acts with a principal purpose contrary to the purposes of this section, to avoid the effect of the rules of this section or apply the rules of this section to avoid the effect of any other provision of the consolidated return regulations, adjustments must be made as necessary to carry out the purposes of this section.

(f) **Predecessors and successors.** For purposes of this section, any reference to a corpora-

tion (or to a share of the corporation's stock) includes a reference to a successor or predecessor (or to a share of stock of a predecessor or successor), as the context may require.

(g) **Examples.** For purposes of the examples in this section, unless otherwise stated, P owns all 100 shares of the only class of S's stock and S owns all 100 shares of the only class of T's stock, the stock is owned for the entire year, T owns no stock of lower-tier members, the tax year of all persons is the calendar year, all persons use the accrual method of accounting, the facts set forth the only corporate activity, all transactions are between unrelated persons, and tax liabilities are disregarded. The principles of this section are illustrated by the following examples.

*Example 1.* Taxable disposition of stock. (a) Facts. P has a $150 basis in S's stock, and S has a $100 basis in T's stock. For Year 1, P has $500 of ordinary income, S has no income or loss, and T has a $200 ordinary loss. S sells T's stock to a nonmember for $60 at the close of Year 1.

(b) Analysis. Under paragraph (c) of this section, the sale is a disposition of T's stock at the close of Year 1 (the day of the sale). Under § 1.1502–32(b), T's loss results in S having a $100 excess loss account in T's stock immediately before the sale. Under paragraph (b)(1) of this section, S takes into account the $100 excess loss account as an additional $100 of gain from the sale. Consequently, S takes into account a $160 gain from the sale in determining the group's consolidated taxable income. Under § 1.1502–32(b), T's $200 loss and S's $160 gain result in a net $40 decrease in P's basis in S's stock as of the close of Year 1, from $150 to $110.

(c) Intercompany sale followed by sale to nonmember. The facts are the same as in paragraph (a) of this Example 1, except that S sells T's stock to P for $60 at the close of Year 1, and P sells T's stock to a nonmember at a gain at the beginning of Year 5. Under paragraph (c) of this section, S's sale is treated as a disposition of T's stock at the close of Year 1 (the day of the sale). Under § 1.1502–13 and paragraph (b)(2) of this section, S's $160 gain from the sale is deferred and taken into account in Year 5 as a result of P's sale of the T stock. Under § 1.1502–32(b), the absorption of T's $200 loss in Year 1 results in P having a $50 excess loss account in S's stock at the close of Year 1. In Year 5, S's $160 gain taken into account eliminates P's excess loss account in S's stock and increases P's basis in the stock to $110.

(d) Intercompany distribution followed by sale to nonmember. The facts are the same as in paragraph (a) of this Example 1, except that the value of the T stock is $60 and S declares and distributes a dividend of all of the T stock to P at the close of Year 1, and P sells the T stock to a nonmember at a gain at the beginning of Year 5. Under paragraph (c) of this section, S's distribution is treated as a disposition of T's stock at the close of Year 1 (the day of the distribution). S's $100 excess loss account in T's stock is treated as additional gain under section 311(b) from the distribution. Under section 301(d), P's basis in the T stock is $60. Under § 1.1502–13, and paragraph (b)(2) of this section, S's $160 gain from the distribution is deferred and taken into account in Year 5 as a result of P's sale of the T stock. Under § 1.1502–32(b), S's $200 loss and S's $60 distribution result in P having a $110 excess loss account in S's stock at the close of Year 1. In Year 5, S's $160 gain taken into account elimi-

ADD-22

nates P's excess loss account in S's stock and increases P's basis in the stock to S50.

**Example 2.** Basis determinations under the Internal Revenue Code in intercompany reorganizations. (a) Facts. P owns all of the stock of S and T. P has a $150 basis in S's stock and a $100 excess loss account in T's stock. P transfers T's stock to S without receiving additional S stock, in a transaction to which section 351 applies.

(b) Analysis. Under paragraph (c) of this section, P's transfer is treated as a disposition of T's stock. Under section 351 and paragraph (b)(2) of this section, P does not recognize gain from the disposition. Under section 358 and paragraph (a)(2)(ii) of this section, P's $100 excess loss account in T's stock decreases P's $150 basis in S's stock to $50. In addition, S takes a $100 excess loss account in T's stock under section 362. (If P had received additional S stock, paragraph (d) of this section would not apply to shift basis from P's original S stock because the basis of the original stock is not adjusted or determined as a result of the contribution; but paragraph (d) would apply to shift basis if P had transferred S's stock to T in exchange for additional T stock, because the basis of the additional T stock would be determined when P has an excess loss account in its original T stock.)

(c) Intercompany merger. The facts are the same as in paragraph (a) of this Example 2, except that T merges into S in a reorganization described in section 368(a)(1)(A) (and in section 368(a)(1)(D)), and P receives no additional S stock in the reorganization. Under section 354 and paragraph (b)(2) of this section, P does not recognize gain. Under section 358 and paragraph (a)(2)(ii) of this section, P's $100 excess loss account in T's stock decreases P's $150 basis in the S stock to $50. (Similarly, if S merges into T and P does not receive additional T stock, P's $150 basis in S's stock eliminates P's excess loss account in T's stock, and increases P's basis in T's stock to $50.)

(d) Liquidation of only subsidiary. Assume instead that P and S are the only members of the P group, P has a $100 excess loss account in S's stock, and S liquidates in a transaction to which section 332 applies. Under paragraph (c)(2) of this section, the liquidation is not a deconsolidation event under paragraph (c)(1)(ii) of this section merely because P is the only remaining member. Under section 332 and paragraph (b)(2) of this section, P does not recognize gain. Under section 334(b), P succeeds to S's basis in the assets it receives from S in the liquidation. (P would also not recognize gain if P transferred all of its assets (including S's stock) to S in a reorganization to which section 361(a) applied, because S would be a successor to P under paragraph (f) of this section.)

**Example 3.** Section 355 distribution of stock with an excess loss account. (a) Facts. P has a $30 excess loss account in S's stock, and S has a $90 excess loss account in T's stock. S distributes the T stock to P in a transaction to which section 355 applies, and neither P nor S recognizes any gain or loss. At the time of the distribution, the T stock represents 33% of the value of the S stock. Following the distribution, P's basis in the S stock is allocated under § 1.358–2 in proportion to the fair market values of the S stock and the T stock.

(b) Analysis. Under paragraph (c) of this section, S's distribution of the T stock is treated as a disposition. Under section 355(c) and paragraph (b)(2) of this section, S does not recognize any gain from the distribution. Under section 358, S's excess loss account in the T stock is eliminated, and P's $30 excess loss account in the S stock is treated as basis allocated between the S stock and the T stock based on their relative values. Consequently, P has a $20 excess loss account in the S stock and a $10 excess loss account in the T stock.

(If P had a $30 basis rather than a $30 excess loss account in the S stock, S would not recognize gain, its excess loss account in the T stock would be eliminated, and P's basis in the stock of S and T would be $20 and $10, respectively.)

(c) Section 355 distribution to nonmember. The facts are the same as in paragraph (a) of this Example 3, except that P also distributes the T stock to its shareholders in a transaction to which section 355 applies. Under paragraph (c) of this section, P's distribution is treated as a disposition of T's stock. Under paragraph (b)(2) of this section, because P's disposition is described in paragraph (c)(1)(ii) of this section, P's $10 excess loss account in the T stock must be taken into account at the time of the distribution, notwithstanding the nonrecognition rules of section 355(c).

**Example 4.** Deconsolidation of a member. (a) Facts. P has a $50 excess loss account in S's stock, and S has a $100 excess loss account in T's stock. T issues additional stock to a nonmember and, as a consequence, T becomes a nonmember.

(b) Analysis. Under paragraph (c)(2) of this section, S is treated as disposing of each of its shares of T's stock immediately before T becomes a nonmember. Under paragraph (b)(1) of this section, S takes into account its $100 excess loss account as gain from the sale or exchange of T's stock. Under § 1.1502–32(b) of this section, S's $100 gain eliminates P's excess loss account in S's stock and increases P's basis in S's stock to $50.

(c) Deconsolidation of a higher-tier member. The facts are the same as in paragraph (a) of this Example 4, except that S (rather than T) issues the stock and, as a consequence, both S and T become nonmembers. Under paragraph (c)(2) of this section, P is treated as disposing of S's stock and S is treated as disposing of T's stock immediately before S and T become nonmembers. Under § 1.1502–32(b) and paragraph (b)(3) of this section, because S and T become nonmembers in the same transaction and T is the lower-tier member, S is first treated under paragraph (b)(1) of this section as taking into account its $100 excess loss account as gain from the sale or exchange of T's stock. Under § 1.1502–32(b), S's $100 gain eliminates P's excess loss account in S's stock and increases P's basis in S's stock to $50 immediately before S becomes a nonmember. Thus, only S's $100 gain is taken into account in the determination of the group's consolidated taxable income.

(d) Intercompany gain and deconsolidation. The facts are the same as in paragraph (c) of this Example 4, except that T has $30 of gain that is deferred under § 1.1502–13 and taken into account in determining consolidated taxable income immediately before T becomes a nonmember. Under § 1.1502–32(b), T's $30 gain decreases S's excess loss account in T's stock from $100 to $70 immediately before S is treated as disposing of T's stock. Under paragraph (b)(1) of this section, S is treated as taking into account its $70 excess loss account as gain from the disposition of T's stock. Under § 1.1502–32(b), S's $70 gain from the excess loss account and T's $30 deferred gain that is taken into account eliminate P's $50 excess loss account in S's stock and increase P's basis in S's stock to $50 immediately before S becomes a nonmember.

**Example 5.** Worthlessness. (a) Facts. P forms S with a $150 contribution, and S borrows $150. For Year 1, S has a $50 ordinary loss that is carried over as part of the group's consolidated net operating loss. For Year 2, P has $160 of ordinary income, and S has a $160 ordinary loss. Under § 1.1502–32(b), S's loss results in P having a $10 excess loss account in S's stock. During Year 3, the value of S's assets (without taking S's liabilities into account) continues to decline and S's stock becomes worthless within the meaning of

§ 1.1502–19 INCOME TAX—CONSOLIDATED RETURNS 1096

section 165(g) (without taking into account § 1.1502–80(c)). For Year 4, S has $10 of ordinary income.

(b) *Analysis.* Under paragraph (c)(1)(iii)(A) of this section, P is not treated as disposing of S's stock in Year 3 solely because S's stock becomes worthless within the meaning of section 165(g) (taking S's liabilities into account). In addition, because S's stock is not treated as worthless, section 382(g)(4)(D) does not prevent the Year 1 consolidated net operating loss carryover from offsetting S's $10 of income in Year 4.

(c) *Discharge of indebtedness.* The facts are the same as in paragraph (a) of this Example 5, except that, instead of S's stock becoming worthless within the meaning of section 165(g), S's creditor discharges $40 of S's indebtedness during Year 3, S is insolvent by more than $40 before the discharge, the discharge is excluded from the P group's gross income under section 108(a), and $40 of the $50 consolidated net operating loss carryover attributable to S is eliminated under section 108(b). Under § 1.1502–32(b)(3)(ii)(C), S's $40 of discharge income is treated as tax-exempt income because there is a corresponding decrease under § 1.1502–32(b)(3)(iii) for elimination of the loss carryover. Under paragraph (c)(1)(iii)(B) of this section, P is treated as disposing of S's stock if the amount discharged is not included in gross income and is not treated as tax-exempt income under § 1.1502–32(b)(3)(ii)(C). Because the discharge is treated as tax-exempt income, P is not treated as disposing of S's stock by reason of the discharge.

*Example 6. Avoiding worthlessness.* (a) *Facts.* P forms S with a $100 contribution and S borrows $150. For Years 1 through 5, S has a $210 ordinary loss that is absorbed by the group. Under § 1.1502–32(b), S's loss results in P having a $110 excess loss account in S's stock. S defaults on the indebtedness, but the creditor does not discharge the debt (or initiate collection procedures). At the beginning of Year 6, S ceases any substantial operations with respect to the assets, but maintains their ownership with a principal purpose to avoid P's taking into account its excess loss account in S's stock.

(b) *Analysis.* Under paragraph (c)(1)(iii)(A) of this section, P's excess loss account on each of its shares of S's stock ordinarily is taken into account at the time substantially all of S's assets are treated as disposed of, abandoned, or destroyed for Federal income tax purposes. Under paragraph (e) of this section, however, S's assets are not taken into account at the beginning of Year 6 for purposes of applying paragraph (c)(1)(iii)(A) of this section. Consequently, S is treated as worthless at the beginning of Year 6, and P's $110 excess loss account is taken into account.

(h) **Effective date—(1) Application.** This section applies with respect to determinations of the basis of (including an excess loss account in) the stock of a member in consolidated return years beginning on or after January 1, 1995. If this section applies, basis (and excess loss accounts) must be determined or redetermined as if this section were in effect for all years (including, for example, the consolidated return years of another consolidated group to the extent adjustments during those consolidated return years are still reflected). Any such determination or redetermination does not, however, affect any prior period.

(2) **Dispositions of stock before effective date—(i) In general.** If P was treated as dispos-

ing of stock of S in a tax year beginning before January 1, 1995 (including, for example, a deemed disposition because S was worthless) under the rules of this section then in effect, the amount of P's income, gain, deduction, or loss, and the stock basis reflected in that amount, are not redetermined under paragraph (h)(1) of this section. See paragraph (h)(3) of this section for the applicable rules.

(ii) **Intercompany amounts.** For purposes of this paragraph (h)(2), a disposition does not include a transaction to which § 1.1502–13, § 1.1502–13T, § 1.1502–14, or § 1.1502–14T applies. Instead, the transaction is deemed to occur as the income, gain, deduction, or loss (if any) is taken into account.

(3) **Prior law.** For prior determinations, see prior regulations under section 1502 as in effect with respect to the determination. See, e.g., § 1.1502–19 as contained in the 26 CFR part 1 edition revised as of April 1, 1994.

[T.D. 6909, 31 FR 16695, Dec. 30, 1966, as amended by T.D. 7246, 38 FR 762, Jan. 4, 1973; T.D. 8364, 56 FR 47392, Sept. 19, 1991; T.D. 8560, 59 FR 41677, Aug. 15, 1994; 62 FR 12097, March 14, 1997]

## § 1.1502–20 Disposition or deconsolidation of subsidiary stock.

(a) **Loss disallowance—(1) General rule.** No deduction is allowed for any loss recognized by a member with respect to the disposition of stock of a subsidiary. See also §§ 1.1502–11(c) (stock losses attributable to certain pre–1966 distributions) and 1.1502–80(c) (deferring the treatment of stock of members as worthless under section 165(g)).

(2) **Disposition.** Disposition means any event in which gain or loss is recognized, in whole or in part.

(3) **Coordination with loss deferral and other disallowance rules—(i) In general.** Loss with respect to the stock of a subsidiary may be deferred or disallowed under other applicable provisions of the Code and regulations, including section 267(f). Paragraph (a)(1) of this section does not apply to loss that is disallowed under any other provision. If loss is deferred under any other provision, paragraph (a)(1) of this section applies when the loss is taken into account. However, if an intercompany event described in paragraph (a)(3)(ii) of this section occurs before the deferred loss is taken into account, paragraph (a)(1) of this section applies to the loss immediately before the event occurs even though the loss

# FEDERAL

# TAX REGULATIONS

# 1999

## IN FORCE JANUARY 1, 1999

## Kept To Date

*Through*

U. S. Code Congressional and
Administrative News

## Volume 4



## § 1.1502-31 INCOME TAX—CONSOLIDATED RETURNS 1124

**Example 2.** *Stock acquisition.* (a) *Facts.* P is the common parent of one group and T is the common parent of another. T has assets with an aggregate basis of $60 and fair market value of $100 and no liabilities. T's shareholders have an aggregate basis of $50 in T's stock. Pursuant to a plan, P forms S and S acquires all of T's stock in exchange for P stock in a transaction described in section 368(a)(1)(B). The transaction is also a reverse acquisition under § 1.1502-75(d)(3). Thus, the transaction is a group structure change under § 1.1502-33(f)(1), and the earnings and profits of P and S are adjusted to reflect T's earnings and profits immediately before T ceases to be the common parent of the T group.

(b) *Analysis.* Under paragraph (d)(4) of this section, although S is not the new common parent of the T group, adjustments must be made to S's basis in T's stock in accordance with the principles of this section. Although S's basis in T's stock would ordinarily be determined under section 362 by reference to the basis of T's shareholders in T's stock immediately before the group structure change, under the principles of paragraph (b)(2) of this section, S's basis in T's stock is determined by reference to T's net asset basis. Thus, S's basis in T's stock is $60.

(c) *Higher-tier adjustments.* Under paragraph (d)(4) of this section, P's basis in S's stock is adjusted to $60 (to be consistent with the adjustment to S's basis in T's stock).

(d) *Cross ownership.* The facts are the same as in paragraph (a) of this Example 2, except that S has owned 10% of T's stock for several years and, pursuant to the plan, S acquires the remaining 90% of T's stock in exchange for P stock. The results are the same as in paragraphs (b) and (c) of this Example 2, because S's basis in the initial 10% of T's stock is redetermined under this section.

(e) *Allocable share.* The facts are the same as in paragraph (a) of this Example 2, except that P owns only 90% of S's stock immediately after the group structure change. S's basis in T's stock is the same as in paragraph (b) of this Example 2. Under paragraph (d)(2) of this section, P's basis in its S stock is adjusted to $54 (90% of S's $60 adjustment).

**Example 3.** *Taxable stock acquisition.* (a) *Facts.* P is the common parent of one group and T is the common parent of another. T has assets with an aggregate basis of $60 and fair market value of $100 and no liabilities. T's shareholders have an aggregate basis of $50 in T's stock. Pursuant to a plan, P acquires all of T's stock in exchange for $70 of P's stock and $30 in a transaction that is a group structure change under § 1.1502-33(f)(1). P's acquisition of T's stock is a taxable transaction. (Because of P's use of cash, the acquisition is not a transaction described in section 368(a)(1)(B).)

(b) *Analysis.* Under paragraph (b)(2) of this section, P's basis in T's stock is adjusted to reflect T's net asset basis. Thus, although P's basis in T's stock would ordinarily be a cost basis of $100, P's basis in T's stock under this section is $60.

(h) **Effective date—(1) General rule.** This section applies to group structure changes occurring in consolidated return years beginning on or after January 1, 1995.

(2) **Prior law.** For prior years, see prior regulations under section 1502 as in effect with respect to the transaction. See, e.g., § 1.1502-31T

as contained in the 26 CFR part 1 edition revised as of April 1, 1994.

[T.D. 6909, 31 FR 16698, Dec. 30, 1966, as amended by T.D. 7246, 38 FR 764, Jan. 4, 1973; T.D. 8226, 53 FR 34731, Sept. 8, 1988; T.D. 8560, 59 FR 41683, Aug. 15, 1994]

## § 1.1502-32 Investment adjustments.

(a) **In general—(1) Purpose.** This section provides rules for adjusting the basis of the stock of a subsidiary (S) owned by another member (P). These rules modify the determination of P's basis in S's stock under applicable rules of law by adjusting P's basis to reflect S's distributions and S's items of income, gain, deduction, and loss taken into account for the period that S is a member of the consolidated group. The purpose of the adjustments is to treat P and S as a single entity so that consolidated taxable income reflects the group's income. For example, if P forms S with a $100 contribution, and S takes into account $10 of income, P's $100 basis in S's stock under section 358 is increased by $10 under this section to prevent S's income from being taken into account a second time on P's disposition of S's stock. Comparable adjustments are made for tax-exempt income and noncapital, nondeductible expenses that S takes into account, to preserve their treatment under the Internal Revenue Code.

(2) **Application of other rules of law.** The rules of this section are in addition to other rules of law. See, e.g., section 358 (basis determinations for distributees), section 1016 (adjustments to basis), § 1.1502-11(b) (limitations on the use of losses), § 1.1502-19 (treatment of excess loss accounts), § 1.1502-20 (additional rules relating to stock loss), and § 1.1502-31 (basis after a group structure change). P's basis in S's stock must not be adjusted under this section and other rules of law in a manner that has the effect of duplicating an adjustment. See also paragraph (h)(5) of this section for basis reductions applicable to certain former subsidiaries.

(3) **Overview—(i) In general.** The amount of the stock basis adjustments and their timing are determined under paragraph (b) of this section. Under paragraph (c) of this section, the amount of the adjustment is allocated among the shares of S's stock. Paragraphs (d) through (g) of this section provide definitions, an anti-avoidance rule, successor rules, and recordkeeping requirements.

(ii) **Excess loss account.** Negative adjustments under this section may exceed P's basis in

S's stock. The resulting negative amount is P's excess loss account in S's stock. See § 1.1502–19 for rules treating excess loss accounts as negative basis, and treating references to stock basis as including references to excess loss accounts.

**(iii) Tiering up of adjustments.** The adjustments to S's stock under this section are taken into account in determining adjustments to higher-tier stock. The adjustments are applied in the order of the tiers, from the lowest to the highest. For example, if P is also a subsidiary, P's adjustment to S's stock is taken into account in determining the adjustments to stock of P owned by other members.

**(b) Stock basis adjustments—(1) Timing of adjustments—(i) In general.** Adjustments under this section are made as of the close of each consolidated return year, and as of any other time (an interim adjustment) if a determination at that time is necessary to determine a tax liability of any person. For example, adjustments are made as of P's sale of S's stock in order to measure P's gain or loss from the sale, and if P's interest in S's stock is not uniform throughout the year (e.g., because P disposes of a portion of its S stock, or S issues additional shares to another person), the adjustments under this section are made by taking into account the varying interests. An interim adjustment may be necessary even if tax liability is not affected until a later time. For example, if P sells only 50% of S's stock and S becomes a nonmember, adjustments must be made for the retained stock as of the disposition (whether or not P has an excess loss account in that stock). Similarly, if S liquidates during a consolidated return year, adjustments must be made as of the liquidation (even if the liquidation is tax free under section 332).

**(ii) Allocation of items.** If § 1.1502–76(b) applies to S for purposes of an adjustment before the close of the group's consolidated return year, the amount of the adjustment is determined under that section. If § 1.1502–76(b) does not apply to the interim adjustment, the adjustment is determined under the principles of § 1.1502–76(b), consistently applied, and ratable allocation under the principles of § 1.1502–76(b)(2)(ii) or (iii) may be used without filing an election under § 1.1502–76(b)(2). The principles would apply, for example, if P becomes a nonmember but S remains a member.

**(2) Amount of adjustments.** P's basis in S's stock is increased by positive adjustments and decreased by negative adjustments under this paragraph (b)(2). The amount of the adjust-

ment, determined as of the time of the adjustment, is the net amount of S's—

**(i)** Taxable income or loss;

**(ii)** Tax-exempt income;

**(iii)** Noncapital, nondeductible expenses; and

**(iv)** Distributions with respect to S's stock.

**(3) Operating rules.** For purposes of determining P's adjustments to the basis of S's stock under paragraph (b)(2) of this section—

**(i) Taxable income or loss.** S's taxable income or loss is consolidated taxable income (or loss) determined by including only S's items of income, gain, deduction, and loss taken into account in determining consolidated taxable income (or loss), treating S's deductions and losses as taken into account to the extent they are absorbed by S or any other member. For this purpose:

**(A)** To the extent that S's deduction or loss is absorbed in the year it arises or is carried forward and absorbed in a subsequent year (e.g., under section 172, 465, or 1212), the deduction or loss is taken into account under paragraph (b)(2) of this section in the year in which it is absorbed.

**(B)** To the extent that S's deduction or loss is carried back and absorbed in a prior year (whether consolidated or separate), the deduction or loss is taken into account under paragraph (b)(2) of this section in the year in which it arises and not in the year in which it is absorbed.

**(ii) Tax-exempt income—(A) In general.** S's tax-exempt income is its income and gain which is taken into account but permanently excluded from its gross income under applicable law, and which increases, directly or indirectly, the basis of its assets (or an equivalent amount). For example, S's dividend income to which § 1.1502–13(f)(2)(ii) applies, and its interest excluded from gross income under section 103, are treated as tax-exempt income. However, S's income not recognized under section 1031 is not treated as tax-exempt income because the corresponding basis adjustments under section 1031(d) prevent S's nonrecognition from being permanent. Similarly, S's tax-exempt income does not include gain not recognized under section 332 from the liquidation of a lower-tier subsidiary, or not recognized under section 118 or section 351 from a transfer of assets to S.

**(B) Equivalent deductions.** To the extent that S's taxable income or gain is permanently offset by a deduction or loss that does not reduce, directly or indirectly, the basis of S's assets (or an equivalent amount), the income or gain is treated

as tax-exempt income and is taken into account under paragraph (b)(3)(ii)(A) of this section. In addition, the income and the offsetting item are taken into account under paragraph (b)(3)(i) of this section. For example, if S receives a $100 dividend with respect to which a $70 dividends received deduction is allowed under section 243, $70 of the dividend is treated as tax-exempt income. Accordingly, P's basis in S's stock increases by $100 because the $100 dividend and $70 deduction are taken into account under paragraph (b)(3)(i) of this section (resulting in $30 of the increase), and $70 of the dividend is also taken into account under paragraph (b)(3)(ii)(A) of this section as tax-exempt income (resulting in $70 of the increase). (See paragraph (b)(3)(iii) of this section if there is a corresponding negative adjustment under section 1059.) Similarly, income from mineral properties is treated as tax-exempt income to the extent it is offset by deductions for depletion in excess of the basis of the property.

(C) Discharge of indebtedness income—(1) In general. Discharge of indebtedness income of S that is excluded from gross income under section 108 is treated as tax-exempt income only to the extent the discharge is applied to reduce tax attributes (e.g., under section 108 or 1017). Discharge of S's indebtedness is treated as applied to reduce tax attributes only to the extent the attribute reduction is taken into account as a reduction under paragraph (b)(3)(iii) of this section.

(2) Expired loss carryovers. If the amount of the discharge exceeds the amount of the attribute reduction, the excess is nevertheless treated as applied to reduce tax attributes to the extent a loss carryover expired without tax benefit, the expiration was taken into account as a noncapital, nondeductible expense under paragraph (b)(3)(iii) of this section, and the loss carryover would have been reduced had it not expired.

(D) Basis shifts. An increase in the basis of S's assets (or an equivalent as described in paragraph (b)(3)(iv)(B) of this section) is treated as tax-exempt income to the extent the increase is not otherwise taken into account in determining stock basis, it corresponds to a negative adjustment that is taken into account by the group under this paragraph (b) (or incurred by the common parent), and it has the effect (viewing the group in the aggregate) of a permanent recovery of the reduction. For example, S's basis increase under section 50(c)(2) is treated as tax-exempt income to the extent the preceding basis reduction under section 50(c)(1) is reflected in the basis of a member's stock. On the other hand, if S increases the basis of an asset as the result of an accounting method change, and the related positive section 481(a) adjustment is taken into account over time, the basis increase is not treated as tax-exempt income.

(iii) Noncapital, nondeductible expenses—(A) In general. S's noncapital, nondeductible expenses are its deductions and losses that are taken into account but permanently disallowed or eliminated under applicable law in determining its taxable income or loss, and that decrease, directly or indirectly, the basis of its assets (or an equivalent amount). For example, S's Federal taxes described in section 275 and loss not recognized under section 311(a) are noncapital, nondeductible expenses. Similarly, if a loss carryover (e.g., under section 172 or 1212) attributable to S expires or is reduced under section 108(b), it becomes a noncapital, nondeductible expense at the close of the last tax year to which it may be carried. However, if S sells and repurchases a security subject to section 1091, the disallowed loss is not a noncapital, nondeductible expense because the corresponding basis adjustments under section 1091(d) prevent the disallowance from being permanent.

(B) Nondeductible basis recovery. Any other decrease in the basis of S's assets (or an equivalent as described in paragraph (b)(3)(iv)(B) of this section) may be a noncapital, nondeductible expense to the extent that the decrease is not otherwise taken into account in determining stock basis and is permanently eliminated for purposes of determining S's taxable income or loss. Whether a decrease is so treated is determined by taking into account both the purposes of the Code or regulatory provision resulting in the decrease and the purposes of this section. For example, S's noncapital, nondeductible expenses include any basis reduction under section 50(c)(1), section 1017, section 1059, § 1.1502–20(b), or § 1.1502–20(g). Also included as a noncapital, nondeductible expense is the amount of any gross-up for taxes paid by another taxpayer that S is treated as having paid (e.g., income included under section 78, or the portion of an undistributed capital gain dividend that is treated as tax deemed to have been paid by a shareholder under section 852(b)(3)(D)(ii), whether or not any corresponding amount is claimed as a tax credit. In contrast, a decrease generally is not a noncapital, nondeductible expense if it results because S redeems stock in a transaction to which section 302(a) applies, S receives assets in a liquidation to which section 332 applies and its basis in the assets is less than

its basis in the stock canceled, or S distributes the stock of a subsidiary in a distribution to which section 355 applies.

(iv) **Special rules for tax-exempt income and noncapital, nondeductible expenses.** For purposes of paragraphs (b)(3)(ii) and (iii) of this section:

(A) Treatment as permanent. An amount is permanently excluded from gross income, or permanently disallowed or eliminated, if it is so treated by S even though another person may take a corresponding amount into account. For example, if S sells property to a nonmember at a loss that is disallowed under section 267(a), S's loss is a noncapital, nondeductible expense even though under section 267(d) the nonmember may treat a corresponding amount of gain as not recognized. (If the nonmember is a subsidiary in another consolidated group, its gain not recognized under section 267(d) is tax-exempt income under paragraph (b)(3)(ii)(A) of this section.)

(B) Amounts equivalent to basis and adjustments to basis. Amounts equivalent to basis include the amount of money, the amount of a loss carryover, and the amount of an adjustment to gain or loss under section 475(a) for securities described in section 475(a)(2). An equivalent to a basis increase includes a decrease in an excess loss account, and an equivalent to a basis decrease includes the denial of basis for taxable income.

(C) Timing. An amount is taken into account in the year in which it would be taken into account under paragraph (b)(3)(i) of this section if it were subject to Federal income taxation.

(D) Tax sharing agreements. Taxes are taken into account by applying the principles of section 1552 and the percentage method under § 1.1502–33(d)(3) (and by assuming a 100% allocation of any decreased tax liability). The treatment of amounts allocated under this paragraph (b)(3)(iv)(D) is analogous to the treatment of allocations under § 1.1552–1(b)(2). For example, if one member owes a payment to a second member, the first member is treated as indebted to the second member. The right to receive payment is treated as a positive adjustment under paragraph (b)(3)(ii) of this section, and the obligation to make payment is treated as a negative adjustment under paragraph (b)(3)(iii) of this section. If the obligation is not paid, the amount not paid generally is treated as a distribution, contribution, or both, depending on the relationship between the members.

(v) **Distributions.** Distributions taken into account under paragraph (b)(2) of this section are distributions with respect to S's stock to which section 301 applies and all other distributions treated as dividends (e.g., under section 356(a)(2)). See § 1.1502–13(f)(2)(iv) for taking into account distributions to which section 301 applies (but not other distributions treated as dividends) under the entitlement rule.

(4) **Waiver of loss carryovers from separate return limitation years—(i) General rule.** If S has a loss carryover from a separate return limitation year when it becomes a member of a consolidated group, the group may make an irrevocable election to treat all or any portion of the loss carryover as expiring for all Federal income tax purposes immediately before S becomes a member of the consolidated group (deemed expiration). If S was a member of another group immediately before it became a member of the consolidated group, the expiration is also treated as occurring immediately after it ceases to be a member of the prior group.

(ii) **Stock basis adjustments from a waiver—** (A) Qualifying transactions. If S becomes a member of the consolidated group in a qualifying cost basis transaction and an election under this paragraph (b)(4) is made, the noncapital, nondeductible expense resulting from the deemed expiration does not result in a corresponding stock basis adjustment for any member under this section. A qualifying cost basis transaction is the purchase (i.e., a transaction in which basis is determined under section 1012) by members of the acquiring consolidated group (while they are members) in a 12-month period of an amount of S's stock satisfying the requirements of section 1504(a)(2).

(B) Nonqualifying transactions. If S becomes a member of the consolidated group other than in a qualifying cost basis transaction and an election under this paragraph (b)(4) is made, the basis of its stock that is owned by members immediately after it becomes a member is subject to reduction under the principles of this section to reflect the deemed expiration. The reduction occurs immediately before S becomes a member, but after it ceases to be a member of any prior group, and it therefore does not result in a corresponding stock basis adjustment for any higher-tier member of the transferring or acquiring consolidated group. Any basis reduction under this paragraph (b)(4)(ii)(B) is taken into account in making determinations of basis under the Code with respect to S's stock (e.g., a determination under section 362 because the stock is

acquired in a transaction described in section 368(a)(1)(B)), but it does not result in corresponding stock basis adjustments under this section for any higher-tier member. If the basis reduction exceeds the basis of S's stock, the excess is treated as an excess loss account to which the members owning S's stock succeed.

(C) Higher-tier corporations. If S becomes a member of the consolidated group as a result, in whole or in part, of a higher-tier corporation becoming a member (whether or not in a qualifying cost basis transaction), additional adjustments are required. The highest-tier corporation (T) whose becoming a member resulted in S becoming a member, and T's chain of lower-tier corporations that includes S, are subject to the adjustment. The deemed expiration of S's loss carryover that results in a negative adjustment for the first higher-tier corporation is treated as an expiring loss carryover of that higher-tier corporation for purposes of applying paragraph (b)(4)(ii)(B) of this section to that corporation. For example, if P purchases all of the stock of T, T owns all of the stock of T1, T1 owns all of the stock of S, S becomes a member as a result of T becoming a member, and the election under this paragraph (b)(4) is made, the basis of the S stock is reduced and the reduction tiers up to T1, T1 treats the negative adjustment to its basis in S's stock as an expiring loss carryover of T1, and T then adjusts its basis in T1's stock. In addition, if T becomes a member of the acquiring group in a transaction other than a qualifying cost basis transaction, the amount that tiers up to T also reduces the basis of its stock under paragraph (b)(4)(ii)(B) of this section (but the amount does not tier up to higher-tier members).

(iii) Net asset basis limitation. Basis reduced under this paragraph (b)(4) is restored before S becomes a member (and before the basis of S's stock is taken into account in determining basis under the Code) to the extent necessary to conform a share's basis to its allocable portion of net asset basis. In the case of higher-tier corporations under paragraph (b)(4)(ii)(C) of this section, the restoration does not tier up but is instead applied separately to each higher-tier corporation. For purposes of determining each corporation's net asset basis (including the basis of stock in lower-tier corporations), the restoration is applied in the order of tiers, from the lowest to the highest. For purposes of the restoration:

(A) A member's net asset basis is the positive or negative difference between the adjusted basis of its assets (and the amount of any of its loss carryovers that are not deemed to expire) and its

liabilities. Appropriate adjustments must be made, for example, to disregard liabilities that subsequently will give rise to deductions (e.g., liabilities to which section 461(h) applies).

(B) Within a class of stock, each share has the same allocable portion of net asset basis. If there is more than one class of common stock, the net asset basis is allocated to each class by taking into account the terms of each class and all other facts and circumstances relating to the overall economic arrangement.

(iv) Election. The election described in this paragraph (b)(4) must be made in a separate statement entitled "ELECTION TO TREAT LOSS CARRYOVER AS EXPIRING UNDER § 1.1502–32(b)(4)." The statement must be filed with the consolidated group's return for the year S becomes a member, and it must be signed by the common parent and S. A separate statement must be made for each member whose loss carryover is deemed to expire. The statement must identify the amount of each loss carryover deemed to expire (or the amount of each loss carryover deemed not to expire, with any balance of any loss carryovers being deemed to expire), the basis of any stock reduced as a result of the deemed expiration, and the computation of the basis reduction.

(5) Examples—(i) In general. For purposes of the examples in this section, unless otherwise stated, P owns all of the only class of S's stock, the stock is owned for the entire year, S owns no stock of lower-tier members, the tax year of all persons is the calendar year, all persons use the accrual method of accounting, the facts set forth the only corporate activity, preferred stock is described in section 1504(a)(4), all transactions are between unrelated persons, and tax liabilities are disregarded.

(ii) Stock basis adjustments. The principles of this paragraph (b) are illustrated by the following examples.

Example 1. Taxable income. (a) Current taxable income. For Year 1, the P group has $100 of taxable income when determined by including only S's items of income, gain, deduction, and loss taken into account. Under paragraph (b)(1) of this section, P's basis in S's stock is adjusted under this section as of the close of Year 1. Under paragraph (b)(2) of this section, P's basis in S's stock is increased by the amount of the P group's taxable income determined by including only S's items taken into account. Thus, P's basis in S's stock is increased by $100 as of the close of Year 1.

(b) Intercompany gain that is not taken into account. The facts are the same as in paragraph (a) of this Example 1, except that S also sells property to another member at a $25 gain in Year 1, the gain is deferred under § 1.1502–13 and

taken into account in Year 3, and P sells 10% of S's stock to nonmembers in Year 2. Under paragraph (b)(3)(i) of this section, S's deferred gain is not additional taxable income for Year 1 or 2 because it is not taken into account in determining the P group's consolidated taxable income for either of those years. The deferred gain is not tax-exempt income under paragraph (b)(3)(ii) of this section because it is not permanently excluded from S's gross income. The deferred gain does not result in a basis adjustment until Year 3, when it is taken into account in determining the P group's consolidated taxable income. Consequently, P's basis in the S shares sold is not increased to reflect S's gain from the intercompany sale of the property. In Year 3, the deferred gain is taken into account, but the amount allocable to the shares sold by P does not increase their basis because these shares are held by nonmembers.

(c) Intercompany gain taken into account. The facts are the same as in paragraph (b) of this Example 1, except that P sells all of S's stock in Year 2 (rather than only 10%). Under § 1.1502–13, S takes the $25 gain into account immediately before S becomes a nonmember. Thus, P's basis in S's stock is increased to reflect S's gain from the intercompany sale of the property.

Example 2. Tax loss. (a) Current absorption. For Year 2, the P group has a $50 consolidated net operating loss when determined by taking into account only S's items of income, gain, deduction, and loss. S's loss is absorbed by the P group in Year 2, offsetting P's income for that year. Under paragraph (b)(3)(i)(A) of this section, because S's loss is absorbed in the year it arises, P has a $50 negative adjustment with respect to S's stock. Under paragraph (b)(2) of this section, P reduces its basis in S's stock by $50. Under paragraph (a)(3)(ii) of this section, if the decrease exceeds P's basis in S's stock, the excess is P's excess loss account in S's stock.

(b) Interim determination from stock sale. The facts are the same as in paragraph (a) of this Example 2, except that S's Year 2 loss arises in the first half of the calendar year, P sells 50% of S's stock on July 1 of Year 2, and P's income for Year 2 does not arise until after the sale of S's stock. P's income for Year 2 (exclusive of the sale of S's stock) is offset by S's loss, even though the income arises after the stock sale, and no loss remains to be apportioned to S. See §§ 1.1502–11 and 1.1502–21T(b). Under paragraph (b)(3)(i)(A) of this section, because S's $50 loss is absorbed in the year it arises, it reduces P's basis in the S shares sold by $25 immediately before the stock sale. Because S becomes a nonmember, the loss also reduces P's basis in the retained S shares by $25 immediately before S becomes a nonmember. See also § 1.1502–20(b) (possible stock basis reduction on the deconsolidation of S).

(c) Loss carryback. The facts are the same as in paragraph (a) of this Example 2, except that P has no income or loss for Year 2, S's $50 loss is carried back and absorbed by the P group in Year 1 (offsetting the income of P or S), and the P group receives a $17 tax refund in Year 2 that is paid to S. Under paragraph (b)(3)(i)(B) of this section, because the $50 loss is carried back and absorbed in Year 1, it is treated as a tax loss for Year 2 (the year in which it arises). Under paragraph (b)(3)(ii) of this section, the refund is treated as tax-exempt income of S. Under paragraph (b)(3)(iv)(C) of this section, the tax-exempt income is taken into account in Year 2 because that is the year it would be taken into account under S's method of accounting if it were subject to Federal income taxation. Thus, under paragraph (b)(2) of this section, P reduces its basis in S's stock by $33 as of the close of Year 2 (the $50 tax loss, less the $17 tax refund).

(d) Loss carryforward. The facts are the same as in paragraph (a) of this Example 2, except that P has no income or loss for Year 2, and S's loss is carried forward and absorbed by the P group in Year 3 (offsetting the income of P or S). Under paragraph (b)(3)(i)(A) of this section, the loss is not treated as a tax loss under paragraph (b)(2) of this section until Year 3.

Example 3. Tax-exempt income and noncapital, nondeductible expenses. (a) Facts. For Year 1, the P group has $500 of consolidated taxable income. However, the P group has a $100 consolidated net operating loss when determined by including only S's items of income, gain, deduction, and loss taken into account. Also for Year 1, S has $80 of interest income that is permanently excluded from gross income under section 103, and S incurs $60 of related expense for which a deduction is permanently disallowed under section 265.

(b) Analysis. Under paragraph (b)(3)(i)(A) of this section, S has a $100 tax loss for Year 1. Under paragraph (b)(3)(ii)(A) of this section, S has $80 of tax-exempt income. Under paragraph (b)(3)(iii)(A) of this section, S has $60 of noncapital, nondeductible expense. Under paragraph (b)(3)(iv)(C) of this section, the tax-exempt income and noncapital, nondeductible expenses are taken into account in Year 1 because that is the year they would be taken into account under S's method of accounting if they were subject to Federal income taxation. Thus, under paragraph (b) of this section, P reduces its basis in S's stock as of the close of Year 1 by an $80 net amount (the $100 tax loss, less $80 of tax-exempt income, plus $60 of noncapital, nondeductible expenses).

Example 4. Discharge of indebtedness. (a) Facts. P forms S on January 1 of Year 1 and S borrows $200. During Year 1, S's assets decline in value and the P group has a $100 consolidated net operating loss when determined by including only S's items of income, gain, deduction, and loss taken into account. None of the loss is absorbed by the group in Year 1, and S is discharged from $100 of indebtedness at the close of Year 1. Under section 108(a), S's $100 of discharge of indebtedness income is excluded from gross income because of insolvency. Under section 108(b), S's $100 net operating loss is reduced to zero at the close of Year 1.

(b) Analysis. Under paragraph (b)(3)(iii)(B) of this section, the reduction of the net operating loss is treated as a noncapital, nondeductible expense in Year 1 because the net operating loss is permanently disallowed by section 108(b). Under paragraph (b)(3)(ii)(C) of this section, all $100 of S's discharge of indebtedness income is treated as tax-exempt income in Year 1 because the discharge results in a $100 reduction to S's net operating loss. Consequently, the loss and the cancellation of the indebtedness result in no net adjustment to P's basis in S's stock under paragraph (b) of this section. (If the basis of assets were reduced under section 1017, rather than S's loss, the reduction would not occur until the beginning of Year 2 and the discharge would not be treated as tax-exempt income until that time.)

(c) Insufficient attributes. The facts are the same as in paragraph (a) of this Example 4, except that $70 of S's net operating loss is absorbed in Year 1, offsetting P's income for that year, and the indebtedness is discharged at the beginning of Year 2. Under paragraph (b) of this section, the $70 of S's loss absorbed in Year 1 reduces P's basis in S's stock by $70 as of the close of Year 1. Under section 108(a), S's discharge of indebtedness income in Year 2 is excluded from the P group's gross income because of insolvency. Under section 108(b), the remaining $30 of S's net operating loss carryover from Year 1 is reduced to zero at the close of Year 2. No other

attributes are reduced. Under paragraph (b)(3)(iii)(B) of this section, the elimination of the remaining $30 net operating loss by section 108(b) is treated as a noncapital, nondeductible expense. Under paragraph (b)(3)(ii)(C) of this section, only $30 of the discharge is treated as tax-exempt income because only that amount is applied to reduce tax attributes. See also § 1.1502–19(c)(1)(iii) (taking into account any excess loss account of P in S's stock). The remaining $70 of discharge income excluded under section 108(a) has no effect on P's basis in S's stock.

(d) *Purchase price adjustment.* Assume instead that S buys land in Year 1 in exchange for S's $100 purchase money note (bearing interest at a market rate of interest in excess of the applicable Federal rate, and providing for a principal payment at the end of Year 10), and the seller agrees with S in Year 4 to discharge $60 of the note as a purchase price adjustment to which section 108(e)(5) applies. S has no discharge of indebtedness income that is treated as tax-exempt income under paragraph (b)(3)(ii) of this section. In addition, the $60 purchase price adjustment is not a noncapital, nondeductible expense under paragraph (h)(3)(iii) of this section. A purchase price adjustment is not equivalent to a discharge of indebtedness that is offset by a deduction or loss. Consequently, the purchase price adjustment results in no net adjustment to P's basis in S's stock under paragraph (b) of this section.

*Example 5. Distributions. (a) Amounts declared and distributed.* For Year 1, the P group has $120 of consolidated taxable income when determined by including only S's items of income, gain, deduction, and loss taken into account. S declares and makes a $10 dividend distribution to P at the close of Year 1. Under paragraph (b) of this section, P increases its basis in S's stock as of the close of Year 1 by a $110 net amount ($120 of taxable income, less a $10 distribution).

(b) *Distributions in later years.* The facts are the same as in paragraph (a) of this Example 5, except that S does not declare and distribute the $10 until Year 2. Under paragraph (b) of this section, P increases its basis in S's stock by $120 as of the close of Year 1, and decreases its basis by $10 as of the close of Year 2. (If P were also a subsidiary, the basis of its stock would also be increased in Year 1 to reflect P's $120 adjustment to basis of S's stock; the basis of P's stock would not be changed as a result of S's distribution in Year 2, because P's $10 of tax-exempt dividend income under paragraph (b)(3)(ii) of this section would be offset by the $10 negative adjustment to P's basis in S's stock for the distribution.)

(c) *Amounts declared but not distributed.* The facts are the same as in paragraph (a) of this Example 5, except that, during December of Year 1, S declares (and P becomes entitled to) another $70 dividend distribution with respect to its stock, but P does not receive the distribution until after it sells all of S's stock at the close of Year 1. Under § 1.1502–13(f)(2)(iv), S is treated as making a $70 distribution to P at the time P becomes entitled to the distribution. (If S is distributing an appreciated asset, its gain under section 311 is also taken into account under paragraph (b)(3)(i) of this section at the time P becomes entitled to the distribution.) Consequently, under paragraph (b) of this section, P increases its basis in S's stock as of the close of Year 1 by only a $40 net amount ($120 of taxable income, less two distributions totaling $80). Any further adjustments after S ceases to be a member and the $70 distribution is made would be duplicative, because the stock basis has already been adjusted for the distribution. Accordingly, the distribution will not result in further adjustments or gain, even if the distribution is a payment to which section 301(c)(2) or (3) applies.

*Example 6. Reorganization with boot. (a) Facts.* P owns all of the stock of S and T. On January 1 of Year 1, P has a $100 basis in the S stock and a $60 basis in the T stock. S and T have no items of income, gain, deduction, or loss for Year 1. S and T each have substantial earnings and profits. At the close of Year 1, T merges into S in a reorganization described in section 368(a)(1)(A) (and in section 368(a)(1)(D)). P receives no additional S stock, but does receive $10 which is treated as a dividend under section 356(a)(2).

(b) *Analysis.* Under section 358, P's basis in the S stock is increased by its basis in the T stock. Under § 1.1502–13(f)(3) the money received is treated as being taken into account immediately after the transaction. Thus, the $10 is treated as a dividend distribution under section 301 and under paragraph (b)(3)(v) of this section, the $10 is a distribution to which paragraph (b)(2)(iv) of this section applies. Accordingly, P's basis in the S stock is $160 immediately after the merger, which is then decreased by the $10 distribution taken into account immediately after the transaction, resulting in a basis of $150.

*Example 7. Tiering up of basis adjustments.* P owns all of S's stock, and S owns all of T's stock. For Year 1, the P group has $100 of consolidated taxable income when determined by including only T's items of income, gain, deduction, and loss taken into account, and $50 of consolidated taxable income when determined by including only S's items taken into account. S increases its basis in T's stock by $100 under paragraph (b) of this section. Under paragraph (a)(3) of this section, this $100 basis adjustment is taken into account in determining P's adjustments to its basis in S's stock. Thus, P increases its basis in S's stock by $150 under paragraph (b) of this section.

*Example 8. Allocation of items. (a) Acquisition in mid-year.* P is the common parent of a consolidated group, and S is an unaffiliated corporation filing separate returns on a calendar-year basis. P acquires all of S's stock and S becomes a member of the P group on July 1 of Year 1. For the entire calendar Year 1, S has $100 of ordinary income and under § 1.1502–76(b) $60 is allocated to the period from January 1 to June 30 and $40 to the period from July 1 to December 31. Under paragraph (b) of this section, P increases its basis in S's stock by $40.

(b) *Sale in mid-year.* The facts are the same as in paragraph (a) of this Example 8, except that S is a member of the P group at the beginning of Year 1 but ceases to be a member on June 30 as a result of P's sale of S's stock. Under paragraph (b) of this section, P increases its basis in S's stock by $60 immediately before the stock sale. (P's basis increase would be the same if S became a nonmember because S issued additional shares to nonmembers.)

(c) *Absorption of loss carryovers.* Assume instead that S is a member of the P group at the beginning of Year 1 but ceases to be a member on June 30 as a result of P's sale of S's stock, and a $100 consolidated net operating loss attributable to S is carried over by the P group to Year 1. The consolidated net operating loss may be apportioned to S for its first separate return year only to the extent not absorbed by the P group during Year 1. Under paragraph (b)(3)(i) of this section, if the loss is absorbed by the P group in Year 1, whether the offsetting income arises before or after P's sale of S's stock, the absorption of the loss carryover is included in the determination of S's taxable income or loss for Year 1. Thus, P's basis in S's stock is adjusted under paragraph (b) of this section to reflect any absorption of the loss by the P group.

**Example 9. Gross-ups.** (a) Facts. P owns all of the stock of S, and S owns all of the stock of T, a newly formed controlled foreign corporation that is not a passive foreign investment company. In Year 1, T has $100 of subpart F income and pays $34 of foreign income tax, leaving T with $66 of earnings and profits. The P group has $100 of consolidated taxable income when determined by taking into account only S's items (the inclusion under section 951(a), taking into account the section 78 gross-up). As a result of the section 951(a) inclusion, S increases its basis in T's stock by $66 under section 961(a).

(b) Analysis. Under paragraph (b)(3)(i) of this section, S has $100 of taxable income. Under paragraph (b)(3)(iii)(B) of this section, the $34 gross-up for taxes paid by T that S is treated as having paid is a noncapital, nondeductible expense (whether or not any corresponding amount is claimed by the P group as a tax credit). Thus, P increases its basis in S's stock under paragraph (b) of this section by the net adjustment of $66.

(c) Subsequent distribution. The facts are the same as in paragraph (a) of this Example 9, except that T distributes its $66 of earnings and profits in Year 2. The $66 distribution received by S is excluded from S's income under section 959(a) because the distribution represents earnings and profits attributable to amounts that were included in S's income under section 951(a) for Year 1. In addition, S's basis in T's stock is decreased by $66 under section 961(b). The excluded distribution is not tax-exempt income under paragraph (b)(3)(ii) of this section because of the corresponding reduction to S's basis in T's stock. Consequently, P's basis in S's stock is not adjusted under paragraph (b) of this section for Year 2.

**Example 10.** Recapture of tax-exempt items. (a) Facts. S is a life insurance company. For Year 1, the P group has $200 of consolidated taxable income, determined by taking into account only S's items of income, gain, deduction, and loss taken into account (including a $300 small company deduction under section 806). In addition, S has $100 of tax-exempt interest income, $60 of which is S's company share. The remaining $40 of tax-exempt income is the policyholders' share that reduces S's deduction for increase in reserves.

(b) Tax-exempt items generally.    Under paragraph (b)(3)(i) of this section, S has $200 of taxable income for Year 1. Also for Year 1, S has $100 of tax-exempt income under paragraph (b)(3)(i)(A) of this section, and another $300 is treated as tax-exempt income under paragraph (b)(3)(ii)(B) of this section because of the deduction under section 806. Under paragraph (b)(3)(iii) of this section, S has $40 of noncapital, nondeductible expenses for Year 1 because S's deduction under section 807 for its increase in reserves has been permanently reduced by the $40 policyholders' share of the tax-exempt interest income. Thus, P increases its basis in S's stock by $560 under paragraph (b) of this section.

(c) Recapture. Assume instead that S is a property and casualty company and, for Year 1, S accrues $100 of estimated salvage recoverable under section 832. Of this amount, $87 (87% of $100) is excluded from gross income because of the "fresh start" provisions of Sec. 11305(c) of P.L. 101–508 (the Omnibus Budget Reconciliation Act of 1990). Thus, S has $87 of tax-exempt income under paragraph (b)(3)(ii)(A) of this section that increases P's basis in S's stock for Year 1. (S also has $13 of taxable income over the period of inclusion under section 481.) In Year 5, S determines that the $100 salvage recoverable was overestimated by $30 and deducts $30 for the reduction of the salvage recoverable. However, S has $26.10 (87% of $30) of taxable income in Year 5 due to the partial recapture of its fresh start. Because S has no basis

corresponding to this income, S is treated under paragraph (b)(3)(iii)(B) of this section as having a $26.10 noncapital, nondeductible expense in Year 5. This treatment is necessary to reflect the elimination of the erroneous fresh start in S's stock basis and causes a decrease in P's basis in S's stock by $30 for Year 5 (a $3.90 taxable loss and a $26.10 special adjustment).

**(c) Allocation of adjustments among shares of stock—(1) In general.**   The portion of the adjustment under paragraph (b) of this section that is described in paragraph (b)(2)(iv) of this section (negative adjustments for distributions) is allocated to the shares of S's stock to which the distribution relates. The remainder of the adjustment, described in paragraphs (b)(2)(i) through (iii) of this section (adjustments for taxable income or loss, tax-exempt income, and noncapital, nondeductible expenses), is allocated among the shares of S's stock as provided in paragraphs (c)(2) through (4) of this section. If the remainder of the adjustment is positive, it is allocated first to any preferred stock to the extent provided in paragraph (c)(3) of this section, and then to the common stock as provided in paragraph (c)(2) of this section. If the remainder of the adjustment is negative, it is allocated only to common stock as provided in paragraph (c)(2) of this section. An adjustment under this section allocated to a share for the period the share is owned by a nonmember has no effect on the basis of the share. See paragraph (c)(4) of this section for the reallocation of adjustments, and paragraph (d) of this section for definitions. See § 1.1502–19(d) for special allocations of basis determined or adjusted under the Code with respect to excess loss accounts.

**(2) Common stock—(i) Allocation within a class.**   The portion of the adjustment described in paragraphs (b)(2)(i) through (iii) of this section (the adjustment determined without taking distributions into account) that is allocable to a class of common stock is generally allocated equally to each share within the class. However, if a member has an excess loss account in shares of a class of common stock at the time of a positive adjustment, the portion of the adjustment allocable to the member with respect to the class is allocated first to equalize and eliminate that member's excess loss accounts and then to increase equally its basis in the shares of that class. Similarly, any negative adjustment is allocated first to reduce the member's positive basis in shares of the class before creating or increasing its excess loss account. Distributions and any adjustments or determinations under the Internal Revenue Code (e.g., under section 358, including any modifications under § 1.1502–19(d)) are tak-

ADD-33

§ 1.1502-32

INCOME TAX—CONSOLIDATED RETURNS   1132

en into account before the allocation is made under this paragraph (c)(2)(i).

(ii) **Allocation among classes—(A) General rule.** If S has more than one class of common stock, the extent to which the adjustment described in paragraphs (b)(2)(i) through (iii) of this section (the adjustment determined without taking distributions into account) is allocated to each class is determined, based on consistently applied assumptions, by taking into account the terms of each class and all other facts and circumstances relating to the overall economic arrangement. The allocation generally must reflect the manner in which the classes participate in the economic benefit or burden (if any) corresponding to the items of income, gain, deduction, or loss allocated. In determining participation, any differences in voting rights are not taken into account, and the following factors are among those to be considered—

(1) The interest of each share in economic profits and losses (if different from the interest in taxable income);

(2) The interest of each share in cash flow and other non-liquidating distributions; and

(3) The interest of each share in distributions in liquidation.

(B) Distributions and Code adjustments. Distributions and any adjustments or determinations under the Internal Revenue Code are taken into account before the allocation is made under this paragraph (c)(2)(ii).

(3) **Preferred stock.** If the adjustment under paragraphs (b)(2)(i) through (iii) of this section (the adjustment determined without taking distributions into account) is positive, it is allocated to preferred stock to the extent required (when aggregated with prior allocations to the preferred stock during the period that S is a member of the consolidated group) to reflect distributions described in section 301 (and all other distributions treated as dividends) to which the preferred stock becomes entitled, and arrearages arising, during the period that S is a member of the consolidated group. For this purpose, the preferred stock is treated as entitled to a distribution no later than the time the distribution is taken into account under the Internal Revenue Code (e.g., under section 305). If the amount of distributions and arrearages exceeds the positive amount (when aggregated with prior allocations), the positive amount is first allocated among classes of preferred stock to reflect their relative priorities, and the amount allocated to each class is then allocat-

ed pro rata within the class. An allocation to a share with respect to arrearages and distributions for the period the share is owned by a nonmember is not reflected in the basis of the share under paragraph (b) of this section. However, if P and S cease to be members of one consolidated group and remain affiliated as members of another consolidated group, P's ownership of S's stock during consolidated return years of the prior group is treated for this purpose as ownership by a member to the extent that the adjustments during the prior consolidated return years are still reflected in the basis of the preferred stock.

(4) **Cumulative redetermination—(i) General rule.** A member's basis in each share of S's preferred and common stock must be redetermined whenever necessary to determine the tax liability of any person. See paragraph (b)(1) of this section. The redetermination is made by reallocating S's net adjustment described in paragraphs (b)(2)(i) through (iii) of this section (the adjustment determined without taking distributions into account) for each consolidated return year (or other applicable period) of the group by taking into account all of the facts and circumstances affecting allocations under this paragraph (c) as of the redetermination date with respect to all of S's shares. For this purpose:

(A) Amounts may be reallocated from one class of S's stock to another class, but not from one share of a class to another share of the same class.

(B) If there is a change in the equity structure of S (e.g., as the result of S's issuance, redemption, or recapitalization of shares), a cumulative redetermination is made for the period before the change. If a reallocation is required by another redetermination after a change, amounts arising after the change are reallocated before amounts arising before the change.

(C) If S becomes a nonmember as a result of a change in its equity structure, any reallocation is made only among the shares of S's stock immediately before the change. For example, if S issues stock to a nonmember creditor in exchange for its debt, and the exchange results in S becoming a nonmember, any reallocation is only among the shares of S's stock immediately before the exchange.

(D) Any reallocation is treated for all purposes after it is made (including subsequent redeterminations) as the original allocation of an amount under this paragraph (c), but the reallocation does not affect any prior period.

**(ii) Prior use of allocations.** An amount may not be reallocated under paragraph (c)(4)(i) of this section to the extent that the amount has been used before the reallocation. For this purpose, an amount has been used to the extent it has been taken into account, directly or indirectly, by any member in determining income, gain, deduction, or loss, or in determining the basis of any property that is not subject to this section (e.g., stock of a corporation that has become a nonmember). For example, if P sells a share of S stock, an amount previously allocated to the share cannot be reallocated to another share of S stock, but an amount allocated to another share of S stock can still be reallocated to the sold share because the reallocated amount has not been taken into account; however, any adjustment reallocated to the sold share may effectively be eliminated, because the reallocation was not in effect when the share was previously sold and P's gain or loss from the sale is not redetermined. If, however, P sells the share of S stock to another member, the amount is not used until P's gain or loss is taken into account under § 1.1502–13.

**(5) Examples.** The principles of this paragraph (c) are illustrated by the following examples.

**Example 1.** Ownership of less than all the stock. (a) Facts. P owns 80% of S's only class of stock with an $800 basis. For Year 1, S has $100 of taxable income.

(b) Analysis. Under paragraph (c)(1) of this section, the $100 positive adjustment under paragraph (b) of this section for S's taxable income is allocated among the shares of S's stock, including shares owned by nonmembers. Under paragraph (c)(2)(i) of this section, the adjustment is allocated equally to each share of S's stock. Thus, P increases its basis in S's stock under paragraph (b) of this section as of the close of Year 1 by $80. (The basis of the 20% of S's stock owned by nonmembers is not adjusted under this section.)

(c) Varying interest. The facts are the same as in paragraph (a) of this Example 1, except that P buys the remaining 20% of S's stock at the close of business on June 30 of Year 1 for $208. Under paragraph (b)(1) of this section and the principles of § 1.1502–76(b), S's $100 of taxable income is allocable $40 to the period from January 1 to June 30 and $60 to the period from July 1 to December 31. Thus, for the period ending June 30, P is treated as having a $32 adjustment with respect to the S stock that P has owned since January 1 (80% of $40) and, under paragraph (c)(2)(i) of this section, the adjustment is allocated equally among those shares. For the period ending December 31, P is treated as having a $60 adjustment (100% of $60) that is also allocated equally among P's shares of S's stock owned after June 30. P's basis in the shares owned as of the beginning of the year therefore increases by $80 (the sum of 80% of $40 and 80% of $60), from $800 to $880, and P's basis in the shares purchased on June 30 increases by $12 (20% of $60), from $208 to $220. Thus, P's aggregate basis in S's stock as of the end of Year 1 is $1,100.

(d) Tax liability. The facts are the same as in paragraph (a) of this Example 1, except that P pays S's $34 share of the group's consolidated tax liability resulting from S's taxable income, and S does not reimburse P. S's $100 of taxable income results in a positive adjustment under paragraph (b)(3)(i) of this section, and S's $34 of tax liability results in a negative adjustment under paragraph (b)(3)(iv)(D) of this section and the principles of section 1552. Because S does not make any payment in recognition of the additional tax liability, by analogy to the treatment under § 1.1552–1(b)(2), S is treated as having made a $34 payment that is described in paragraph (b)(3)(iii) of this section (noncapital, nondeductible expenses) and as having received an equal amount from P as a capital contribution. Thus, P increases its basis in its S stock by $52.80 (80% of the $100 of taxable income, less 80% of the $34 tax payment). In addition, P increases its basis in S's stock by $34 under the Internal Revenue Code and paragraph (a)(2) of this section to reflect the capital contribution. In the aggregate, P increases its basis in S's stock by $86.80. (If, as in paragraph (c) of this Example 1, P buys the remaining 20% of S's stock at the close of business on June 30, P increases its basis in S's stock by another $7.90 for the additional 20% interest in S's income after June 30 ($60 multiplied by 20%, less 20% of the $20.40 tax payment on $60); the $34 capital contribution by P is reflected in all of its S shares (not just the original 80%), and P's aggregate basis adjustment under this section is $94.70 ($86.80 plus $7.90).)

**Example 2.** Preferred stock. (a) Facts. P owns all of S's common stock with an $800 basis, and nonmembers own all of S's preferred stock. The preferred stock was issued for $200, has a $20 annual, cumulative preference as to dividends, and has an initial liquidation preference of $200. For Year 1, S has $50 of taxable income and no distributions are declared or made.

(b) Analysis of arrearages. Under paragraphs (c)(1) and (3) of this section, $20 of the $50 positive adjustment under paragraph (b) of this section is allocated first to the preferred stock to reflect the dividend arrearage arising in Year 1. The remaining $30 of the positive adjustment is allocated to the common stock, increasing P's basis from $800 to $830 as of the close of Year 1. (The basis of the preferred stock owned by nonmembers is not adjusted under this section.)

(c) Current distribution. The facts are the same as in paragraph (a) of this Example 2, except that S declares and makes a $20 distribution with respect to the preferred stock during Year 1 in satisfaction of its preference. The results are the same as in paragraph (b) of this Example 2.

(d) Varying interest. The facts are the same as in paragraph (a) of this Example 2, except that S has no income or loss for Years 1 and 2, P purchases all of S's preferred stock at the beginning of Year 3 for $240, and S has $70 of taxable income for Year 3. Under paragraph (c)(3) of this section, $60 of the $70 positive adjustment under paragraph (b) of this section is allocated to the preferred stock to reflect the dividends arrearages for Years 1 through 3, but only the $20 for Year 3 is reflected in the basis of the preferred stock under paragraph (b) of this section. (The remaining $40 is not reflected because the preferred stock was owned by nonmembers during Years 1 and 2.) Thus, P increases its basis in S's preferred stock from $240 to $260, and its basis in S's common stock from $800 to $810, as of the close of Year 3. (If P had acquired all of S's preferred stock in a transaction to which section 351 applies, and P's initial basis in S's preferred stock was $200 under section 362, P's basis in S's preferred stock would increase from $200 to $220.)

(e) Varying interest with current distributions. The facts are the same as in paragraph (d) of this Example 2, except

that S declares and makes a $20 distribution with respect to the preferred stock in each of Years 1 and 2 in satisfaction of its preference, and P purchases all of S's preferred stock at the beginning of Year 3 for $200. Under paragraph (c)(3) of this section, $40 of the $70 positive adjustment under paragraph (b) of this section is allocated to the preferred stock to reflect the distributions in Years 1 and 2, and $20 of the $70 is allocated to the preferred stock to reflect the arrearage for Year 3. However, as in paragraph (d) of this Example 2, only the $20 attributable to Year 3 is reflected in the basis of the preferred stock under paragraph (b) of this section. Thus, P increases its basis in S's preferred stock from $200 to $220, and P increases its basis in S's common stock from $800 to $810.

**Example 3. Cumulative redetermination. (a) Facts.** P owns all of S's common and preferred stock. The preferred stock has a $100 annual, cumulative preference as to dividends. For Year 1, S has $200 of taxable income, the first $100 of which is allocated to the preferred stock and the remaining $100 of which is allocated to the common stock. For Year 2, S has no adjustment under paragraph (b) of this section, and P sells all of S's common stock at the close of Year 2.

(b) Analysis. Under paragraph (c)(4) of this section, P's basis in S's common stock must be redetermined as of the sale of the stock. The redetermination is made by reallocating the $200 positive adjustment under paragraph (b) of this section for Year 1 by taking into account all of the facts and circumstances affecting allocations as of the sale. Thus, the $200 positive adjustment for Year 1 is reallocated entirely to the preferred stock to reflect the dividend arrearages for Years 1 and 2. The reallocation away from the common stock reflects the fact that, because of the additional amount of arrearage in Year 2, the common stock is not entitled to any part of the $200 of taxable income from Year 1. Thus, the common stock has no positive or negative adjustment, and the preferred stock has a $200 positive adjustment. These reallocations are treated as the original basis adjustments for Years 1 and 2. (The results for the common stock would be the same if the common and preferred stock were not owned by the same member, or the preferred stock were owned by non-members.)

(c) Preferred stock issued after adjustment arises. The facts are the same as in paragraph (a) of this Example 3, except that S does not issue its preferred stock until the beginning of Year 2, S has no further adjustment under paragraph (b) of this section for Years 2 and 3, and P sells S's common stock at the close of Year 3. Under paragraphs (c) (1) and (2) of this section, the $200 positive adjustment for Year 1 is initially allocated entirely to the common stock. Under paragraph (c)(4) of this section, the $200 adjustment is reallocated to the preferred stock to reflect the arrearages for Years 2 and 3. Thus, the common stock has no positive or negative adjustment.

(d) Common stock issued after adjustment arises. The facts are the same as in paragraph (a) of this Example 3, except that S has no preferred stock, S issues additional common stock of the same class at the beginning of Year 2, S has no further adjustment under paragraph (b) of this section in Years 2 and 3, and P sells its S common stock at the close of Year 3. Under paragraphs (c) (1) and (2) of this section, the $200 positive adjustment for Year 1 is initially allocated entirely to the original common stock. Under paragraph (c)(4)(i)(A) of this section, the $200 adjustment is not reallocated among the original common stock and the additional stock. Unlike the preferred stock in paragraph (c) of this Example 3, the additional common stock is of the same class

as the original stock, and there is no reallocation between shares of the same class.

(e) Positive and negative adjustments. The facts are the same as in paragraph (a) of this Example 3, except that S has a $200 loss for Year 2 that results in a negative adjustment to the common stock before any redetermination. For purposes of the basis redetermination under paragraph (c)(4) of this section, the Year 1 and 2 adjustments under paragraph (b) of this section are not netted. Thus, as in paragraph (b) of this Example 3, the redetermination is made by reallocating the $200 positive adjustment for Year 1 entirely to the preferred stock. The $200 negative adjustment for Year 2 is allocated entirely to the common stock. Consequently, the preferred stock has a $200 positive cumulative adjustment, and the common stock has a $200 negative cumulative adjustment. (The results would be the same if there were no other adjustments described in paragraph (b) of this section, P sells S's common stock at the close of Year 3 rather than Year 2, and an additional $100 arrearage arises in Year 3; only adjustments under paragraph (b) of this section may be reallocated, and there is no additional adjustment for Year 3.)

(f) Current distributions. The facts are the same as in paragraph (a) of this Example 3, except that, during Year 1, S declares and makes a distribution to P of $100 as a dividend on the preferred stock and $100 as a dividend on the common stock. The taxable income and distributions result in no Year 1 adjustment under paragraph (b) of this section for either the common or preferred stock. However, as in paragraph (b) of this Example 3, the redetermination under paragraph (c)(4) of this section is made by reallocating a $200 positive adjustment for Year 1 (S's net adjustment described in paragraph (b) of this section, determined without taking distributions into account) to the preferred stock. Consequently, the preferred stock has a $100 positive cumulative adjustment ($200 of taxable income, less a $100 distribution with respect to the preferred stock) and the common stock has a $100 negative cumulative adjustment (for the distribution).

(g) Convertible preferred stock. The facts are the same as in paragraph (a) of this Example 3, except that the preferred stock is convertible into common stock that is identical to the common stock already outstanding, the holders of the preferred stock convert the stock at the close of Year 2, and no stock is sold until the close of Year 5. Under paragraph (c)(4) of this section, the $200 positive adjustment for Year 1 is reallocated entirely to the preferred stock immediately before the conversion. The newly issued common stock is treated as a second class of S common stock, and adjustments under paragraph (b) of this section are allocated between the original and the new common stock under paragraph (c)(2)(ii) of this section. Although the preferred stock is converted to common stock, the $200 adjustment to the preferred stock is not subsequently reallocated between the original and the new common stock. Because the original and the new stock are equivalent, adjustments under paragraph (b) of this section for subsequent periods are allocated equally to each share.

(h) Prior use of allocations. The facts are the same as in paragraph (a) of this Example 3, except that P sells 10% of S's common stock at the close of Year 1, and the remaining 90% at the close of Year 2. P's basis in the common stock sold in Year 1 reflects $10 of the adjustment allocated to the common stock for Year 1. Under paragraph (c)(4)(ii) of this section, because $10 of the Year 1 adjustment was used in determining P's gain or loss, only $90 is reallocated to the preferred stock, and $10 remains allocated to the common stock sold.

(i) Lower-tier members. The facts are the same as in paragraph (a) of this Example 3, except that P owns only S's

common stock, and P is also a subsidiary. If there is a redetermination under paragraph (c)(4) of this section by a member owning P's stock, a redetermination with respect to S's stock must be made first, and the effect of that redetermination on P's adjustments is taken into account under paragraph (b) of this section. However, as in paragraph (h) of this Example 3, to the extent an amount of the initial adjustments with respect to S's common stock have already been tiered up and used by a member owning P's stock, that amount remains with S's common stock (and the higher-tier member using the adjustment with respect to P's stock), and may not be reallocated to S's preferred stock.

**Example 4.** Allocation to preferred stock between groups. (a) Facts. P owns all of S's only class of stock, and S owns all of T's common and preferred stock. The preferred stock has a $100 annual, cumulative preference as to dividends. For Year 1, T has $200 of taxable income, the first $100 of which is allocated to the preferred stock and the remaining $100 of which is allocated to the common stock, and S has no adjustments other than the amounts tiered up from T. S and T have no adjustments under paragraph (b) of this section for Years 2 and 3. X, the common parent of another consolidated group, purchases all of S's stock at the close of Year 3, and S and T become members of the X group. For Year 4, T has $200 of taxable income, and S has no adjustments other than the amounts tiered up from T.

(b) Analysis for Years 1 through 3. Under paragraph (c)(4) of this section, the allocation of S's adjustments under paragraph (b) of this section (determined without taking distributions into account) must be redetermined as of the time P sells S's stock. As a result of this redetermination, T's common stock has no positive or negative adjustment and the preferred stock has a $200 positive adjustment.

(c) Analysis for Year 4. Under paragraph (c)(3) of this section, the allocation of T's $200 positive adjustment in Year 4 to T's preferred stock with respect to arrearages is made by taking into account the consolidated return years of both the P group and the X group. Thus, the allocation of the $200 positive adjustment for Year 4 to T's preferred stock is not treated as an allocation for a period for which the preferred stock is owned by a nonmember. Thus, the $200 adjustment is reflected in S's basis in T's preferred stock under paragraph (b) of this section.

**(d) Definitions.** For purposes of this section—

**(1) Class.** The shares of a member having the same material terms (without taking into account voting rights) are treated as a single class of stock.

**(2) Preferred stock.** Preferred stock is stock that is limited and preferred as to dividends and has a liquidation preference. A class of stock that is not described in section 1504(a)(4), however, is not treated as preferred stock for purposes of paragraph (c) of this section if members own less than 80% of each class of common stock (determined without taking this paragraph (d)(2) into account).

**(3) Common stock.** Common stock is stock that is not preferred stock.

**(4) Becoming a nonmember.** A member is treated as becoming a nonmember if it has a

separate return year (including another group's consolidated return year). For example, S may become a nonmember if it issues additional stock to nonmembers, but S does not become a nonmember as a result of its complete liquidation.

**(e) Anti-avoidance rule—(1) General rule.** If any person acts with a principal purpose contrary to the purposes of this section, to avoid the effect of the rules of this section or apply the rules of this section to avoid the effect of any other provision of the consolidated return regulations, adjustments must be made as necessary to carry out the purposes of this section.

**(2) Examples.** The principles of this paragraph (e) are illustrated by the following examples.

**Example 1.** Preferred stock treated as common stock. (a) Facts. S has 100 shares of common stock and 100 shares of preferred stock described in section 1504(a)(4). P owns 80 shares of S's common stock and all of S's preferred stock. The shareholders expect that S will have negative adjustments under paragraph (b) of this section for Years 1 and 2 (all of which will be allocable to S's common stock), the negative adjustments will have no significant effect on the value of S's stock, and S will have offsetting positive adjustments thereafter. When the preferred stock was issued, P intended to cause S to recapitalize the preferred stock into additional common stock at the end of Year 2 in a transaction described in section 368(a)(1)(E). P's temporary ownership of the preferred stock is with a principal purpose to limit P's basis reductions under paragraph (b) of this section to 80% of the anticipated negative adjustments. The recapitalization is intended to cause significantly more than 80% of the anticipated positive adjustments to increase P's basis in S's stock because of P's increased ownership of S's common stock immediately after the recapitalization.

(b) Analysis. S has established a transitory capital structure with a principal purpose to enhance P's basis in S's stock under this section. Under paragraph (e)(1) of this section, all of S's common and preferred stock is treated as a single class of common stock in Years 1 and 2 for purposes of this section. Thus, S's items are allocated under the principles of paragraph (c)(2)(ii) of this section, and P decreases its basis in both the common and preferred stock accordingly.

**Example 2.** Contribution of appreciated property. (a) Facts. P owns all of the stock of S and T, and S and T each own 50% of the stock of U. P's S stock has a $150 basis and $200 value, and P's T stock has a $200 basis and $200 value. With a principal purpose to eliminate P's gain from an anticipated sale of S's stock, T contributes to U an asset with a $100 value and $0 basis, and S contributes $100 cash. U sells T's asset and recognizes a $100 gain that results in a $100 positive adjustment under paragraph (b) of this section.

(b) Analysis. Under paragraph (c)(2) of this section, U's adjustment ordinarily would be allocated equally to each share of U's stock. If so allocated, P's basis in S's stock would increase from $150 to $200 and P would recognize no gain from the sale of S's stock for $200. Under paragraph (e)(1) of this section, however, because T transferred an appreciated asset to U with a principal purpose to shift a portion of the stock basis increase from P's stock in T to P's stock in S, the allocation of the $100 positive adjustment under paragraph (c) of this section between the shares of U's stock must take into

account the contribution. Consequently, all 100% of the positive adjustment is allocated to the U stock owned by T, rather than $50 to the U stock owned by S and $50 to the U stock owned by T. P's basis in S's stock remains $150, and its basis in T's stock increases to $300. Thus, P recognizes a $50 gain from its sale of S's stock for $200.

**Example 3. Reorganizations.** (a) Facts. P forms S with an $800 contribution, $200 of which is in exchange for S's preferred stock described in section 1504(a)(4) and the balance of which is for S's common stock. For Years 1 through 3, S has a total of $160 of ordinary income, $60 of which is distributed with respect to the preferred stock in satisfaction of its $20 annual preference as to dividends. Under this section, P's basis in S's preferred stock is unchanged, and its basis in S's common stock is increased from $600 to $700. To reduce its gain from an anticipated sale of S's preferred stock, P forms T at the close of Year 3 with a contribution of all of S's stock in exchange for corresponding common and preferred stock of T in a transaction to which section 351 applies. At the time of the contribution, the fair market value of the common stock is $700 and the fair market value of the preferred stock is $300 (due to a decrease in prevailing market interest rates). P subsequently sells T's preferred stock for $300.

(b) Analysis. Under section 358(b), P ordinarily has a $630 basis in T's common stock (70% of the $900 aggregate stock basis) and a $270 basis in T's preferred stock (30% of the $900 aggregate stock basis). However, because P transferred S's stock to T with a principal purpose to shift the allocation of basis adjustments under this section, adjustments are made under paragraph (e)(1) of this section to preserve the allocation under this section. Thus, P has a $700 basis in T's common stock and a $200 basis in T's preferred stock. Consequently, P recognizes a $100 gain from the sale of T's preferred stock.

**Example 4. Post-deconsolidation basis adjustments.** (a) Facts. For Year 1, the P group has $40 of taxable income when determined by including only S's items of income, gain, deduction, and loss taken into account, and P increases its basis in S's stock by $40 under paragraph (b) of this section. P anticipates that S will have a $40 ordinary loss for Year 2 that will be carried back and offset S's income in Year 1 and result in a $40 reduction to P's basis in S's stock for Year 2 under paragraph (b) of this section. With a principal purpose to avoid the reduction, P causes S to issue voting preferred stock that results in S becoming a nonmember at the beginning of Year 2. (Section 1.1502-20(b) does not reduce P's basis in the S stock as a result of S's deconsolidation.) As anticipated, S has a $40 loss for Year 2, which is carried back to Year 1 and offsets S's income from Year 1.

(b) Analysis. Under paragraph (e)(1) of this section, because P caused S to become a nonmember with a principal purpose to absorb S's loss but avoid the corresponding negative adjustment under this section, and P bears a substantial portion of the loss because of its continued ownership of the S common stock, basis of P's common stock in S is decreased by $40 for Year 2. (If P has less than a $40 basis in the retained S stock, P must recognize income for Year 2 to the extent of the excess.) Section 1504(a)(3) limits the ability of S to subsequently rejoin the P group's consolidated return.

(c) Carryback to pre-consolidation year. The facts are the same as in paragraph (a) of this Example 4, except that P anticipates that S's loss will be carried back and absorbed in a separate return year of S before Year 1 (rather than to the P group's consolidated return for Year 1). Although P causes S to become a nonmember with a principal purpose to avoid the negative adjustment under this section, and P bears a substan-

tial portion of the loss because of its continued ownership of S common stock, both S's income and loss are taken into account under the separate return rules. Consequently, no one has acted with a principal purpose contrary to the purposes of this section, and no adjustments are necessary to carry out the purposes of this section.

**Example 5. Pre-consolidation basis adjustments.** (a) Facts. P forms S with a $100 contribution, and S becomes a member of the P affiliated group which does not file consolidated returns. For Years 1 through 3, S earns $300. P anticipates that it will elect under section 1501 for the P group to begin filing consolidated returns in Year 5. In anticipation of filing consolidated returns, and to avoid the negative stock basis adjustment that would result under paragraph (b) of this section from distributing S's earnings after Year 5, P causes S to distribute $300 during Year 4 as a qualifying dividend within the meaning of section 243(b). There is no plan or intention to recontribute the funds to S after the distribution.

(b) Analysis. Although S's distribution of $300 is with a principal purpose to avoid a corresponding negative adjustment under this section, the $300 was both earned and distributed entirely under the separate return rules. Consequently, P and S have not acted with a principal purpose contrary to the purposes of this section, and no adjustments are necessary to carry out the purposes of this section.

**(f) Predecessors and successors.** For purposes of this section, any reference to a corporation or to a share of stock includes a reference to a successor or predecessor as the context may require. A corporation is a successor if the basis of its assets is determined, directly or indirectly, in whole or in part, by reference to the basis of another corporation (the predecessor). For example, if T merges into S, S is treated, as the context may require, as a successor to T and as becoming a member of the group. A share is a successor if its basis is determined, directly or indirectly, in whole or in part, by reference to the basis of another share (the predecessor).

**(g) Recordkeeping.** Adjustments under this section must be reflected annually on permanent records (including work papers). See also section 6001, requiring records to be maintained. The group must be able to identify from these permanent records the amount and allocation of adjustments, including the nature of any tax-exempt income and noncapital, nondeductible expenses, so as to permit the application of the rules of this section for each year.

**(h) Effective date—(1) General rule.** This section applies with respect to determinations of the basis of the stock of a subsidiary (e.g., for determining gain or loss from a disposition of stock) in consolidated return years beginning on or after January 1, 1995. If this section applies, basis must be determined or redetermined as if this section were in effect for all years (including, for example, the consolidated return years of another consolidated group to the extent adjustments from those years are still reflected). For

example, if the portion of a consolidated net operating loss carryover attributable to S expired in 1990 and is treated as a noncapital, nondeductible expense under paragraph (b) of this section, it is taken into account in tax years beginning on or after January 1, 1995 as a negative adjustment for 1990. Any such determination or redetermination does not, however, affect any prior period. Thus, the negative adjustment for S's noncapital, nondeductible expense is not taken into account for tax years beginning before January 1, 1995.

**(2) Dispositions of stock before effective date—(i) In general.** If P disposes of stock of S in a consolidated return year beginning before January 1, 1995, the amount of P's income, gain, deduction, or loss, and the basis reflected in that amount, are not redetermined under this section. See § 1.1502–19 as contained in the 26 CFR part 1 edition revised as of April 1, 1994 for the definition of disposition, and paragraph (h)(5) of this section for the rules applicable to such dispositions.

**(ii) Lower-tier members.** Although P disposes of S's stock in a tax year beginning before January 1, 1995, S's determinations or adjustments with respect to the stock of a lower-tier member with which it continues to file a consolidated return are redetermined in accordance with the rules of this section (even if they were previously taken into account by P and reflected in income, gain, deduction, or loss from the disposition of S's stock). For example, assume that P owns all of S's stock, S owns all of T's stock, and T owns all of U's stock. If S sells 80% of T's stock in a tax year beginning before January 1, 1995 (the effective date), the amount of S's income, gain, deduction, or loss from the sale, and the stock basis adjustments reflected in that amount, are not redetermined if P sells S's stock after the effective date. If S sells the remaining 20% of T's stock after the effective date, S's stock basis adjustments with respect to that T stock are also not redetermined because T became a nonmember before the effective date. However, if T and U continue to file a consolidated return with each other and T sells U's stock after the effective date, T's stock basis adjustments with respect to U's stock are redetermined (even though some of those adjustments may have been taken into account by S in its prior sale of T's stock before the effective date).

**(iii) Deferred amounts.** For purposes of this paragraph (h)(2), a disposition does not include a transaction to which § 1.1502–13, § 1.1502–13T, § 1.1502–14, or § 1.1502–14T applies. Instead, the transaction is deemed to occur as the income, gain, deduction, or loss (if any) is taken into account.

**(3) Distributions—(i) Deemed dividend elections.** If there is a deemed distribution and recontribution pursuant to § 1.1502–32(f)(2) as contained in the 26 CFR part 1 edition revised as of April 1, 1994 in a consolidated return year beginning before January 1, 1995, the deemed distribution and recontribution under the election are treated as an actual distribution by S and recontribution by P as provided under the election.

**(ii) Affiliated earnings and profits.** This section does not apply to reduce the basis in S's stock as a result of a distribution of earnings and profits accumulated in separate return years, if the distribution is made in a consolidated return year beginning before January 1, 1995, and the distribution does not cause a negative adjustment under the investment adjustment rules in effect at the time of the distribution. See paragraph (h)(5) of this section for the rules in effect with respect to the distribution.

**(4) Expiring loss carryovers.** If S became a member of a consolidated group in a consolidated return year beginning before January 1, 1995, and S had a loss carryover from a separate return limitation year at that time, the group does not treat any expiration of the loss carryover (even if in a tax year beginning on or after January 1, 1995) as a noncapital, nondeductible expense resulting in a negative adjustment under this section. If S becomes a member of a consolidated group in a consolidated return year beginning on or after January 1, 1995, and S has a loss carryover from a separate return limitation year at that time, adjustments with respect to the expiration are determined under this section.

**(5) Prior law—(i) In general.** For prior determinations, see prior regulations under section 1502 as in effect with respect to the determination. See, e.g., §§ 1.1502–32 and 1.1502–32T as contained in the 26 CFR part 1 edition revised as of April 1, 1994.

**(ii) Continuing basis reductions for certain deconsolidated subsidiaries.** If a subsidiary ceases to be a member of a group in a consolidated return year beginning before January 1, 1995, and its basis was subject to reduction under § 1.1502–32T or § 1.1502–32(g) as contained in the 26 CFR part 1 edition revised as of April 1, 1994, its basis remains subject to reduction under those principles. For example, if S ceased to be a member in 1990, and P's basis in any retained S

stock was subject to a basis reduction account, the basis remains subject to reduction. Similarly, if an election could be made to apply § 1.1502–32T instead of § 1.1502–32(g), the election remains available. However, §§ 1.1502–32T and 1.1502–32(g) do not apply as a result of a subsidiary ceasing to be a member in tax years beginning on or after January 1, 1995.

[T.D. 6909, 31 FR 16698, Dec. 30, 1966, as amended by T.D. 7246, 38 FR 764, Jan. 4, 1973; T.D. 7637, 44 FR 46841, Aug. 9, 1979; T.D. 7947, 49 FR 8250, March 6, 1984; T.D. 8188, 53 FR 8749, March 17, 1988; T.D. 8245, 54 FR 10981, March 16, 1989; T.D. 8294, 55 FR 9437, March 14, 1990; T.D. 8319, 55 FR 49038, Nov. 26, 1990; T.D. 8364, 56 FR 47401, Sept. 19, 1991; T.D. 8401, 57 FR 9211, March 17, 1992; T.D. 8560, 59 FR 41685, Aug. 15, 1994; T.D. 8677, 61 FR 33323, June 27, 1996; T.D. 8560, 62 FR 12098, March 14, 1997]

## § 1.1502–33   Earnings and profits.

(a) In general—(1) Purpose. This section provides rules for adjusting the earnings and profits of a subsidiary (S) and any member (P) owning S's stock. These rules modify the determination of P's earnings and profits under applicable rules of law, including section 312, by adjusting P's earnings and profits to reflect S's earnings and profits for the period that S is a member of the consolidated group. The purpose for modifying the determination of earnings and profits is to treat P and S as a single entity by reflecting the earnings and profits of lower-tier members in the earnings and profits of higher-tier members and consolidating the group's earnings and profits in the common parent. References in this section to earnings and profits include deficits in earnings and profits.

(2) Application of other rules of law. The rules of this section are in addition to other rules of law. For example, the allowance for depreciation is determined in accordance with section 312(k). P's earnings and profits must not be adjusted under this section and other rules of law in a manner that has the effect of duplicating an adjustment. For example, if S's earnings and profits are reflected in P's earnings and profits under paragraph (b) of this section, and S transfers its assets to P in a liquidation to which section 332 applies, S's earnings and profits that P succeeds to under section 381 must be adjusted to prevent duplication.

(b) Tiering up earnings and profits—(1) General rule. P's earnings and profits are adjusted under this section to reflect changes in S's earnings and profits in accordance with the applicable principles of § 1.1502–32, consistently applied, and an adjustment to P's earnings and profits for a tax year under this paragraph (b)(1) is treated as earnings and profits of P for the tax year in which the adjustment arises. Under these principles, for example, the adjustments are made as of the close of each consolidated return year, and as of any other time if a determination at that time is necessary to determine the earnings and profits of any person. Similarly, S's earnings and profits are allocated under the principles of § 1.1502–32(c), and the adjustments are applied in the order of the tiers, from the lowest to the highest. However, modifications to the principles include:

(i) The amount of P's adjustment is determined by reference to S's earnings and profits, rather than S's taxable and tax-exempt items (and therefore, for example, the deferral of a negative adjustment for S's unabsorbed losses does not apply).

(ii) The tax sharing rules under paragraph (d) of this section apply rather than those of § 1.1502–32(b)(3)(iv)(D).

(2) Affiliated earnings and profits. The reduction in S's earnings and profits under section 312 from a distribution of earnings and profits accumulated in separate return years of S that are not separate return limitation years does not tier up to P's earnings and profits. Thus, the increase in P's earnings and profits under section 312 from receipt of the distribution is not offset by a corresponding reduction.

(3) Examples—(i) In general. For purposes of the examples in this section, unless otherwise stated, P owns all of the only class of S's stock, the stock is owned for the entire year, S owns no stock of lower-tier members, the tax year of all persons is the calendar year, all persons use the accrual method of accounting, the facts set forth the only corporate activity, preferred stock is described in section 1504(a)(4), all transactions are between unrelated persons, and tax liabilities are disregarded.

(ii) Tiering up earnings and profits. The principles of this paragraph (b) are illustrated by the following examples.

Example 1. Tier-up and distribution of earnings and profits. (a) Facts. P forms S in Year 1 with a $100 contribution. S has $100 of earnings and profits for Year 1 and no earnings and profits for Year 2. During Year 2, S declares and distributes a $50 dividend to P.

(b) Analysis. Under paragraph (b)(1) of this section, S's $100 of earnings and profits for Year 1 increases P's earnings and profits for Year 1. P has no additional earnings and profits for Year 2 as a result of the $50 distribution in Year 2,

# FEDERAL

# TAX REGULATIONS

# 1999

### IN FORCE JANUARY 1, 1999

## Kept To Date

*Through*

### U. S. Code Congressional and
### Administrative News

## Volume 4



of a group paid estimated income taxes on a separate basis, then any application under section 6425 shall be made by the member of the group which claims an overpayment on a separate basis. Any refund allowable under an application under section 6425 shall be made directly to and in the name of the corporation filing the application. [T.D. 6894, 31 FR 11794, Sept. 3, 1966, as amended by T.D. 7059, 35 FR 14546, Sept. 17, 1970; T.D. 7246, 38 FR 767, Jan. 4, 1973; T.D. 8387, 56 FR 67489, Dec. 31, 1991; T.D. 8446, 57 FR 53034, Nov. 6, 1992; T.D. 8677, 61 FR 33324, June 27, 1996]

## § 1.1502–79 Separate return years.

(a) Carryover and carryback of consolidated net operating losses to separate return years. For losses arising in consolidated return years beginning before January 1, 1997, see § 1.1502–79A(a). For later years, see § 1.1502–21T(b).

(b) Carryover and carryback of consolidated net capital loss to separate return years. For losses arising in consolidated return years beginning before January 1, 1997, see § 1.1502–79A(b). For later years, see § 1.1502–22T(b).

(c) Carryover and carryback of consolidated unused investment credit to separate return years—(1) In general. If a consolidated unused investment credit can be carried under the principles of section 46(b) and paragraph (b) of § 1.1502–3 to a separate return year of a corporation (or could have been so carried if such corporation were in existence) which was a member of the group in the year in which such unused credit arose, then the portion of such consolidated unused credit attributable to such corporation (as determined under subparagraph (2) of this paragraph) shall be apportioned to such corporation (and any successor to such corporation in a transaction to which section 381(a) applies) under the principles of § 1.1502–21T(b) (or §§ 1.1502–79A(a)(1) and (2), as appropriate) and shall be an investment credit carryover or carryback to such separate return year.

(2) Portion of consolidated unused investment credit attributable to a member—(i) Investment credit carryback. In the case of a consolidated unused credit which is an investment credit carryback, the portion of such consolidated unused credit attributable to a member of the group is an amount equal to such consolidated unused credit multiplied by a fraction, the numerator of which is the credit earned of such member for the consolidated unused credit year, and the denomi-

nator of which is the consolidated credit earned for such unused credit year.

(ii) Investment credit carryover. In the case of a consolidated unused credit which is an investment credit carryover, the portion of such consolidated unused credit attributable to a member of the group is an amount equal to such consolidated unused credit multiplied by a fraction, the numerator of which is the credit earned with respect to any section 38 property placed in service in the consolidated unused credit year and owned by such member (whether or not placed in service by such member) at the close of the last day as of which the taxable income of such member is included in a consolidated return filed by the group, and the denominator of which is the consolidated credit earned for such unused credit year.

(d) Carryover and carryback of consolidated unused foreign tax—(1) In general. If a consolidated unused foreign tax can be carried under the principles of section 904(d) and paragraph (e) of § 1.1502–4 to a separate return year of a corporation (or could have been so carried if such corporation were in existence) which was a member of the group in the year in which such unused foreign tax arose, then the portion of such consolidated unused foreign tax attributable to such corporation (as determined under subparagraph (2) of this paragraph) shall be apportioned to such corporation (and any successor to such corporation in a transaction to which section 381(a) applies) under the principles of § 1.1502–21T(b) (or §§ 1.1502–79A(a)(1) and (2), as appropriate) and shall be deemed paid or accrued in such separate return year to the extent provided in section 904(d).

(2) Portion of consolidated unused foreign tax attributable to a member. The portion of a consolidated unused foreign tax for any year attributable to a member of a group is an amount equal to such consolidated unused foreign tax multiplied by a fraction, the numerator of which is the foreign taxes paid or accrued for such year (including those taxes deemed paid or accrued, other than by reason of section 904(d)) to each foreign country or possession (or to all foreign countries or possessions if the overall limitation is effective) by such member, and the denominator of which is the aggregate of all such taxes paid or accrued for such year (including those taxes deemed paid or accrued, other than by reason of section 904(d)) to each such foreign country or possession (or to all foreign countries or posses-

sions if the overall limitation is effective) by all the members of the group.

**(e) Carryover of consolidated excess charitable contributions to separate return years—(1) In general.** If the consolidated excess charitable contributions for any taxable year can be carried under the principles of section 170(b)(2) and paragraph (b) of § 1.1502–24 to a separate return year of a corporation (or could have been so carried if such corporation were in existence) which was a member of the group in the year in which such excess contributions arose, then the portion of such consolidated excess charitable contributions attributable to such corporation (as determined under subparagraph (2) of this paragraph) shall be apportioned to such corporation (and any successor to such corporation in a transaction to which section 381(a) applies) under the principles of § 1.1502–21T(b) (or §§ 1.1502–79A(a)(1) and (2), as appropriate) and shall be a charitable contribution carryover to such separate return year.

**(2) Portion of consolidated excess charitable contributions attributable to a member.** The portion of the consolidated excess charitable contributions attributable to a member of a group is an amount equal to such consolidated excess contributions multiplied by a fraction, the numerator of which is the charitable contributions paid by such member for the taxable year, and the denominator of which is the aggregate of all such charitable contributions paid for such year by all the members of the group.

[T.D. 6894, 31 FR 11794, Sept. 8, 1966, as amended by T.D. 7728, 45 FR 72650, Nov. 3, 1980; T.D. 8294, 55 FR 9438, March 14, 1990; T.D. 8319, 55 FR 49038, Nov. 26, 1990; T.D. 8364, 56 FR 47402, Sept. 19, 1991; T.D. 8597, 60 FR 36710, July 18, 1995; T.D. 8677, 61 FR 33324, 33325, 33334, June 27, 1996]

## § 1.1502–80 Applicability of other provisions of law.

**(a) In general.** The Internal Revenue Code, or other law, shall be applicable to the group to the extent the regulations do not exclude its application. Thus, for example, in a transaction to which section 381(a) applies, the acquiring corporation will succeed to the tax attributes described in section 381(c). Furthermore, sections 269 and 482 apply for any consolidated year. Section 304 applies except as provided in paragraph (b) of this section.

**(b) Non-applicability of section 304.** Section 304 does not apply to any acquisition of stock of a corporation in an intercompany transaction or to any intercompany item from such transaction occurring on or after July 24, 1991.

**(c) Deferral of section 165.** For consolidated return years beginning on or after January 1, 1995, stock of a member is not treated as worthless under section 165 before the stock is treated as disposed of under the principles of § 1.1502–19(c)(1)(iii). See §§ 1.1502–11(c) and 1.1502–20 for additional rules relating to stock loss.

**(d) Non-applicability of section 357(c)—(1) In general.** Section 357(c) does not apply to any transaction to which § 1.1502–13, § 1.1502–13T, § 1.1502–14, or § 1.1502–14T applies, if it occurs in a consolidated return year beginning on or after January 1, 1995. For example, P, S, and T are members of a consolidated group, P owns all of the stock of S and T with bases of $30 and $20, respectively, S has a $30 basis in its assets and $40 of liabilities, and S merges into T in a transaction described in section 368(a)(1)(A) (and in section 368(a)(1)(D)); section 357(c) does not apply to the merger, P's basis in T's stock increases to $50 ($30 plus $20), and T succeeds to S's $30 basis in the assets transferred subject to the $40 liability. Similarly, if S instead transferred its assets and liabilities to a newly formed subsidiary in a transaction to which section 351 applies, section 357(c) does not apply and S's basis in the subsidiary's stock is a $10 excess loss account. This paragraph (d) does not apply to a transaction if the transferor or transferee becomes a nonmember as part of the same plan or arrangement. The transferor (or transferee) is treated as becoming a nonmember once it is no longer a member of a consolidated group that includes the transferee (or transferor). For purposes of this paragraph (d), any reference to a transferor or transferee includes, as the context may require, a reference to a successor or predecessor.

**(2) Prior period transactions.** If, in a tax year beginning before January 1, 1995, a member's stock with an excess loss account is transferred in a transaction to which § 1.1502–13, § 1.1502–13T, § 1.1502–14, or § 1.1502–14T applies, paragraph (d)(1) of this section applies to the stock transfer to the extent that the income, gain, deduction, or loss (if any) is not taken into account in a tax year beginning before January 1, 1995. For example, if P, S, and T, are members of a consolidated group, T's stock has an excess loss account, and P transfers the T stock to S in 1993 in a transaction to which section 351 and § 1.1502–13 apply, section 357(c) applies to the

## § 1.1502–80

transfer only to the extent P's gain is taken into account in tax years beginning before January 1, 1995.

**(e) Non-applicability of section 163(e)(5).** Section 163(e)(5) does not apply to any intercompany obligation (within the meaning of § 1.1502–13(g)) issued in a consolidated return year beginning on or after July 12, 1995.

**(f) Non-applicability of section 1031.** Section 1031 does not apply to any intercompany transaction occurring in consolidated return years beginning on or after July 12, 1995.

[T.D. 6894, 31 FR 11817, Sept. 8, 1966; T.D. 8402, 57 FR 9385, March 18, 1992; T.D. 8560, 59 FR 41703, Aug. 15, 1994; T.D. 8597, 60 FR 36710, July 18, 1995; T.D. 8677, 61 FR 33325, June 27, 1996; T.D. 8560, 62 FR 12098, March 14, 1997]

## § 1.1502–81T  Alaska Native Corporations.

**(a) General Rule.** The application of section 60(b)(5) of the Tax Reform Act of 1984 and section 1804(e)(4) of the Tax Reform Act of 1986 (relating to Native Corporations established under the Alaska Native Claims Settlement Act (43 U.S.C. 1601 *et seq.* )) is limited to the use on a consolidated return of losses and credits of a Native Corporation, and of a corporation all of whose stock is owned directly by a Native Corporation, during any taxable year (beginning after the effective date of such sections and before 1992), against the income and tax liability of a corporation affiliated with the Native Corporation. Thus, no other tax saving, tax benefit, or tax loss is intended to result from the application of section 60(b)(5) of the Tax Reform Act of 1984 and section 1804(e)(4) of the Tax Reform Act of 1986 to any person (whether or not such person is a member of an affiliated group of which a Native Corporation is the common parent). In particular, except as approved by the Secretary, no positive adjustment under § 1.1502–32(b) will be made with respect to the basis of stock of a corporation that is affiliated with a Native Corporation through application of section 60(b)(5) of the Tax Reform Act of 1984 and section 1804(e)(4) of the Tax Reform Act of 1986.

**(b) Effective Dates.** This section applies to taxable years beginning after December 31, 1984. [T.D. 8130, 52 FR 8448, March 18, 1987; T.D. 8560, 59 FR 41675, Aug. 15, 1994]

## § 1.1502–90T  Table of contents (temporary).

The following table contains the major headings in §§ 1.1502–91T through 1.1502–99T.

### § 1.1502–91T  Application of section 382 with respect to a consolidated group (temporary).

(a) Determination and effect of an ownership change.

(1) In general.

(2) Special rule for post-change year that includes the change date.

(3) Cross reference.

(b) Definitions and nomenclature.

(c) Loss group.

(1) Defined.

(2) Coordination with rule that ends separate tracking.

(3) Example.

(d) Loss subgroup.

(1) Net operating loss carryovers.

(2) Net unrealized built-in loss.

(3) Loss subgroup parent.

(4) Principal purpose of avoiding a limitation.

(5) Special rules.

(6) Examples.

(e) Pre-change consolidated attribute.

(1) Defined.

(2) Example.

(f) Pre-change subgroup attribute.

(1) Defined.

(2) Example.

(g) Net unrealized built-in gain and loss.

(1) In general.

(2) Members included.

(i) Consolidated group.

(ii) Loss subgroup.

(3) Acquisitions of built-in gain or loss assets.

(4) Indirect ownership.

(h) Recognized built-in gain or loss.

(1) In general. [Reserved]

(2) Disposition of stock or an intercompany obligation of a member.

(3) Deferred gain or loss.